IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br>MAWSON INFRASTRUCTURE GROUP, INC.<br>Alleged Debtor. | Chapter 11<br><br>Case No. 24-12726 (MFW) |

**ALLEGED DEBTOR'S MOTION TO COMPEL DISCOVERY AND DEPOSITIONS**

Mawson Infrastructure Group, Inc. ("Mawson" or the "Alleged Debtor" or the "Company"),[1] hereby brings this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit 1** (the "Proposed Order"), (i) compelling W Capital Advisors Pty Ltd ("W Capital"), Marshall Investments MIG Pty Ltd ("Marshall Investments"), Rayra Pty Ltd ("Rayra" and together with W Capital and Marshall Investments, the "Initial Petitioning Creditors"), and Liam Healey and Quentin Olde in their capacity as Receivers and Managers of MIG No.1 Pty Ltd (in Liq.) (Receivers and Managers Appointed) (the "MIG1 Receivers" together with the Initial Petitioning Creditors, the "Petitioning Creditors" and each a "Petitioning Creditor") to provide complete responses to Mawson's First Set of Discovery Demands and the MIG1 Discovery Requests (defined below); (ii) compelling depositions of the Petitioning Creditors' representatives. In support hereof, the Mawson respectfully states:

---

[1] Mawson is a Delaware corporation listed on the NASDAQ under MIGI.

**Preliminary Statement[2]**

Despite multiple meet and confers and letters from Mawson's counsel to counsel for the Petitioning Creditors detailing the deficiencies in the Petitioning Creditors' discovery responses, the Petitioning Creditors' responses to Mawson's First Set of Discovery Demands remain deficient. As outlined in Mawson's Answer, the Involuntary Petition is an extension of ongoing disputes between Mawson and its former Board Director and Chief Executive Officer, James Manning ("Manning"). The Answer details the bad faith nature of the Involuntary Petition,[3] and how it was filed, with the assistance of the Initial Petitioning Creditors, to harass, intimidate, and destroy Mawson. Mawson also alleges that the Assignment Agreement between Marshall Investments and Rayra was manufactured solely to meet the numerosity requirement of section 303(b) of the Bankruptcy Code and in violation of Bankruptcy Rule 1003(a). The discovery served by Mawson seeks to explore these issues, among others. Specifically, Mawson seeks documents relating to: (1) Manning's relationship with the Initial Petitioning Creditors and his involvement with the entry of certain agreements, including but not limited to the Secured Loan Agreements and the Assignment Agreement, as well as the Initial Petitioning Creditors' decision to file the involuntary bankruptcy against Mawson; (2) ownership of the Initial Petitioning Creditors; (3) the Initial Petitioning Creditors' decision to file the Involuntary Petition; and (4) the relationship between Marshall Investments and Rayra, and their related Assignment Agreement.

---

[2] Capitalized terms used but not defined in this Preliminary Statement section, shall have the meaning ascribed to them as defined subsequently in this Motion.

[3] The Third Circuit has held that even if petitioning creditors meet the statutory requirements for filing an involuntary petition under section 303 of the Bankruptcy Code (and Mawson argues that the Petitioning Creditors here do not meet the requirements), an involuntary petition may still be dismissed if it was filed in bad faith. *See In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328 (3d Cir. 2015).

Notwithstanding their relevance to this dispute, the Initial Petitioning Creditors' object to these Discovery Requests (and the MIG1 Receivers have not yet responded to discovery requests propounded nearly one month ago).  Mawson respectfully requests entry of an order compelling (i) complete responses to Mawson's First Set of Discovery Demands and the MIG1 Discovery Requests, (ii) corresponding production of documents responsive to the requests, and (iii) depositions of representatives of the Petitioning Creditor requested by Mawson

## Background[4]

### A. The Involuntary Petition

1. On December 4, 2024 (the "Petition Date"), the Initial Petitioning Creditors, all of which are Australian entities, filed an involuntary petition (the "Involuntary Petition") [Docket No. 1] seeking relief against the Alleged Debtor under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

2. On December 20, 2024, sixteen (16) days after the Petition Date, the Initial Petitioning Creditors filed their Corporate Ownership Statements [Docket Nos. 7, 8 and 9]. Each of the Corporate Ownership Statements were filed and dated after the Petition Date.[5]

---

[4] A more detailed factual background, including but not limited to facts surrounding the Involuntary Petition, the Australian Proceeding, issues relating to James Manning and his relationship with the Petitioning Creditors and the claims of the Petitioning Creditors, are set forth in Mawson's Answer and the Manning/Marshall Deposition Motion (defined below and filed contemporaneously herewith), and incorporated herein by reference.

[5] Pursuant to Bankruptcy Rule 1010(b), corporate ownership statements must be filed with the involuntary petition.

3. Also on December 20, 2024, the Petitioning Creditors filed an assignment agreement purportedly signed on October 18, 2024, whereby Rayra took assignment of A$50,000 (0.41%) of Marshall Investment's claim at 100 cents on the dollar.[6]

4. On December 30, 2024, the Court entered the *Order Approving Stipulation Extending Time to Respond to Involuntary Petition* ("Order Approving Stipulation") [Docket No. 12], which extended Mawson's deadline to respond to the Involuntary Petition through and including January 10, 2025.

5. On January 10, 2025, Mawson filed its answer [Docket No. 16] (the "Answer") contesting the Involuntary Petition.

6. On March 7, 2025, the MIG1 receivers filed a joinder ("Joinder") to the Involuntary Petition [Docket No. 61].

B. **Discovery Demands and the Related Meet and Confer**

7. On January 10, 2025, Mawson served its First Set of Interrogatories (the "Interrogatories") and the First Request for Production of Documents (the "Request for Production") on the Initial Petitioning Creditors (collectively, the "First Set of Discovery Demands") and requested a meet and confer on or before January 17th regarding pre-trial scheduling, as required by the Order Approving Stipulation. *See* Docket Nos. 22 – 24; *see* Exhibit A to Niederman Declaration.

---

[6] Beginning on December 12, 2024, Mawson's counsel made multiple requests to Petitioning Creditors' counsel for a copy of the assignment. The assignment was not provided in response to these requests. Bankruptcy Rule 1003(a) requires a transferor or transferee of a claim to annex to the involuntary petition a copy of all documents evidencing the transfer. Additionally, the assignment occurred just three (3) days after Mawson filed a lawsuit against a Manning-related entity, Vertua Property, Inc., in Pennsylvania. That matter has since been removed to the United States Bankruptcy Court for the Western District of Pennsylvania, under case number 25-01003-JCM.

8. On January 16, 2025, the Initial Petitioning Creditors served their First Set of Requests for Productions and First Set of Interrogatories to Mawson (the "<u>Initial Petitioning Creditors' First Set of Discovery Demands</u>" together with Mawson's First Set of Discovery Demands the "<u>First Set of Discovery Demands</u>"). *See* Docket No. 31.

9. After conducting a meet and confer on January 17, 2025, the parties agreed that responses to the First Set of Discovery Demands would be due on or before February 24, 2025.

10. After mutually agreeing to an extension of time, the Initial Petitioning Creditors and Mawson exchanged their respective responses and objections to the First Set of Discovery Demands on February 27, 2025. Notably, the Initial Petitioning Creditors' responses and objections refused, for the most part, to produce any documents in response to requests for materials related to Manning, including communications with Manning. *See* Exhibit B to Niederman Declaration.

11. On March 11, 2025, Mawson served a discovery deficiency letter (the "<u>Deficiency Letter</u>") on the Initial Petitioning Creditors and requested a meet and confer. *See* Exhibit C to Niederman Declaration. The deficiency letter outlined that the Initial Petitioning Creditors' responses were deficient for a multitude of reasons, including, but not limited to, the Initial Petitioning Creditors' failure to produce any discovery related to (1) Manning, (2) the ownership structure of the Initial Petitioning Creditors, (3) information relating to the decision to file the Involuntary Petition, and (4) documents relating to the Assignment Agreement. *Id.*

12. On March 14, 2025, the parties conducted a meet and confer regarding the Initial Petitioning Creditors' deficient discovery responses. Following the meet and confer, on March 21, 2025, counsel for the Initial Petitioning Creditors advised Mawson's counsel by email that the Initial Petitioning Creditors' document production will now "include all non-privileged

communications and documents relating to Manning responsive to the production requests." *See* Exhibit D to Niederman Declaration. Notably, the Petitioning Creditors have not served amended discovery responses to reflect this concession.

13. Although the Initial Petitioning Creditors produced a supplemental response and objection to Mawson's First Set of Discovery Demands (the "Supplemental Responses" and individually a "Supplemental Response" (*See* Docket No. 66)), several of their responses remain deficient. *See* Exhibit E to Niederman Declaration.

14. On March 26, 2025, Mawson served its First Set of Interrogatories and First Set of Request for Production to the MIG1 Receivers (the "MIG1 Discovery Requests"). *See* Docket No. 67; *see* Exhibit F to Niederman Declaration. To date, Mawson has not received a response to these discovery demands.[7]

15. On April 9, 2025, Mawson's counsel sent the Petitioning Creditors' counsel an email requesting that the following individuals be made available for virtual depositions during the week of April 28, 2025: Darron Wolter of W Capital;[8] Andrew Martin of Marshall Investments; David Marshall of Marshall Investments; Ray Itaoui of Rayra; Liam Healey and Quentin Olde, the MIG1 Receivers; and James Manning. Darron Wolter, Andrew Martin, Ray Itaoui, Liam Healey and Quetin Olde all signed the Petition or discovery verifications on behalf of the Petitioning Creditors in these proceedings. *See* Exhibit G to Niederman Declaration. To date, the Petitioning Creditors have not provided dates or otherwise agreed to produce any of the requested individuals for depositions.

---

[7] During a meet and confer on April 14, 2025, the Petitioning Creditors' counsel advised that responses to the MIG1 Discovery Requests would be made that week.

[8] As detailed in Mawson's Answer and the Manning/Marshall Deposition Motion, there are a number of connections between Manning and Marshall that raise questions.

16. Mawson and the Initial Petitioning Creditors began to exchange documents on April 10, 2025. As of this filing, production remains ongoing, and it remains to be seen whether the Initial Petitioning Creditors' production will cure any of the deficiencies outlined in the Deficiency Letter.

17. On April 15, 2025, respective counsel for the parties participated in another meet and confer to discuss the ongoing production of documents and scheduling of depositions. Regarding the production of documents, the Initial Petitioning Creditors have asserted privilege with respect to certain responsive documents, including with respect to the purportedly sole responsive document identified on behalf of Rayra.[9] Additionally, as noted above, counsel for the Petitioning Creditors advised on March 21, 2025, that the Initial Petitioning Creditors would produce "all non-privileged communications and documents relating to Manning." *See* Exhibit D to Niederman Declaration. Adding to that intrigue, during the April 15, 2025 meet and confer, Petitioning Creditors' counsel advised that they do not represent Manning *for this matter*, but also stated that they too would like to speak with Manning. To date, the Petitioning Creditors have not produced a privilege log.

18. Following the aforementioned meet and confer, on April 17, 2025, counsel for Mawson served a letter summarizing the discussion, and detailing outstanding documents and depositions needed in discovery (the "Second Deficiency Letter"). *See* Exhibit H to Niederman Declaration.

19. On April 17, 2025 and April 18, 2025, Mawson's counsel sent the Petitioning Creditors' counsel emails requesting responses to the Second Deficiency Letter. *See* Exhibit I to

---

[9] It is surprising that Rayra purportedly has only one document (and allegedly privileged at that) related to the assignment of the claim from Marshall Investments.

Niederman Declaration. The second such email was sent after the Petitioning Creditors' counsel advised the Court by email, without consulting with Mawson's counsel, that "we are still going forward" with trial on May 13, 2025. *See id.* The Petitioning Creditors have not provided a substantive response to any of the items addressed in the Second Deficiency Letter—however, they have acknowledged that depositions still need to be scheduled. *See id.*

20. Contemporaneous with the filing of the within Motion, Mawson has also filed a *Motion for Entry of an Order Compelling Petitioning Creditors to Produce James Manning and David Marshall for Depositions or Alternatively Issuing a Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on Taking of Evidence Abroad in Civil or Commercial Matters* (the "Manning/Marshall Deposition Motion"). As detailed in the Manning/Marshall Deposition Motion and Mawson's Answer, Manning, over the course of nearly two years, has refused Mawson's requests to disclosures related to his self-dealing while he was CEO and a Director of Mawson. Additionally, Manning has made threats to the Company, has stated that he controls W Capital, and appears to be coordinating with the Petitioning Creditors to procure additional petitioning creditors in Australia.[10]

**BASIS FOR RELIEF**

**I.    The Motion To Compel Discovery Should Be Granted As The Discovery Sought Is Relevant To Defenses Asserted By Mawson**

21. It is well established under FED. R. CIV. P. 26(b)(1), applicable in this Involuntary Case by FED. R. BANKR. P. 7026, that "[p]arties may obtain discovery on any nonprivileged

---

[10]   The efforts to produce new petitioning creditors from Australia may be motivated by the possibility that Rayra and Marshall Investments are disqualified as petitioning creditors under Bankruptcy Rule 1003(a) due to the extremely dubious nature of the Assignment Agreement, which appears to have been done to manufacture the numerosity requirement for filing the Involuntary Petition.

8

matter that is relevant to any party's claim or defense and proportional to the needs of the case." *In re Allied Sys. Holdings, Inc.*, No. 12-11564 (CSS), 2015 WL 6874790, at *4 (Bankr. D. Del. Nov. 9, 2015); *see also In re NewStarcom Holdings, Inc.*, 514 B.R. 394, 399-400 (Bankr. D. Del. 2014) (same).

22. "Construed as a broad standard," this Court has explained that "discovery is ordinarily allowed under the concept of relevancy unless it is clear that the information sought can have no possible bearing upon the subject matter of the action." *Id.* Similarly, it is "well recognized" in the Third Circuit "that the federal rules allow broad and liberal discovery." *In re MiMedx Grp. Sec. Litig.*, Case No. 15-84-RGA, 2015 WL 5445140, at *2 (D. Del. July 17, 2015) (quoting *Pacitti v. Macy's*, 193 F.3d 766, 777 (3d Cir. 1999)).

23. Indeed, "relevancy is more liberally and broadly construed at the discovery stage than at trial." *Padilla v. Price Toyota*, Case No. 04–3422–JBS–AMD, 2005 WL 6209494 at *8 (D.N.J. Oct. 28. 2005); *see also Nestle Foods Corp. v. Aetna Cas. & Sur. Co.*, 135 F.R.D. 101, 104 (D.N.J. 1990). Here, Mawson is entitled to discovery of any matter that is reasonably calculated to lead to discovery of admissible evidence. Fed. R. Civ. P. 26(b)(1). Objections that a discovery request seeks information that is not admissible at trial (or here, at plan confirmation) are therefore inappropriate. *Nestle*, 135 F.R.D. at 104.

24. Moreover, the burden is on the party objecting to discovery to state the grounds for the objection with specificity. *Momah v. Albert Einstein Medical Center*, 164 F.R.D. 412, 417 (E.D. Pa. 1996) (citing Fed.R.Civ.P. 33(b)(4)). "Mere recitation of the familiar litany that an interrogatory or a document production request is 'overly broad, burdensome, oppressive and irrelevant' will not suffice." *Id.* (citing *Josephs v. Harris Corp.*, 677 F.2d 985, 992 (3d Cir. 1982)).

25. As discussed herein, despite two deficiency letters, follow-up emails, and meet and confers, the Petitioning Creditors have not fully responded to discovery and have given little indication that they intend to fully respond. Following the pattern of Manning over nearly the past two years, it appears that the Petitioning Creditors may be seeking to run out the clock before trial to avoid having produce potentially critical information.

**A. Discovery Related to Manning is Relevant and the Initial Petitioning Creditors Should be Compelled to Produce Responses to the Discovery Demands**

26. The Initial Petitioning Creditors have, without any valid justification, uniformly refused to provide any discovery relating to Manning. Specifically, Marshall refused to respond to Interrogatory Nos. 2, 3, 5, 8, and 9, or provide relevant documents in response to Request for Production Nos. 10, 11, 21, 22, 23, 27, and 36, which all relate to Manning's relationship with Marshall, and Manning's involvement with the Secured Loan Agreements,[11] the Assignment Agreement,[12] and the Initial Petitioning Creditors' decision to file an involuntary bankruptcy against Mawson. Similarly, Rayra did not provide responses to Interrogatory Nos. 2, and 3, as well as Request for Production Nos. 20, 21, 22, 26, and 33, and W Capital did not provide

---

[11] The term "Secured Loan Agreements" means, collectively, that certain Secured Loan Facility Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and any related agreements, including, but not limited to, that certain General Security Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and that certain Continuing Guaranty, dated as of December 9, 2021, between MIG Pty Ltd and Mawson Infrastructure Group Inc.

[12] The term "Assignment Agreement" means that certain Assignment Agreement dated October 18, 2024 by and between Marshall Investments MIG Pty Ltd, as trustee for the Marshall Investments MIG Trust, and Rayra Pty Ltd, as trustee for The Mountainview Trust, attached as Exhibit A to the Notice of Filing of Exhibit A to the Declaration of Ray Itaoui on Behalf of Rayra Pty Ltd Pursuant to Federal Rule of Bankruptcy Procedures 1003(a) [Docket No. 6].

responses Interrogatory Nos. 2, 3, 5, and 7, and Requests No. 17, 18, 22, and 30, which are all similar to the demands served upon Marshall.

27. Rather than responding to the Interrogatories or providing documents responsive to the Request for Production, the Initial Petitioning Creditors generally objected to these discovery demands on relevancy grounds and that the discovery demands seeks discovery with respect to factual allegations and legal conclusions in the Involuntary Petition that are unrelated to issues currently before the Court. These assertions are patently false and contrary to the record presently before this Court.

28. As explained above, as well as the in the Answer, Mawson alleges that the Involuntary Petition is an extension of ongoing disputes with Manning, and was filed in bad faith, with the assistance of the Initial Petitioning Creditors, as a means for Manning to avoid accounting for various misconduct while he was Board Director and/or Chief Executive Officer of Mawson. *See* Docket No. 16 at ¶¶ 13 – 19. Moreover, with the involvement of Manning, the bad faith nature of the Involuntary Petition is evident as it filed with the improper purpose to harass and intimidate Mawson. *Id.* at ¶ 1. This is all part of Manning's plan and in furtherance of his personal vendetta to burn down Mawson. Additionally, Mawson's Answer details its defenses to the Involuntary Petition and explains how it was filed in bad faith, and those assertions directly relate to the Assignment Agreement, the filing of the Involuntary Petition and the relationship between Manning and the Initial Petitioning Creditors.

29. Given the circumstances leading up to the filing of the Involuntary Petition, it is evident that discovery relating to Manning, his relationship with the Initial Petitioning Creditors, his involvement with pre-petition transactions including the Assignment Agreement, and Manning's knowledge relating to the Involuntary Petition are all relevant and discoverable. This

discovery is plainly relevant as it directly relates to Mawson's defenses as explicitly asserted in its Answer, and are proportional to the needs of this matter as set forth in Rule 26(b)(1).

30. Accordingly, the Court should grant Mawson's Motion and compel the Initial Petitioning Creditors to response to the aforementioned discovery demands that relate to Manning.

**B. Ownership of the Initial Petitioning Creditors is Relevant and the Initial Petitioning Creditors Should be Compelled to Produce Responses to the Discovery Demands**

31. The Initial Petitioning Creditors failed to provide responses to Request for Production Nos 1 – 3, which sought documentation relating to the ownership, management, governing instruments. The Initial Petitioning Creditors objected to the discovery demands on relevancy grounds, and did not produce any documents.

32. Additionally, Marshall failed to provide responses to Interrogatory No. 1, which asked Marshall to identify all persons or entities who hold any financial or legal interest in Marshall and disclose the percentage of each of such persons' or entities' interest in Marshall. While Marshall provided that "the loan to the Alleged Debtor was advanced by Marshall via the following unit holdings: Rayra Pty Ltd acting for The Mountainview Trust, Marshall Investments Growth Credit Fund ("Fund 1"), Marshall Investments Growth Capital Partners Fund 2 ("Fund 2") and Marshall Investments Management Pty Ltd. There are 105 investors in Fund 1 and 101 investors in Fund 2," Marshall failed to disclose the percentage interest of such persons' or entities' interest in Marshall and does not disclose the identification of the 105 investors in Fund 1 and 101 investors in Fund 2.

33. Again, this discovery sought is relevant to establishing the defenses asserted in Mawson's Answer. As outlined above, the Answer asserts that the Involuntary Petition was filed in bad faith. To establish that the Involuntary Petition was filed in bad faith, it is necessary to obtain discovery regarding the ownership of the Initial Petitioning Creditors, whether the Initial

12

Petitioning Creditors are related or affiliated entities, or whether the Initial Petitioning Creditors maintain any relationship with Manning or another common owner. Plainly put, the discovery demands seeking information relating to the corporation ownership, management, as well as the investors in Fund 1 and Fund 2 is entirely relevant to establish the relationship between the Initial Petitioning Creditors themselves, as well as their relationship with Manning.

34. Therefore, the discovery sought above is relevant under Rule 26(b)(1) as it relates to Mawson's defenses asserted in the Answer, and this Court should compel the Initial Petitioning Creditors to provide responses to the discovery demands.

**C. Discovery Relating to the Initial Petitioning Creditors' Decision to File the Involuntary Petition is Relevant and the Initial Petitioning Creditors Should be Compelled to Produce Responses to the Discovery Demands**

35. Mawson served various discovery demands on the Initial Petitioning Creditors relating to their decision to file the Involuntary Petition (*i.e.*, Interrogatory No. 12 and Request for Production Nos. 37 and 39 to Marshall; Interrogatory No. 12 and Request for Production Nos. 34 and 35 to Rayra; and Interrogatory No. 10 and Request for Production Nos. 31 and 32 to W Capital). Again, while the Initial Petitioning Creditors object to the discovery demands as not relevant, Mawson submits that these discovery demands are relevant to its defenses asserted in the Answer. Specifically, the discovery demands are relevant to determine whether the Involuntary Petition was filed in bad faith; they relate to the circumstances leading up to the filing of the Involuntary Petition; and seek information regarding Manning's involvement prior to the filing of the Involuntary Petition.

36. These discovery demands are relevant to the defenses asserted by Mawson, and the Court should enter an order compelling the Initial Petitioning Creditors to respond to the discovery demands.

### D. Discovery Relating to the Relationship Between Marshall and Rayra is Relevant and the Initial Petitioning Creditors Should be Compelled to Produce Responses to the Discovery Demands

37. Mawson served discovery demands on Marshall and Rayra relating to the facts and circumstances leading to the Assignment Agreement between the two Initial Petitioning Creditors (Interrogatory No. 10 to Marshall and Interrogatory No. 9 to Rayra), as well as other demands relating to Rayra acquiring debt from anyone (Interrogatory No. 10), documentation evidencing financial obligation to Rayra and Initial Petitioning Creditors, vice versa (Request for Production No. 7) and Rayra's efforts to sell any alleged indebtedness of the Alleged Debtor to other parties (Request for Production No. 18).

38. These discovery demands are certainly relevant to establish defenses asserted by Mawson. The Answer asserts that the circumstances and timing surrounding Rayra's acquisition of its claim by assignment from Marshall are highly suspect, and the Assignment Agreement between Marshall and Rayra is a sham agreement, likely at the direction of Manning, for the sole purpose of meeting the involuntary petition numerosity requirement. Specifically, the Answer provides the following factors which emphasizes the suspicious nature of the Assignment Agreement:

> (i) the timing of the assignment, shortly before the filing of the Involuntary Petition and in proximity to when Mawson sued an entity in which Manning (and/or parties related to Manning) holds an interest and Manning and W Capital's (one of the petitioners in this matter) Director and Secretary, Darron Siegfried Wolter, are directors, and (ii) the de minimis amount of the purported assignment. The assignment to Rayra was for just A$50,000 of Marshall Investment's purported A$12,073,339 claim.[13] Rayra's pre-filing assignment amounts to just under $31,000 (U.S. Dollars)

---

[13] The claim of the third Petitioning Creditor, Rayra, was acquired from Marshall Investments, one of the other three Petitioning Creditors.

as of January 9, 2025, *i.e.*, 0.41% of the A$12,073,339 disputed debt.

Docket No. 16 at ¶ 5.

39. Of note, Marshall Investment's responses to interrogatories stated that its loan to Mawson was made via various holdings, including Rayra. Meanwhile, Rayra's supplemental responses to interrogatories attested to the fact that "[t]he Assignment Agreement was entered into because Rayra, as an investor in Marshall, wanted to participate directly in Marshall's efforts to collect the debt owed by Mawson using any means available, including, but not limited to, the Winding Up Petition and the Involuntary Petition filed against Mawson. There was no marketing effort for the assignment." *See* Exhibit E to Niederman Declaration. Based on these responses, it is evident that Rayra, which appears to already had a relationship with Marshall Investments, acquired a scant percentage of Marshall Investment's claim (0.41%) for the purposes of meeting the numerosity requirement to file the Involuntary Petition. Further discovery is needed with regard to the Assignment Agreement and the Initial Petitioning Creditors' bad faith motives to manufacture numerosity. The discovery demands are certainly relevant to Mawson's defenses and Mawson respectfully requests entry of an Order compelling responses to the foregoing discovery demands.

**E. Rayra has Failed to Respond to Mawson's First Set of Discovery Demands**

40. Despite conducting multiple meet and confers, Rayra still has not produced a single document. Conversely, during the meet and confer, counsel for Rayra stated that they identified only *one* responsive document, and Rayra intends to withhold it as privileged. To date, Rayra has not produced a privilege log.

41. As explained in detail above, despite Rayra's position, it is highly unlikely that Rayra does not have any documents or correspondence with Marshall relating to Mawson, the

15

Assignment Agreement, or the involuntary bankruptcy. As such, Mawson moves to compel complete responses to Mawson's First Set of Discovery Demands.

### F. The Initial Petitioning Creditors Failed to Produce All Forms of Communication.

42. Despite the broad definition of "document"[14] and "communication"[15], the Initial Petitioning Creditors limited their production to documents and emails, and failed to produce other forms of responsive communication, including, but not limited to, telephone records, text messages, WhatsApp messages, etc. Moreover, although the Initial Petitioning Creditors represented that "our clients have been gathering all documents with wide search terms relating to

---

[14] The word "document" includes, but is not limited to, any written or graphic matter of any kind or character, however produced or reproduced; any electronically or magnetically recorded matter of any kind or character, however produced or reproduced; and any other matter constituting the recording of data or information upon any tangible thing by any means, as well as any tangible thing on which information is recorded in writing, sound, electronic or magnetic, impulse, or in any other manner including, but not limited to, paper, cards, tapes, film electronic facsimile, computer storage devices, video discs, or any other media. For the purpose of this definition, "matter" shall include, but shall not be limited to paper, cards, tapes, film, electronic facsimile, computer storage devices, video disks, memoranda, notes, minutes, records, photographs, correspondence, electronic mail, telegrams, diaries, bookkeeping entries, financial statements, tax returns, checks, check stubs, reports, studies, charts, graphs, statements, notebooks, handwritten notes, applications, agreements, books, pamphlets, periodicals, appointment calendar, notes, records, and recordings of oral conversations and work papers, and shall also include, but shall not be limited to, originals plus all copies which are different in any way from the original whether by handwritten notes, interlineation, receipt stamped notation, indication of copies sent or received, or otherwise, as well as preliminary versions, drafts of revisions of any of the foregoing, and any supporting, underlying or preparatory material, which are in your possession, custody, or control, or in the possession, custody or control of your present or former agents, representatives, or attorneys, or any and all persons acting on their behalf.

[15] The word "communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomever made, and including without limitation, correspondence, electronic mail, documents, conversations, dialogues, discussions, interviews, consultations, agreements, telephone conversations, letters, notes, memoranda, telegrams, telexes, and any other forms of communication.

Manning or Mawson, and reviewing for responsiveness and privilege," it does not appear that responsive documents were collected. *See* Exhibit D to Niederman Declaration. The Petitioning Creditors should be ordered to disclose their collection and review process, including custodians and search parameters (terms, dates, etc.) that were used for each of Mawson's discovery requests.

43. Given the Initial Petitioning Creditor's failure to comply with Mawson's First Set of Discovery Demands, Mawson hereby requests an order compelling the Initial Petitioning Creditors to produce documents in all applicable forms of communication.

### G. The MIG1 Receivers Have Failed to Respond to the MIG1 Discovery Requests

44. Despite serving the MIG1 Discovery Requests nearly one month ago, the MIG1 Receivers have not produced any responses to the MIG1 Discovery Requests.[16] Mawson therefore hereby requests an order compelling the MIG1 Receivers to respond to the MIG1 Discovery Requests.

### H. The Petitioning Creditors Refuse to Provide Dates or Otherwise Make Their Clients Available For Requested Depositions.

45. On April 9, Mawson requested dates for depositions of a party-representative of each of the Petitioning Creditors during the week of April 28. *See* Exhibit G to Niederman Declaration. Mawson identified the individuals who signed the Involuntary Petition and Discovery Verifications as the requested deponents and advised counsel during the April 14 meet and confer that those individuals could serve as a Company representative as necessary.

46. Notably, in the Second Deficiency Letter, Mawson advised the Petitioning Creditors that it reserves all rights to seek relief from the Court if any of the aforementioned

---

[16] During the April 14, 2025 meet and confer, the Petitioning Creditors counsel advised that they anticipated sending responses to the MIG1 Discovery requests by the end of that week. No responses were made, and there has been no further indication as to when responses will be made.

individuals are not voluntarily offered for a deposition in a timely manner. *See* Exhibit H to Niederman Declaration.

47. Thereafter, the Petitioning Creditors acknowledged that these depositions still need to occur—however, as of the date of this Motion, the Petitioning Creditors have failed or refused to provide available dates for the requested depositions. *See* Exhibit I to Niederman Declaration. Accordingly, it is respectfully requested that the Court enter an order compelling the depositions of Darron Wolter (W Capital), Andrew Martin (Marshall Investments), Ray Itaoui (Rayra), Liam Healey and Quetin Olde (the MIG1 Receivers).

### Local Rule 7026-1(d) Certification

48. In accordance with Local Rule 7026-1(d), the undersigned avers that counsel for the Alleged Debtor has made a reasonable attempt to reach an agreement with counsel for the Petitioning Creditors regarding the discovery requested in this Motion without success.

### CONCLUSION

WHEREFORE, as set forth herein, Mawson respectfully requests entry of an order substantially in the form attached hereto as **Exhibit 1** (i) granting the Motion; (ii) compelling the Initial Petitioning Creditors to fully respond to Mawson's First Set of Discovery Demands; and (iii) granting such other and further relief as the Court deems just and proper.

Dated: April 24, 2025           **FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (No. 4588)
Stephanie Slater Ward (No. 6922)
1201 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 654-7444
Email: sniederman@foxrothschild.com
Email: sward@foxrothschild.com

-and-

Michael A. Sweet (admitted *pro hac vice*)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: msweet@foxrothschild.com

-and-

Michael R. Herz (admitted *pro hac vice*)
49 Market Street
Morristown, NJ 07960
Telephone: (973) 548-3330
Email: mherz@foxrothschild.com

*Counsel to the Alleged Debtor*