**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| *In re* | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Alleged Debtor | **Re: D.I. 69 & 72** |

**THE PETITIONING CREDITORS' OMNIBUS REPLY TO THE**
**ALLEGED DEBTOR'S MOTIONS TO COMPEL DISCOVERY AND DEPOSITIONS**

Marshall Investments MIG Pty Ltd ("Marshall"), W Capital Advisors Pty Ltd ("W Capital"), Rayra Pty Ltd ("Rayra" and, together with Marshall Investments and W Capital, the "Initial Petitioning Creditors"), and Liam Healey and Quentin Olde ("Receivers" and, together with the Initial Petitioning Creditors, the "Petitioning Creditors" and each a "Petitioning Creditor") in their capacity as Receivers and Managers of MIG No.1 Pty Ltd (in Liq.) (Receivers and Managers Appointed) ("MIG1"), by an through their undersigned counsel, hereby respectfully submit this omnibus reply ("Objection") to (i) the *Alleged Debtor's Motion to Compel Discovery and Depositions* (Dkt. No. 69) (the "First Motion to Compel" or "First Mot."); and (ii) the *Amended Motion of Mawson Infrastructure Group Inc. for Entry of An Order Compelling Petitioning Creditors to Produce James Manning and David Marshall for a Deposition or Alternatively Issuing a Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters* (Dkt. No. 72) (the "Second Motion to Compel" or "Second Mot." and, together with the First Motion to Compel, the "Motions to Compel"), filed by the above-captioned alleged debtor

Mawson Infrastructure Group, Inc. (the "<u>Alleged Debtor</u>" or "<u>Mawson</u>").  In support of the Objection, the Petitioning Creditors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Motions to Compel are extensions of Mawson's years-long campaign to harass creditors that are owed tens of millions of dollars in the hope that they will forfeit the right to recover their debts.  Mawson's irresponsibility and obfuscation are breathtaking.

2.      Mawson has filed four annual reports and over ten quarterly reports with the SEC acknowledging the full amount of the debts owed to the Petitioning Creditors and Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC (collectively, "<u>Celsius</u>") on their financial statements.   These annual reports were all audited, and, in the 2023 and 2024 annual reports, Mawson's auditor issued "going concern" qualifications to its audit opinion based on Mawson's demonstrable inability to repay these debts, which had matured, and Mawson had defaulted.  None of these filings articulate any basis to avoid repayment of these debts.  Mawson made regular payments on these debts before they defaulted, and W Capital has obtained a judgment from an Australian court following Mawson's default on an interest payment.  Mawson could have—but did not—dispute W Capital's claim in that proceeding.  Instead, it defaulted.  While Mawson purportedly disputed its debt to Celsius in an arbitration proceeding Mawson commenced and then sought to stay, the arbitrator granted Celsius summary judgment against Mawson because it failed to proffer a cognizable basis to dispute the debt.

3.      Faced with the prospect of an order for relief being granted against it in these proceedings, Mawson has attempted to concoct a dispute over the Petitioning Creditors' debts.  Mawson contends that its former CEO, James Manning, has relationships with the Petitioning Creditors, who are purportedly conspiring with Manning to destroy Mawson.  The Court should

reject Mawson's false, unsupported, and incoherent narrative that forms the basis of the Motion to Compel.

4.      As a threshold matter, Manning had no investment or economic interest in Marshall, W Capital or Rayra (the Initial Petitioning Creditors) when the loans to Mawson were extended. Manning invested an immaterial amount into a Marshall fund (less than 0.37% of Marshall's fund) *over a year after its loan to Mawson closed*. Thus, there can be no argument that Marshall's loan can be attacked as a related-party transaction. That argument is also belied by the fact that the economic terms of the Marshall loan are consistent with those of the Celsius loan and the W Capital loan, all of which have a 12% interest rate. There can be no dispute that the other Petitioning Creditor, MIG1, a subsidiary of Mawson now in liquidation, has debts owed by Mawson. Indeed, *two of Mawson's directors* issued a statutory report in Australia confirming the validity of these debts.

5.      Marshall, W Capital, and the Receivers entered into a common interest agreement with Manning in 2024 (after Mawson defaulted on the payment of the loans at maturity), and these arrangements are to protect privilege for enforcement proceedings. Manning is a creditor of the Debtor here, and there is nothing inappropriate about collaborating with parties to share information on a privileged basis to aid in the recovery of their debts. Manning had no role in the decision to file the Involuntary Petition, nor could he, because he has no authority or control over the Petitioning Creditors (he is not an officer, director or controlling shareholder of any of them). The Initial Petitioning Creditors have provided discovery responses substantiating these facts, but Mawson simply refuses to accept them because doing so dooms its case and paves the way for an order for relief to be granted.

6.      A debtor cannot simply state it has a bona fide dispute over a debt without articulating any cognizable basis for that contention; this is particularly the case for a public company, which must provide accurate public disclosure about its finances on an audited basis to investors. The Debtor's behavior here is reckless and irresponsible.  It has tens of millions of dollars in defaulted debts under its credit facilities that it simply wishes to ignore.  It does not dispute that it received the proceeds of these loans.  It does not argue that the terms of the loans were inappropriate.  Instead, Mawson seeks to punish the creditors that it refuses to repay in a cynical attempt to beat the creditors into submission.

7.      The Court should not sanction this conduct.  The Petitioning Creditors have adhered to their discovery obligations, and the Court should deny the Motions to Compel.

## **BACKGROUND**

### I.      **The Involuntary Petition.**

8.      On December 4, 2024 ("Petition Date"), the Initial Petitioning Creditors filed an involuntary Chapter 11 petition ("Involuntary Petition") against Mawson pursuant to 11 U.S.C. § 303(b).

9.      On January 10, 2025, Mawson filed its answer (Dkt. No. 16) ("Answer") contesting the Involuntary Petition.  In the Answer, Mawson asserts, among other things, that (i) the Petitioning Creditors' "debts are the product of Manning's self-dealing and are subject to dispute," and (ii) one of the Petitioning Creditors' debts appears to have been acquired from another Petitioning Creditor for the purpose of meeting the involuntary petition numerosity requirement.

10.     On March 7, 2025, the MIG1 Receivers filed a joinder ("Joinder") to the Involuntary Petition (Dkt. No. 61) on the basis of its noncontingent and undisputed intercompany loan.

## II.    The Petitioning Creditors' Claims.

*11.*    The Petitioning Creditors hold valid, noncontingent claims against Mawson, each arising from loan agreements, corporate guarantees, and intercompany obligations that remain unpaid despite repeated demands for payment by the Petitioning Creditors.

### A.    *Marshall's Claims*

12.    On December 9, 2021, Marshall and MIG1, an affiliate of Mawson, entered into a loan facility agreement by and between Marshall Investments MIG Pty Ltd and its affiliate, MIG No. 1 Pty Ltd, dated as of December 9, 2021 ("Secured Loan Facility Agreement" and the loan made thereunder, "Marshall Loan").  Simultaneously, Mawson executed a Continuing Guaranty, dated as of December 9, 2021, whereby Mawson guaranteed the obligations of its affiliate, MIG1, under the Secured Loan Facility Agreement.  James Manning ("Manning") was the CEO of Mawson at the time of the Alleged Debtor's entry into the Secured Loan Facility Agreement.

13.    On March 31, 2022, MIG1 failed to comply with certain financial covenants under Section 12.9(b) of the Secured Loan Facility Agreement.  In June 2023, MIG1 advised Marshall that it would not be able to make the scheduled payment due on June 30, 2023.  In fact, MIG1 failed to make the payments due under the Secured Loan Facility Agreement on June 30, 2023 and July 31, 2023.

14.    In November 2022, Marshall agreed to a forbearance and a revised payment schedule of the amounts owed under the Secured Loan Facility Agreement.  In June 2023, Marshall agreed to a further conditional forbearance on the next repayment due under the agreement.  The conditional forbearance expired by its terms on July 13, 2023.  By July 31, 2023, the Marshall Loan was again in default.

15.     On March 1, 2024, Marshall issued a formal notice of default to MIG1 based on its failure to repay Marshall.  Between August 2023 and April 2024, Marshall sent no fewer than six written demands to Mawson, demanding payment pursuant to the Continuing Guaranty.

16.     As of the Petition Date, neither MIG1 nor Mawson had cured the defaults under the Secured Loan Facility Agreement or otherwise satisfied the outstanding indebtedness.  Marshall has received no intervening payments, and the Alleged Debtor has not identified any bona fide dispute regarding its liability under, or the enforceability of, the governing agreements.  That remains true as of the date of this Objection.

**B.      *W Capital's Claims***

17.     On September 2, 2022, W Capital entered into a secured loan deed by and between W Capital Advisors Pty Ltd and Mawson Infrastructure Pty Ltd, an affiliate of the Alleged Debtor, dated as of September 2, 2022 ("Secured Loan Deed" and the loan made thereunder, "Deed Loan"). The Secured Loan Deed was signed by the directors of Mawson Infrastructure Pty Ltd, including Michael Hughes and Manning.  Yet Mawson still falsely asserts that "Manning *alone* was intimately involved in the Related-Party Transactions," including the W Capital Loans.  Second Mot. at 32 (emphasis added).  That is demonstrably false.  The Secured Loan Deed clearly reflects that ***another director of Mawson Infrastructure Pty Ltd. signed it***.  *See* Ex. A ("Secured Loan Deed") at 13.  Mawson subsequently executed a Corporate Guaranty, dated September 29, 2022, unconditionally guaranteeing the obligations of its affiliate ("Corporate Guaranty").

18.     On November 15, 2022, Mawson Infrastructure Pty Ltd failed to satisfy its repayment obligations under the Secured Loan Deed.  In March 2023, following discussions between Mawson and W Capital concerning Mawson's defaults under the Secured Loan Deed,

Mawson made partial repayments in two tranches. Nevertheless, the Deed Loan was in default by early 2024.

19.    On July 8, 2023, Mawson failed to repay the principal amount due under a Convertible Promissory Note, dated July 8, 2022 ("Convertible Note" and, together with the Deed Loan, "W Capital Loans") in favor of W Capital. W Capital demanded repayment shortly thereafter.

20.    By letter dated January 3, 2024, W Capital's counsel, Holman Fenwick Willan LLP Australia ("HFW Australia"), demanded that the Alleged Debtor pay the amounts due under the Secured Loan Deed, including principal and accrued interest. Ex. B ("January 3, 2024 HFW Letter").[1] By letter dated February 13, 2024, HFW Australia demanded that the Alleged Debtor pay the interest due under the Convertible Note. Ex. C ("February 13, 2024 HFW Letter"). By letter dated March 15, 2024, HFW Australia specified that Mawson owed A$496,434.84 in interest and demanded payment pursuant to the Corporate Guaranty. Ex. D ("March 15, 2024 HFW Letter"). Between January 3, 2024 and March 2024, W Capital issued statutory demands[2] to Mawson and Mawson Infrastructure Pty Ltd demanding repayment of the W Capital Loans, and in response to the statutory demands, Mawson paid the principal amount of $500,000 under the Convertible Note.

21.    On March 28, 2024, W Capital commenced proceedings in Australia against the Alleged Debtor for interest owed on the W Capital Loans. On May 31, 2024, the Supreme Court of New South Wales entered a final default judgement, awarding W Capital $166,218.30 in interest

---

[1]    "Ex. _" refers to the enumerated exhibit attached to the accompanying declaration of Andrew K. Glenn, dated May 2, 2025.

[2]    Under Australian corporate law, a statutory demand is a formal notice issued pursuant to Section 459E of the Corporations Act 2001 (Cth). See Corporations Act 2001 (Cth), ss 459E. It requires a company to pay a debt of at least A$4,000 within 21 days and failure to comply gives rise to a statutory presumption of insolvency, allowing the creditor to apply to the court for the company's winding up.

owed on the Convertible Note and A$298,926.30 of interest owed on the Deed Loan.  Ex. E ("May 31, 2024 Order").

22.     As of the Petition Date, Mawson had not cured the defaults or otherwise satisfied the outstanding indebtedness, nor proposed any refinancing or restructuring to facilitate repayment.  W Capital has received no intervening payments, and the Alleged Debtor has not identified any bona fide dispute regarding its liability under, or the enforceability of, the governing agreements.  That remains true as of the date of this Objection.

### C.     *Rayra's Claims*

23.     Rayra holds claims against Mawson in the aggregate principal amount of at least A$50,000 plus accruing interest based upon its holdings under the Secured Loan Facility Agreement ("Rayra Loan").  Rayra acquired its holdings under the Secured Loan Facility Agreement from Marshall Investments pursuant to an Assignment Agreement dated October 18, 2024 ("Assignment Agreement").

### D.     *MIG1's Claims*

24.     MIG1 is a subsidiary of Mawson.  On February 16, 2024, Flynt ICS Pty Ltd initiated winding-up proceedings against MIG1 in the Supreme Court of New South Wales, Australia.  On March 19, 2024, the court issued a winding-up order for MIG1 and appointed David Webb of Webb Advisory Pty Limited as the liquidator.[3]  On March 7, 2025, the Receivers were appointed as Receivers and Managers of MIG1.

---

[3]     The Alleged Debtor makes much of the fact that Mr. Webb, via a notice of meeting of creditors disseminated to creditors of MIG1, disclosed that he was approached by the Petitioning Creditors about joining the Involuntary Petition.  But there is nothing inherently wrong or nefarious about creditors who have filed an involuntary petition seeking the support of other creditors to join the petition.  Indeed, Section 303 of the Bankruptcy Code explicitly contemplates the joinder of additional creditors to an involuntary petition, and provides a mechanism for such joinders to occur up until the time that an order for relief is entered or the case is dismissed.  *See* 11 U.S.C. § 303(c); *see also In re FKF Madison Park Grp. Owner, LLC,* 435 B.R. 906, 908 (Bankr. D. Del. 2010) (holding that courts in the Third Circuit construes Section 303(c) strictly and permit the joinder of additional creditors to an involuntary petition as matter of right).

25.     MIG1, through the Petitioning Creditor as the Receivers and Managers, holds undisputed, noncontingent, and liquidated claims against the Alleged Debtor in the amount of A$3,672,445.41, arising from an inter-company loan repayable to MIG1 (the "MIG1 Loan").

**III.    Mawson Publicly Acknowledges the Validity of the Petitioning Creditors' Debts.**

26.     Mawson has never articulated any bona fide basis to challenge the validity of its debt obligations to the Petitioning Creditors.  Nor could Mawson do so credibly.  In fact, Mawson has repeatedly and unequivocally acknowledged the validity and existence of the Petitioning Creditors' debts in public filings with the United States Securities and Exchange Commission ("SEC").

27.     For example, on March 21, 2022, Mawson filed a Form 10-K with the SEC disclosing its audited financial statements for the fiscal year ending December 31, 2021, which includes the Secured Loan Facility Agreement in the Management Discussion and Analysis without any mention of a dispute or controversy concerning the validity of the indebtedness.  *See* Ex. F ("2021 Form 10-K") at F-27 ("In December 2021, the Company entered into a Secured Loan Facility Agreement with Marshall Investments MIG Pty Ltd." that "matures in 2023.").  Even more significantly, Mawson accounted for the Secured Loan Facility Agreement as a valid liability on its balance sheet (*id.* at F-4, F-26), which Mawson's certified public accountant opined "present fairly, in all material respects, the financial position of the Company"(*id.* at F-2).

28.     Similarly, on March 23, 2023 and April 1, 2024, Mawson subsequently filed Form 10-Ks with the SEC, disclosing its audited financial statements for the fiscal year ending December 31, 2022 and December 31, 2023, respectively, that describe the Marshall Loan and the W Capital Loans as "Outstanding Loans" with no mention of any dispute regarding the validity of the indebtedness.  *See* Ex. G ("2022 Form 10-K") at 35, F-29 (listing Marshall and W Capital as valid

loan obligations and noting that in 2022 Mawson "repaid $28.0 million of principal payments against the historical facilities provided by," among others, Marshall and W Capital); Ex. H ("2023 Form 10-K") at F-31 (reporting Marshall Loan and W Capital Loans as outstanding obligations of Mawson).  Moreover, Mawson's 2023 Form 10-K acknowledges that the Secured Loan Facility Agreement and the Secured Loan Deed were "in default" as of December 31, 2023.  *See* Ex. H (2023 Form 10-K) at 35.  Again, Mawson accounted for the Secured Loan Facility Agreement and the Secured Loan Deed as a valid liability on its balance sheet (Ex. G at F-4; Ex. H at F-6), which Mawson's certified public accountant opined "present fairly, in all material respects, the financial position of the Company" (Ex. G at F-2; Ex. H at F-2).

29.      Moreover, as reflected in its 2022 Form 10-K and 2023 Form 10-K, Mawson had previously made regular payments on the Marshall and W Capital Loans without protest.  *See* Ex. G (2022 Form 10-K) at 35 ("During the year ended December 31, 2022, we repaid $28.0 million of principal payments against the historical facilities provided by Foundry, Celsius, Marshall, W Capital and the convertible notes."); Ex. H (2023 Form 10-K) at 34 ("During the year ended December 31, 2023, we repaid $12.46 million of principal payments against the historical facilities provided by Celsius, Marshall and W Capital Advisors Pty Ltd.").

30.      Mawson's 2022 Form 10-K and 2023 Form 10-K also make clear that the Marshall and W Capital Loans were offered on the same economic terms as Mawson's other sources of financing.  *See, e.g.*, Ex. H (2023 Form 10-K) at 36 (noting that the Marshall Loan, W Capital Loans, and the secured promissory note issued by a Mawson subsidiary, Luna Squares LLC, to Celsius Mining LLC, all accrue interest at the same rate of 12% per annum).

31.      Only after Manning's resignation as CEO of Mawson in May 2023, and after Marshall and W Capital initiated collection efforts on their Marshall Loan and W Capital Loans in

Australia, did Mawson's narrative begin to shift.  In its 2023 Form 10-K, Mawson disclosed that its audit committee ("Audit Committee") conducted an internal investigation into Manning's alleged failure to *properly disclose* what Mawson contends were "related party" transactions. Ex. H (2023 Form 10-K) at F-40–F-41.  However, the 2023 Form 10-K failed to articulate *any* basis for disputing the validity of the Marshall Loan and W Capital Loans.  *Id*. at F-41.  That is no surprise.  The March 11, 2024 letter memorializing the Audit Committee's investigation does not even address, much less challenge, the validity of the Marshall Loan and the W Capital Loans. *See* Ex. I ("March 11, 2024 Letter").

32.     In its 2024 Form 10-K, filed on March 28, 2025, Mawson asserted that it supposedly had "significant concerns" based on its speculation that "W Capital and James Manning" might be "related parties." Ex. J ("2024 Form 10-K") at F-31.  Notwithstanding that speculation, Mawson expressly acknowledged that the Marshall Loan and the W Capital Loans were "classified as [] current liabilit[ies]" on its audited balance sheet.  *Id*. at F-35.

33.     In its March 27, 2024 Form 507 (Report on Company Activities and Properties), a statutory report of company debts and liabilities filed with the Australian Securities Investment Commission ("ASIC"), Michael Hughes and Greg Martin—who were directors of both MIG1 and Mawson—explicitly identify the Marshall Loan of $13.8M as "Amounts the Company owes to its creditors" and the MIG1 Loan of $3,672,445 as "Money owed to the Company" from Mawson. *See* Ex. K ("ASIC Form 507, Part A Appendix") at 2–3.

34.     Mawson's admissions in formal regulatory filings in both the United States and Australia constitute clear acknowledgment of the validity of the Marshall Loan and the MIG1 Loan and refute any post hoc suggestion of a bona fide dispute.  To date, Mawson has failed to produce a single document identifying, reflecting, or substantiating any genuine dispute regarding the

validity of the Petitioning Creditors' underlying debts.  Rather than articulate a plausible theory as to why the debt at issue is supposedly invalid, Mawson simply asserts that there is a bona fide dispute as to its validity and seeks irrelevant documents related to Manning in the apparent hope of finding some legitimate basis to dispute the debt.  There is no such basis.

35.     As reflected in the Initial Petitioning Creditors' responses to the First Discovery Demands and communicated repeatedly during three discovery meet-and-confers, Manning had no control, influence, or involvement in the Initial Petitioning Creditors' decision to file the Involuntary Petition.

**IV.     The Common Interest Agreement.**

36.     In April 2024, long after their debts had matured following Mawson's default, Marshall approached W Capital to discuss the debts owed by the Alleged Debtor to both W Capital and Marshall.  Marshall subsequently invited W Capital to participate in an information-sharing agreement together with Mr. Manning.  As a former director and creditor of the Alleged Debtor, Mr. Manning was an obvious choice to include as an additional member for the purpose of sharing any information regarding the Alleged Debtor.  The nature of the alleged debts owed by the Alleged Debtor to Mr. Manning is publicly available information.

37.     On or around July 18, 2024, Marshall, W Capital, and Mr. Manning entered into a common interest agreement ("Common Interest Agreement").  On or around January 16, 2025, the Receivers, each in their capacity as Receivers and Managers of MIG1, joined the Common Interest Agreement.  The sole purpose of the Common Interest Agreement is to share information among its members and to ensure that any such information is covered by the common interest privilege.  Mr. Manning is in no way involved in any of the decisions made by Marshall, W Capital, or the Receivers in their pursuit to secure repayment of Mawson's debts.

## V.    The Petitioning Creditors' Discovery Efforts.

38.    In the months since the Petition Date, the Petitioning Creditors have participated in good faith in the discovery process.

39.    On January 10, 2025, the Alleged Debtor served its First Set of Interrogatories ("Interrogatories") and the First Request for Production of Documents (the "First Request for Production") on the Initial Petitioning Creditors (collectively, the "First Discovery Demands"). *See* Dkt. Nos. 22–24.

40.    On January 16, 2025 the Initial Petitioning Creditors served their First Set of Requests for Productions and First Set of Interrogatories to Mawson.  *See* Dkt. No. 31.

41.    On January 17, 2025, the Initial Petitioning Creditors met and conferred with Mawson regarding pre-trial scheduling, including dates for service of responses and objections to the First Discovery Demands.

42.    On February 27, 2025, the Initial Petitioning Creditors subsequently served responses and objections ("Initial Responses and Objections")[4] to the First Discovery Demands. *See* Dkt. No. 64.

---

[4]    The Responses and Objections include: (i) *Marshall Investments MIG Pty Ltd's Responses and Objections to Alleged Debtor's First Set of Interrogatories* ("Marshall's Initial Response"), (ii) *Marshall Investments MIG Pty Ltd's Responses and Objections to Alleged Debtor's First Request for Production of Documents*, (iii) *Rayra Pty Ltd's Responses and Objections to Alleged Debtor's First Set of Interrogatories* ("Rayra's Initial Response") , (iv) *Rayra Pty Ltd's Responses and Objections to Alleged Debtor's First Request for Production of Documents*, (v) *W Capital Advisors Pty Ltd's Responses and Objections to Alleged Debtor's First Set of Interrogatories*, (vi) *W Capital Advisors Pty Ltd's Responses and Objections to Alleged Debtor's First Request for Production of Documents* ("W Capital's Response"), (vii) *Rayra Pty Ltd's First Supplemental  Responses and Objections to the Alleged Debtor's First Set of Interrogatories and Verification of Ray Itaoui* ("Rayra's Supplemental Response"); (viii) *Marshall Investments MIG Pty Ltd's First Supplemental Responses and Objections to the Alleged Debtor's First Set of Interrogatories and Verification of Andrew Martin* ("Marshall's Supplemental Response"); and (ix) *W Capital Advisors Pty Ltd's First Amended Responses and Objections to the Alleged Debtor's First Set of Interrogatories.*

43.    On March 14, 2025, in response to a letter from Mawson outlining various alleged deficiencies in the Initial Petitioning Creditors responses to the First Discovery Demands, the parties again met and conferred.

44.    On March 26, 2025, the Initial Petitioning Creditors served supplemental responses to the First Discovery Demands ("Supplemental Responses and Objections," and together with the Initial Responses and Objections, the "Responses and Objections").  *See* Dkt. No. 66.

45.    Since April 10, 2025, the Initial Petitioning Creditors have produced responsive, non-privileged documents on a rolling basis, including non-privileged emails, copies of relevant loan documents, and other responsive documents.[5]

46.    On March 26, 2025, Mawson served its First Set of Interrogatories and First Set of Request for Production to the Receivers ("MIG1 Discovery Requests"), which largely duplicated the interrogatories and requests for production served on the Initial Petitioning Creditors.  *See* Dkt. No. 67.

47.    On April 25, 2025, the Receivers served responses and objections to the MIG1 Discovery Requests.  *See* Dkt. No. 76.

48.    On April 28, 2025, the Petitioning Creditors offered deposition dates for the majority of the Alleged Debtor's requested deponents, including Andrew Martin, David Marshall, Darron Wolter, and Liam Healey.  Mawson has not yet offered any deposition dates for its witnesses.

---

[5]    The Petitioning Creditors have properly asserted privilege where applicable. Privilege logs are being finalized in compliance with Rule 26(b)(5)(A).

# ARGUMENT

## I.    Applicable Legal Standards.

49.    A party may obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Rule 26(b)(1) of the Federal Rules of Civil Procedure ("FRCP" and each a "Rule").  Relevance under Rule 26(b)(1) is not limitless, however, and the scope of discovery has "ultimate and necessary boundaries." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S. Ct. 2380, 2389, 57 L. Ed. 2d 253 (1978); *see also Salvati v. Deutsche Bank Nat'l Tr. Co.*, 575 F. App'x 49, 56 (3d Cir. 2014) (same). If a relevancy objection has been asserted, the party seeking discovery bears the burden of demonstrating that the information sought is relevant to the claims, defenses, or the subject matter of the litigation.  *Inventio AG v. ThyssenKrupp Elevator Americas Corp.*, 662 F. Supp. 2d 375, 381 (D. Del. 2009).

50.    While a plaintiff may seek discovery of evidence "in support of cognizable claims set out in [the] complaint," a plaintiff is not entitled to discovery "for the purpose of determining whether or not there may be a factual basis for a claim . . . not [yet] made."  *McLaughlin v. Copeland*, 455 F. Supp. 749, 753 (D. Del. 1978), *aff'd*, 595 F.2d 1213 (3d Cir. 1979).  "A court must balance the right to discovery with the need to prevent fishing expeditions."  *In re Ohio Execution Protocol Litig.*, 845 F.3d 231, 236–37 (6th Cir. 2016) (internal quotations and citation omitted).  "While most discovery involves some 'fishing,' as with actual fishing, the hook must first be appropriately baited."  *In re ML-Lee Acquisition Fund II, L.P.*, 151 F.R.D. 37, 41 (D. Del. 1993).

51.    Further, while Rule 26(b)(1) permits discovery of non-privileged matters relevant to any party's claim or defense, it also mandates proportionality.  Courts must consider whether

the burden or expense of the proposed discovery outweighs its likely benefit.  *Novanta Corp. v. Iradion Laser, Inc.,* Civil Action No. 15-1033-SLR-SRF, 2016 U.S. Dist. LEXIS 126042, at *6 (D. Del. Sep. 16, 2016).  Thus, even where the information sought is relevant, the "court may, for good cause, issue an order" forbidding or limiting discovery "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."  Rule 26(c).

## II.    The First Motion to Compel Should Be Denied.

### A.    The Petitioning Creditors Have Complied With Their Discovery Obligations.

52.    The Alleged Debtor contends that the Initial Petitioning Creditors have "uniformly refused to provide any discovery" into Manning and are "seeking to run out the clock before trial." First Mot. at 25–26.  That is not so.  In fact, the Initial Petitioning Creditors have provided full, substantive, and appropriate responses to the First Discovery Demands.  That the Alleged Debtor may not like those responses does not render them deficient.  In fact, as set forth in the table below, in response to the First Discovery Demands, the Initial Petitioning Creditors have (i) disclosed relevant information regarding the ownership structures of the Initial Petitioning Creditors; (ii) addressed allegations regarding Mr. Manning; and (iii) described the factual circumstances surrounding the filing of the Involuntary Petition.

53.    With respect to the Initial Petitioning Creditors' responses to Mawson's interrogatories:

| Mawson's Contention | The Initial Petitioning Creditors' Interrogatory Responses |
|---|---|
| The Initial Petitioning Creditors refused to disclose Manning's relationship with Marshall, and | • **Marshall:**<br>○ Response to Interrogatory No. 3: "Manning does not hold, and has never held, any capacity to assert or attempt to assert any direction, control, or influence over Marshall." Marshall's Initial Response at 8. |

| Mawson's Contention | The Initial Petitioning Creditors' Interrogatory Responses |
|---|---|
| Manning's involvement with the Secured Loan Agreements, the Assignment Agreement, and the Initial Petitioning Creditors' decision to file an involuntary bankruptcy against Mawson..<br><br>First Mot. at 26–29 | o  Response to Interrogatory No. 8: "Manning was the CEO of the Alleged Debtor at the time of entry into the Secured Loan Agreements." *Id*. at 11.<br><br>o  Response to Interrogatory No. 11(e): "Manning, in his capacity as CEO of the Alleged Debtor, was involved in email correspondence with Marshall in respect of the Alleged Debtor[']s defaults under the Secured Loan Agreements." *Id*. at 14.<br><br>o  First Supplemental Response to Interrogatory No. 1: "[A]n entity affiliated with Manning (as defined herein) holds a de minimis interest of 0.37% (A\$250,000) stake in Fund 2. This interest was entered into on January 17, 2023, which is well after the entry by Marshall and the Alleged Debtor into the Facility Agreement."  Marshall's Supplemental Response at 6–7.<br><br>o  First Supplemental Response to Interrogatory No. 10: "Manning had no involvement in negotiating, entering into, or considering the Assignment Agreement between Marshall and Rayra." *Id*. at 7.<br><br>• **Rayra:**<br><br>o  Response to Interrogatory No. 3: "Manning has never asserted or attempted to assert any direction, control, or influence over Rayra, including but not limited to in respect of the Alleged Debtor." Rayra's Initial Response at 8.<br><br>o  Response to Interrogatory No. 5: "[T]here are no transactions between Rayra and Manning." *Id*. at 9.<br><br>o  Response to Interrogatory No. 7: "Manning has never negotiated, discussed or corresponded with Rayra concerning any Alleged Debt." *Id*. at 10.<br><br>o  Response to Interrogatory No. 8: "Manning has never been involved with the Assignment Agreement." *Id*. at 11.<br><br>o  First Supplemental Response to Interrogatory No. 2: "[N]o principals, directors, officers, shareholders, partners, agents, |

17

| Mawson's Contention | The Initial Petitioning Creditors' Interrogatory Responses |
|---|---|
| | and representatives of Rayra or any other person or entity acting on Rayra's behalf or under its direct or indirect control had or has any relationship with Manning." Rayra's Supplemental Response at 6.<br><br>o  First Supplemental Response to Interrogatory No. 9: "Manning had no involvement in negotiating, entering into, or considering the Assignment Agreement between Marshall and Rayra." *Id*. at 6.<br><br>•  **W Capital:**<br><br>o  Response to Interrogatory No. 2: "Manning does not hold, and has never held, any capacity to assert or attempt to assert any direction, control, or influence over W Capital." W Capital's Response at 7.<br><br>o  Response to Interrogatory No. 7: "[B]etween February 10, 2023 and July 2023, Manning on behalf of the Alleged Debtor and Mr. Darron Siegfried Wolter on behalf of W Capital engaged in negotiations with respect to the proposed issuance of shares and/or warrants by the Alleged Debtor in its own entity." *Id*. at 9.<br><br>o  Response to Interrogatory No. 9: "Manning engaged in several discussions with W Capital from November 2022 and onwards, regarding the alleged defaults of the Alleged Debtor, including conversations where Manning presented various options to W Capital with a view to settling the claims between Mawson and W Capital, which included W Capital accepting payment in shares in the Alleged Debtor instead of in warrants (as the number of warrants able to be issued was less than the agreed number of warrants to be issued).." *Id*. at 13. |
| The Initial Petitioning Creditors failed to disclose ownership, management, and | •  **Marshall:**<br><br>o  Response to Interrogatory No. 1: "[T]he loan to the Alleged Debtor was advanced by Marshall via the following unit holdings: Rayra Pty Ltd acting for The Mountainview Trust, Marshall Investments Growth Credit Fund ("Fund 1"), |

| Mawson's Contention | The Initial Petitioning Creditors' Interrogatory Responses |
|---|---|
| governing instruments.<br><br>First Mot. at 31–34. | Marshall Investments Growth Capital Partners Fund 2 ("Fund 2") and Marshall Investments Management Pty Ltd. There are 105 investors in Fund 1 and 101 investors in Fund 2." Marshall's Initial Response at 6–7.<br><br>    o  <u>First Supplemental Response to Interrogatory No. 1</u>: "[A]n entity affiliated with Manning holds a de minimis 0.37% (A\$250,000) interest in Fund 2, acquired in January 2023." an entity affiliated with Manning (as defined herein) holds a de minimis interest of 0.37% (A\$250,000) stake in Fund 2. This interest was entered into on January 17, 2023, which is well after the entry by Marshall and the Alleged Debtor into the Facility Agreement.  With respect to Rayra, an organizational extract obtained from the Australian Securities and Investments Commission discloses the shareholdings of Rayra as being held 50/50 as between Mr. Ray Itaoui and Ms. Rachel Lee Itaoui, since the date of its incorporation.  As of the Petition Date, Rayra's interest in Marshall comprised a loan principal of A\$2,716,501 plus interest." Marshall's Supplemental Response at 6–7.<br><br>•  **Rayra:** "Mr. Ray Itaoui and Ms. Rachel Lee Itaoui jointly share equal interests in Rayra." Rayra's Initial Response at 6.<br><br>•  **W Capital**: "Mr. Darron Siegfried Wolter is the sole director and beneficiary of W Capital." W Capital's Response at 6. |
| The Initial Petitioning Creditors failed to disclose the Initial Petitioning Creditor's Decision to file the Involuntary Petition, including Manning's involvement.<br><br>First Mot. at 35–36. | The Petitioning Creditors "filed the Involuntary Petition because the Alleged Debtor failed to pay its debts as they come due, has not committed to paying the debt, and has no viable plan to pay its debts."   Marshall's Initial Response at 16; W Capital's Response at 14; Rayra's Initial Response at 13. |

| Mawson's Contention | The Initial Petitioning Creditors' Interrogatory Responses |
|---|---|
| Marshall and Rayra improperly withheld Assignment Agreement-related facts.<br><br>First Mot. at 37–39 | • **Marshall:**<br><br>  o <u>First Supplemental Response to Interrogatory No. 10</u>: "Manning had no involvement in negotiating, entering into, or considering the Assignment Agreement between Marshall and Rayra.  The Assignment Agreement was entered into because Rayra, as an investor in Marshall, wanted to participate directly in Marshall's efforts to collect the debt owed by Mawson using any means available, including, but not limited to, the Winding Up Petition and the Involuntary Petition filed against Mawson.  There was no marketing effort for the assignment." Marshall's Supplemental Response at 7.<br><br>• **Rayra:**<br><br>  o <u>Response to Interrogatory No. 8</u>: "Manning has never been involved with the Assignment Agreement. The Secured Loan Facility Agreements were negotiated between Marshall and the Alleged Debtor, including Manning in his capacity as the director of MIG No.1 Pty Ltd."  Rayra's Initial Response at 11.<br><br>  o <u>First Supplemental Response to Interrogatory No. 9</u>: "Manning had no involvement in negotiating, entering into, or considering the Assignment Agreement between Marshall and Rayra.  The Assignment Agreement was entered into because Rayra, as an investor in Marshall, wanted to participate directly in Marshall's efforts to collect the debt owed by Mawson using any means available, including, but not limited to, the Winding Up Petition and the Involuntary Petition filed against Mawson.  There was no marketing effort for the assignment."  Rayra's Supplemental Response at 6–7. |

54.    With respect to Mawson's discovery demands concerning Manning, the Initial

Petitioning Creditors, through formal responses to the First Discovery Demands and repeated

meet-and-confers have made clear that Manning had no influence, control, or involvement in their decision to file the Involuntary Petition.

55.     With respect to Mawson's requests for the production of documents, the Initial Petitioning Creditors have searched for and produced any non-privileged documents relating to Manning that are responsive to the First Request for Production.  Any additional Manning-related documents in the possession of the Initial Petitioning Creditors are privileged, pursuant to the Common Interest Agreement.  Similarly, the Petitioning Creditors searched for and have produced any non-privileged documents relating to the (i) Assignment Agreement; and (ii) the filing of the Involuntary Petition.

## B. The Additional Discovery the Alleged Debtor Seeks Is Neither Relevant Nor Proportional to the Needs of this Case.

56.     Mawson demands wide-ranging discovery into irrelevant matters—such as Manning's purported influence and internal creditor assignments—that bear no connection to the issues under 11 U.S.C. § 303(b) and (h).  Nor does Mawson explain how this "bad faith" theory is relevant to whether to the statutory requirements for filing the Involuntary Petition have been met.

57.     The Petitioning Creditors have the burden "to first establish a prima facie case that no bona fide dispute exists."  *In re AMC Invs., LLC*, 406 B.R. 478, 484 (Bankr. D. Del. 2009). The burden then shifts to Mawson to present evidence establishing that a bona fide dispute exists. *Id.*  The Court then evaluates whether there is an "***objective basis*** for either a factual or a legal dispute as to the validity of the debt."  *Id*. (emphasis added).  Under Third Circuit precedent, a bona fide dispute exists when "there is a genuine issue of a *material* fact that bears upon the debtor's liability."  *B.D.W. Assocs., Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (emphasis added).  There must be "[s]ubstantial factual and legal questions."  *In re Food Gallery at Valleybrook,* 222 B.R. 480, 489 (Bankr. W.D. Pa. 1998) (holding that a dispute over

the interest rate and the amortization rate of the debt did not constitute bona fide dispute as to the creditor's entire claim).

58.     Mawson has not come close to meeting this standard.  It has not identified a single genuine dispute as to the debts owed.  The Petitioning Creditor's debts, and the Alleged Debtor's defaults thereupon, are well-documented, including in Mawson's own audited SEC and ASIC filings.  *See, e.g.*, Ex. F (2021 Form 10-K) at  F-4, F-26–27; Ex. G (2022 Form 10-K) at 35, F-2, F-29, Ex. H (2023 Form 10-K) at 35, F-2. F-6, F-31, Ex. K (ASIC Form 507, Part A Appendix) at 2–3.  There are no material factual disputes requiring resolution; thus, the discovery it now seeks to substantiate its bad faith theory is unwarranted.  Mawson is not entitled to discovery merely to see if it can find a factual basis some "bad faith" theory it has not even cogently articulated.  Courts routinely reject such fishing expeditions.  *In re NewStarcom Holdings, Inc.*, 514 B.R. 394, 400 (Bankr. D. Del. 2014) (denying motion to compel post-sale financial documents where requested discovery provided "limited assistance" in determining the reasonableness of directors for breach of duty claims).  There are no "genuine" or "substantial" factual questions about the occurrence of Mawson defaults under the Secured Facility Credit Agreement and the Secured Loan Deed, as Mawson has conceded in its SEC and ASIC filings.  *See* Ex. G (2022 Form 10-K) at F-4; Ex. H (2023 Form 10-K) at F-6, 35.

59.     Further, Mawson has failed to allege any of the factors in the Third Circuit for bad faith filing of the Involuntary Petition and merely repeats its speculation that Manning's "evident" involvement renders the Involuntary Petition to have been filed "bad faith."  *See* First Mot. at 28–29, 39.  The Petitioning Creditors are "presumed to have acted in good faith," and Mawson bears the burden to "show by a preponderance of the evidence that the [Petitioning] [C]reditors acted in bad faith." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335 (3d Cir. 2015).

60.    While bad faith may be an independent cause for dismissal of an involuntary petition under Section 303(b) of the Bankruptcy Code, Mawson has not alleged, much less proven, any of the accepted indicia of bad faith.  In the Third Circuit, bad faith is assessed under the "totality of the circumstances," focusing on whether: (i) the petition was filed for a valid bankruptcy purpose; or (ii) the petition was filed merely to gain a tactical litigation advantage. *See, e.g., id*. at 335–36.  The purported evidence proffered by Mawson does not even suggest—let alone prove—that Manning orchestrated the filing of this Involuntary Petition.  That Manning may be "an intended recipient in the waterfall of proceeds" (Second Mot. at 13) does not establish any improper influence or control over the Involuntary Petition.  Manning is simply one of Mawson's creditors, with an alleged $3 million claim.  By Mawson's logic, any creditor initiating or supporting an involuntary petition would automatically be suspect of bad faith—an argument that, if accepted, would render the statutory framework for creditor-initiated involuntary proceedings effectively unworkable.

61.    Further, Mawson's reference to a text message from Manning containing an "image of a house on fire," sent on the same day the statutory demands for loan repayment were issued in Australia, is irrelevant.  Second Mot. at 11.  Neither does the Manning's Twitter post made after the Involuntary Petition cited by Mawson—featuring a screenshot of Mawson's declining stock price with a caption "terminal decline on the back of insolvency"—offers no credible evidence of the Petitioning Creditors' bad faith especially because the debtor *is insolvent*.  Moreover, to the extent that Mawson suggests that Manning's use of the word "insolvency" is a reference to the Involuntary Petition, it is equally probable that his comments on Mawson's insolvency refer to the fact that, (i) as reported in Mawson's 2024 Form 10-K filing, the Alleged Debtor's reported liabilities exceed its assets, and the company is accordingly balance-sheet insolvent; and (ii) an

Australian court ordered the winding-up of Mawson based on a finding that Mawson is insolvent. *See* Ex. J (2024 Form 10-K) at F-4 (reporting liabilities in excess of current assets); Ex. L ("Winding-up Order") (finding that Mawson "is unable to pay its debts"). These images have no legal or factual bearing on the propriety of the Involuntary Petition, and their inclusion only underscores Mawson's effort to distract from the substantive issues before the Court. The Initial Petitioning Creditors filed the Involuntary Petition to work with their stakeholders to maximize the value of Mawson's estate for the benefit of all creditors, not to advance the alleged "vendetta" of a former CEO.

62.      When defining the scope of discovery, the amendment to Fed. R. Civ. P. 26 requires courts to consider proportionality. Fed. R. Civ. P. 26 (b)(1); *Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.,* No. CV 3:15-290, 2019 WL 587296, at *2 (M.D. Pa. Feb. 13, 2019) (explaining the Advisory Committee's notes that parties must consider the proportionality of all discovery). A party is not entitled to "all" documents merely by virtue of having typed the words. *See, e.g., In re Unitek Global Services, Inc.*, Del. Bankr. 14-12471 (PJW), Tr. Hr'g (Nov. 21, 2014) (rejecting discovery request seeking "all" communications and ordering party only to produce communications relevant to the requesting party's arguments). The mere inclusion of broad keywords in a request does not make the request reasonable and the request must be proportional.

63.      Mawson requests for production of documents that are not "proportional to the needs of the case." In its First Request for Production, Mawson requests "all documents" and "all communications" involving Manning in connection with the various agreements underlying Marshall Loan, W Capital Loans, and MIG1 Loan, as well as the filing of the Involuntary Petition. Communications with Manning with the Petitioning Creditors, if any, were made in his capacity as the CEO of Mawson, and the production of such communications will be more burdensome and

expensive than requiring Mawson to look through its own documents, which should have been produced in this litigation from documents in its own files. If the Alleged Debtor really had a bona fide basis to dispute the Petitioning Creditors' claims based on Manning's purported misconduct, the Alleged Debtor would have already reviewed those documents and identified the basis of its dispute. Tellingly, Mawson has provided zero documents evidencing their bad faith theory or the existence of a bona fide dispute.

64.    Mawson has not provided any basis as to how Mawson alleges that Manning orchestrated the Involuntary Petition. Manning is neither a director, officer, or employee of any of the Petitioning Creditors, and has never asserted any control over or influenced investment decisions or the decision to file the Involuntary Petition. The Court should not allow Mawson to seek such broad requests that are not proportional to the needs of this case, particularly in light of the burdens imposed and the lack of relevance to the Involuntary Petition. Moreover, Mawson's responses to the Petitioning Creditors' Documents Requests show that Mawson itself failed to comply with the discovery standard it invokes in the Motion. Mawson argued that the Petitioning Creditors' discovery requests and interrogatories are "overbroad, unduly burdensome, and irrelevant to the Involuntary Petition" and similarly failed to produce "all" methods of communications, including "telephone records, text messages, WhatsApp messages, etc." *See* Ex. M ("Mawson's Responses and Objections").

65.    At bottom, Mawson's Manning-related inquiries appear to be an attempt to obtain, via the Petitioning Creditors, discovery that Mawson has attempted and failed to obtain from Manning himself in connection with Mawson's belief that Manning committed breached of fiduciary duty while employed as the Alleged Debtor's CEO. But this is irrelevant to the issues

before this Court, and is an improper use of the discovery process in connection with this involuntary Chapter 11 case.

### C. The Receivers Are Complying With Their Discovery Obligations.

66.     The Alleged Debtor's statement that the Receivers have failed to respond to discovery requests is inaccurate.  On April 25, 2025, the Receivers served responses and objections to the Alleged Debtor's First Request for Production of Documents and First Set of Interrogatories. *See* Notice of Service (Dkt. No. 76).

### D. The Petitioning Creditors Have Agreed to Sit For Depositions.

67.     The First Motion to Compel should be denied for the additional reason that the Petitioning Creditors have agreed to produce Andrew Martin, Darron Wolter, and Liam Healey for depositions, as representatives of the Petitioning Creditors.

68.     Mawson has provided no explanation for why it needs to depose Quentin Olde in addition to Liam Healey.  Mr. Olde and Mr. Healey are both Receivers and Managers of MIG1 with access to the same information concerning the MIG1 Loan, which is the basis for MIG1's claim against the Alleged Debtor.

69.     Likewise, the Alleged Debtor cannot explain why it needs to depose Ray Itaoui, in addition to the representatives of the other three Petitioning Creditors, when any alleged deficiency or defect in Rayra's claim for purposes of meeting the Involuntary Petition's numerosity requirement has been cured by the joinder of the Receivers to the Involuntary Petition under Section 303(c).  The provision permits creditors to join an involuntary petition after its filing but before the case is dismissed or relief is ordered "as a matter of right," and treats the joining creditors as if they were original petitioning creditors under Section 303(b).  *See In re FKF Madison Park*

*Grp. Owner, LLC*, 435 B.R. 906, 907–08 (Bankr. D. Del. 2010*)* (holding that the Third Circuit construes Section 303(c) strictly and allows joinder as matter of right).

70.     Accordingly, the First Motion to Compel should be denied.

### III.     The Second Motion to Compel Should Be Denied.

71.     By the Second Motion to Compel, the Alleged Debtor seeks an order (i) compelling the Petitioning Creditors to produce David Marshall and James Manning for depositions, or (ii) alternatively, issuing a letter of request for international judicial assistance to the appropriate Central Authority of Australia for assistance in obtaining the depositions of (a) Manning, in his capacity as former CEO of the Alleged Debtor, and (b) David Marshall, in his capacity as Managing Director of Marshall.  *See* Second Mot. ¶¶ 21–34.  The Second Motion to Compel should be denied for three reasons.

72.     *First,* the Petitioning Creditors have agreed to make Mr. Marshall available for a deposition, thereby rendering moot the portion of the Second Motion to Compel that requests that the Court compel Mr. Marshall's testimony.

73.     *Second,* the Second Motion to Compel should be denied because, as counsel to the Petitioning Creditors has explained to counsel for Mawson, (i) counsel for the Petitioning Creditors does not represent Mr. Manning and is not authorized to accept service of a notice of deposition on his behalf, and, more importantly and (ii) the Petitioning Creditors do not control Mr. Manning. Mr. Manning is not a director, officer, or employee of any of the Petitioning Creditors. Accordingly, the Petitioning Creditors have no legal authority to compel him to sit for a deposition. *See Ethypharm S.A. France v. Abbott Laboratories*, 271 F.R.D. 82, 92 (D. Del. 2010) (noting that "there is simply no authority for the proposition that a corporate party must produce for deposition fact witnesses who are not employed by, and do not speak for, that party"); *Trans Pacific Ins. Co.*

27

*v. Trans-Pacific Ins. Co.*, 136 F.R.D. 385, 393 (E.D. Pa. 1991) (denying motion to compel deposition where "Plaintiff has made no showing that [the party] is an officer, director or managing agent of the defendant.").[6]

74.     *Third,* Mawson's singular fixation on investigating Mr. Manning's every interaction with the Petitioning Creditors amounts to nothing more than a fishing expedition that is wholly irrelevant to the issues properly before this Court: namely whether the Alleged Debtor is paying its debts as they become due and whether there is any bona fide dispute as to the validity of the Petitioning Creditors' debts.  The answer is an emphatic no on both counts.  Mr. Manning's testimony is simply not relevant to either of these issues.  To the extent that the Alleged Debtor wishes to question the Petitioning Creditors about their interactions with Manning, it will have the opportunity to do so at the depositions of the representatives of the Petitioning Creditors.

75.     Finally, issuance of a letter of request for international judicial assistance to the appropriate Australian authority to secure Manning's deposition is likely to significantly extend the timeline for resolution of the Involuntary Petition.  Issuance of legal process in Australia and subsequent service of Manning is likely to take several months.  The Court should not permit the Alleged Debtor to use the guise of Manning's deposition to continue its quest to delay a decision on the Involuntary Petition indefinitely.

76.     Accordingly, the Second Motion to Compel should be denied.

---

[6]     The Alleged Debtor's reliance on *In re Global Power Equipment Group, Inc.,* 418 B.R. 833 (Bankr. D. Del. 2009) ("Global Power"), for the proposition that Manning is "within the control of the Petitioning Creditors such that this Court may compel Mr. Manning to appear for a deposition" (Second Mot. ¶ 23) is unavailing.  *Global Power* addressed whether a party could be compelled to produce employees of the party's sister corporation, where there was evidence in the record that the sister corporation acted as the party's agent.  418 B.R at 844–45.  By contrast, Manning is not an employee, director, officer, or agent of any of the Petitioning Creditors.

## <u>CONCLUSION</u>

WHEREFORE, for the reasons set forth above, the Petitioning Creditors request that the Court enter an order (i) denying the Motions to Compel and (ii) awarding such other and further relief as the Court deems just and proper.

*[Remainder of page left intentionally blank.]*

Dated: May 2, 2025

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Luke Brzozowski*
Robert J. Dehney, Sr. (No. 3578)
Tamara K. Mann (No. 5643)
Luke Brzozowski (No. 7377)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
  tmann@morrisnichols.com
  lbrzozowski@morrisnichols.com

– and –

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (*pro hac vice* forthcoming)
Margaret J. Lovric (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
  twelch@glennagre.com
  mlovric@glennagre.com
  ehong@glennagre.com

*Counsel to the Petitioning Creditors*