## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Alleged Debtor | **Re: D.I. 88** |

### PETITIONING CREDITORS' AND CAMERON HAMISH GRAY'S OPPOSITION TO DEBTOR'S MOTION (I) FOR A BOND PURSUANT TO 11 U.S.C. § 303(e), AND (II) FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY

Marshall Investments MIG Pty Ltd ("Marshall"), W Capital Advisors Pty Ltd ("W Capital"), Rayra Pty Ltd ("Rayra" and together with Marshall and W Capital, the "Initial Petitioning Creditors"), Liam Healey and Quentin Olde (the "Receivers") in their capacity as Receivers and Managers of MIG No.1 Pty Ltd (in Liq.) (Receivers and Managers Appointed) ("MIG1"), John McInerney and Phillip Campbell-Wilson (the "Mawson Services Liquidators" and, together with Marshall, W Capital, Rayra, and the Receivers, the "Petitioning Creditors") in their capacity as Joint and Several Liquidators of Mawson Services Pty Ltd ("Mawson Services"), and Cameron Hamish Gray (the "MIGI Liquidator"), in his capacity Liquidator of Mawson Infrastructure Group, Inc. (the "Alleged Debtor" or "Mawson") hereby submit this objection (this "Objection") to the Alleged Debtor's *Motion (I) For A Bond Pursuant to 11 U.S.C. § 303(e), and (II) For Sanctions for Violation of the Automatic Stay* [Dkt. No. 88] (the "Motion"). In support of the Objection, the Petitioning Creditors and the MIGI Liquidator respectfully state as follows:

### PRELIMINARY STATEMENT

1.     The Debtor just fired and sued its Chief Executive Officer, Rahul Mewawalla, for malfeasance. The Motion predates that event.

2.      The Alleged Debtor's lawsuit, filed in Delaware Chancery Court, asserts that Mr. Mewawalla misled the Alleged Debtor's Board of Directors into paying him a multimillion-dollar bonus in the fall of 2024 without informing the Board of the resulting liquidity problems that would leave the Alleged Debtor unable to pay approximately $2.5 million in taxes.  While the Board professes ignorance of the Alleged Debtor's inability to pay these taxes at the time, it still approved payment of this bonus after the Petitioning Creditors threatened to file an involuntary bankruptcy petition if the Alleged Debtor continued to ignore their obligation to repay the debts owed to them. Rather than engage with the Petitioning Creditors, the Alleged Debtor paid the bonus.  This is not a responsible debtor.

3.      Faced with their consistent refusal to repay their debts (or, at a minimum, engage constructively to address their inability to pay them), the Alleged Debtor engages in projection. They claim that this bankruptcy—a last-ditch effort to find some way to ensure that the Petitioning Creditors' debts are repaid—was instead some sort of cynical, self-destructive attempt to harm the Alleged Debtor (and thereby further jeopardize their prospects of being repaid).  Rather than confronting its own irresponsibility and bad faith led by Mr. Mewawalla, this Motion is, at its core, the latest effort by Mawson to harass and intimidate creditors that are owed tens of millions of dollars in the hope that they will abandon this Involuntary Petition and forfeit the right to recover their debts, despite the fact that such debts have been outstanding, due, and owing for ***years***.  And indeed, Mawson has publicly acknowledged the debts for years.  Mawson has filed four annual reports and over ten quarterly reports with the SEC acknowledging the full amount of the debts owed to the Petitioning Creditors and Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC (collectively, "Celsius") on their financial statements.  These annual reports were all audited, and, in the 2023 and 2024 annual reports, Mawson's auditor issued "going concern"

qualifications to its audit opinion based on Mawson's demonstrable inability to repay these debts. None of these filings articulate any basis to avoid repayment of these debts. Mawson made regular payments on these debts before they ultimately defaulted, and W Capital has obtained a judgment from an Australian court following Mawson's default on an interest payment. Mawson could have—but did not—dispute W Capital's claim in that proceeding. Instead, it defaulted.

4.       In an attempt to divert attention away from the bad acts of its former CEO (and the Board's failure to oversee him), its admitted insolvency and effective abandonment of its creditors, Mawson has attempted to manufacture a dispute over the Petitioning Creditors' debts by claiming that they are engaged in a malevolent conspiracy with the Alleged Debtor's former CEO, James Manning, to "destroy" Mawson. By Mawson's telling, Manning is the puppet master controlling the actions of the Petitioning Creditors, and the Involuntary Petition, rather than being a last-ditch effort to get their debts repaid, is nothing more than a bad-faith attempt to embarrass, harass, and financially ruin Mawson as part of Manning's "vendetta" against the company. In reality, the evidence proffered by Mawson does not even suggest—let alone prove—that Manning orchestrated the filing of this Involuntary Petition, nor does the evidence support the contention that the Petitioning Creditors brought the Involuntary Petition for any purpose other than the one that is the most obvious: to collect on multimillion dollar debts that have been in default for several years. The Court should reject Mawson's outlandish, unsupported, and blatantly false narrative that underpins the Motion.

5.       This Court should further reject Mawson's attempt to weaponize the Stay Relief Motion (as defined herein) against the Petitioning Creditors. Prior to the Petition Date, certain of the Petitioning Creditors sought to pursue a restructuring by filing an application to force the Debtor into a winding-up proceeding in Australia after the Debtor repeatedly rebuffed negotiations

on a consensual restructuring.  The Australian Court granted the Winding-Up Application on February 11, 2025 and appointed Cameron Hamish Gray as liquidator.  In its objection to the Winding-Up Petition, the Debtor raised the issue of the imposition of the automatic stay as an impediment to the Liquidator's appointment.  Accordingly, the Petitioning Creditors and the Liquidator filed the Stay Relief Motion to allow the MIGI Liquidator to (i) file an application for recognition of the Winding-up Proceeding and the Liquidator as a Foreign Representative and (ii) for the MIGI Liquidator to file an involuntary petition for relief in his own right against the Debtor under Chapter 11 of the Bankruptcy Code.

6.      Contrary to Mawson's assertions to the contrary, the Stay Relief Motion is a good-faith effort by the Petitioning Creditors and the MIGI Liquidator to *avoid* the protracted and expensive litigation that Mawson appears otherwise determined to engage in and to streamline the resolution of Mawson's insolvency.

7.      The Court should not sanction Mawson's latest attempt to brow beat its creditors into submission and should deny the Motion.

## **BACKGROUND**[1]

### I.      **The Involuntary Petition.**

8.      On December 4, 2024 ("Petition Date"), the Initial Petitioning Creditors filed an involuntary Chapter 11 petition [Dkt. No. 1] (the "Involuntary Petition") against Mawson pursuant to 11 U.S.C. § 303(b).

9.      On January 10, 2025, Mawson filed its answer [Dkt. No. 16] (the "Answer") contesting the Involuntary Petition.  In the Answer, Mawson asserts, among other things, that (i) the Petitioning Creditors' "debts are the product of Manning's self-dealing and are subject to

---

[1]      Citations herein to "Ex. _" refer to exhibits attached to the Declaration of Andrew K. Glenn, filed contemporaneously herewith.

dispute," and (ii) one of the Petitioning Creditors' debts appears to have been acquired from another Petitioning Creditor for the purpose of meeting the involuntary petition numerosity requirement.

10.    On March 7, 2025, the Receivers filed a joinder [Dkt. No. 61] to the Involuntary Petition on the basis of a noncontingent and undisputed intercompany loan made by MIG1 to the Alleged Debtor.

11.    On May 27, 2025, the Mawson Services Liquidators filed a joinder [Dkt. No. 126] to the to the Involuntary Petition on the basis of a noncontingent and undisputed intercompany loan made by Mawson Services to the Alleged Debtor.

## II.    The Petitioning Creditors' Claims.

### A.    Marshall's Claim

12.    On December 9, 2021, Marshall and MIG1, an affiliate of Mawson, entered into a loan facility agreement by and between Marshall Investments MIG Pty Ltd and its affiliate, MIG No. 1 Pty Ltd, dated as of December 9, 2021 (the "Secured Loan Facility Agreement" and the loan made thereunder, the "Marshall Loan").    Simultaneously, Mawson executed a Continuing Guaranty, dated as of December 9, 2021, whereby Mawson guaranteed the obligations of its affiliate, MIG1, under the Secured Loan Facility Agreement (the "Marshall Corporate Guarantee").    James Manning was the CEO of Mawson when the Secured Loan Facility Agreement was executed.    The financing also was approved by Michael Hughes, another director of Mawson.

13.    On March 31, 2022, MIG1 failed to comply with certain financial covenants under Section 12.9(b) of the Secured Loan Facility Agreement.    Then, in June 2023, MIG1 advised Marshall that it would not be able to make the scheduled payment due on June 30, 2023.    In fact,

MIG1 failed to make the payments due under the Secured Loan Facility Agreement on June 30, 2023 and July 31, 2023.

14.    In November 2022, Marshall agreed to a forbearance and a revised payment schedule of the amounts owed under the Secured Loan Facility Agreement.  In June 2023, Marshall agreed to a further conditional forbearance on the next repayment due under the agreement.  The conditional forbearance expired by its terms on July 13, 2023.  By July 31, 2023, the Marshall Loan was again in default.  The Secured Loan Facility Agreement matured in February 2024.

15.    On March 1, 2024, Marshall issued a formal notice of default to MIG1 based on its failure to repay Marshall.  Between August 2023 and April 2024, Marshall sent no fewer than six written demands to Mawson, demanding payment pursuant to the Marshall Corporate Guaranty.

16.    As of the Petition Date, neither MIG1 nor Mawson had cured the defaults under the Secured Loan Facility Agreement or otherwise satisfied the outstanding indebtedness.  Marshall has received no intervening payments, and the Debtor has not identified any bona fide dispute regarding its liability under, or the enforceability of, the governing agreements.

**B.  W Capital's Claim**

17.    On July 8, 2022, W Capital and Mawson entered into a Convertible Promissory Note (the "Convertible Note").  The Convertible Note matured in July 2023.  On September 2, 2022, W Capital entered into a secured loan deed by and between W Capital Advisors Pty Ltd and Mawson Infrastructure Pty Ltd, an affiliate of the Debtor, dated as of September 2, 2022 (the "Secured Loan Deed" and the loan made thereunder, the "Deed Loan" and, together with the Convertible Note, the "W Capital Loans").  The Secured Loan Deed was signed by the directors of Mawson Infrastructure Pty Ltd, including Michael Hughes and James Manning.  Mawson subsequently executed a Corporate Guaranty, dated September 29, 2022, unconditionally

guaranteeing the obligations of its affiliate (the "W Capital Corporate Guaranty").  The Deed Loan matured in March 2023.

18.     On November 15, 2022, Mawson Infrastructure Pty Ltd failed to satisfy its repayment obligations under the Secured Loan Deed.  In March 2023, following discussions between Mawson and W Capital concerning Mawson's defaults under the Secured Loan Deed, Mawson made partial repayments in two tranches.  Nevertheless, the Deed Loan was in default by early 2024.  On July 8, 2023, Mawson failed to repay the principal amount due under the Convertible Note.  W Capital demanded repayment shortly thereafter.

19.     By letter dated January 3, 2024, W Capital's counsel, Holman Fenwick Willan LLP Australia ("HFW Australia"), demanded that the Debtor pay the amounts due under the Secured Loan Deed, including principal and accrued interest.  By letter, dated February 13, 2024, HFW Australia demanded that the Debtor pay the interest due under the Convertible Note.  By letter, dated March 15, 2024, HFW Australia specified that Mawson owed A$496,434.84 in interest and demanded payment pursuant to the Corporate Guaranty.

20.     Between January 2024 and March 2024, W Capital issued statutory demands[2] to Mawson and Mawson Infrastructure Pty Ltd demanding repayment of the W Capital Loans, and in response to the statutory demands, Mawson paid the principal amount of $500,000 under the Convertible Note.

21.     On March 28, 2024, W Capital commenced proceedings in Australia against the Debtor for interest owed on the W Capital Loans.  On May 31, 2024, the Supreme Court of New

---

[2]     Under Australian corporate law, a statutory demand is a formal notice issued pursuant to Section 459E of the Corporations Act 2001 (Cth).  See Corporations Act 2001 (Cth), ss 459E.  It requires a company to pay a debt of at least A$4,000 within 21 days and failure to comply gives rise to a statutory presumption of insolvency, allowing the creditor to apply to the court for the company's winding up.

South Wales entered a final default judgement, awarding W Capital $166,218.30 in interest owed on the Convertible Note and A$298,926.30 of interest owed on the Deed Loan.

22.     As of the Petition Date, Mawson had not cured the defaults or otherwise satisfied the outstanding indebtedness, nor proposed any refinancing or restructuring to facilitate repayment.  W Capital has received no intervening payments, and the Debtor has not identified any bona fide dispute regarding its liability under, or the enforceability of, the governing agreements.

### C.  Rayra's Claim

23.     Rayra holds claims against Mawson in the aggregate principal amount of at least A$50,000 plus accruing interest based upon its holdings under the Secured Loan Facility Agreement (the "Rayra Loan").  Rayra acquired its holdings under the Secured Loan Facility Agreement from Marshall Investments pursuant to an Assignment Agreement dated October 18, 2024 (the "Assignment Agreement").

### D.  MIG1's Claim

24.     MIG1 is a wholly-owned subsidiary of Mawson.  On February 16, 2024, Flynt ICS Pty Ltd initiated winding-up proceedings against MIG1 in the Supreme Court of New South Wales, Australia.  On March 19, 2024, the court issued a winding-up order for MIG1 and appointed David Webb of Webb Advisory Pty Limited as the liquidator.  On March 7, 2025, the Receivers were appointed as Receivers and Managers of MIG1.

25.     MIG1, through the Petitioning Creditors as the Receivers and Managers, holds undisputed, noncontingent, and liquidated claims against the Debtor in the amount of A$3,672,445.41, arising from an inter-company loan repayable to MIG1 (the "MIG1 Loan").

**E. Mawson Services' Claim**

26.     Mawson Services holds a noncontingent, undisputed, and liquidated claim against the Debtor in the amount of at least A$299,116.08.  This liability arises from an intercompany loan, fully matured and payable, and is evidenced in the books and records of the Debtor.  To date, no factual or legal dispute has been asserted by the Debtor with respect to the existence, enforceability, or amount of this obligation.

**III.     Mawson Publicly Acknowledges the Petitioning Creditors' Debts For Years.**

27.     Mawson has never articulated any bona fide basis to challenge the validity of its debt obligations to the Petitioning Creditors.  Nor could Mawson do so credibly.  Mawson unconditionally guaranteed the debts of the Initial Petitioning Creditors pursuant to the Marshall Corporate Guarantee and the W Capital Corporate Guarantee.  And Mawson has repeatedly and unequivocally acknowledged the validity and existence of the Petitioning Creditors' debts in public filings with the United States Securities and Exchange Commission ("SEC") and the Australian Securities Investment Commission ("ASIC").

28.     For example, on March 21, 2022, Mawson filed a Form 10-K with the SEC disclosing its audited financial statements for the fiscal year ending December 31, 2021, which includes the Secured Loan Facility Agreement in the Management Discussion and Analysis without any mention of a dispute or controversy concerning the validity of the indebtedness.  *See* Ex. A ("2021 Form 10-K") at F-27 ("In December 2021, the Company entered into a Secured Loan Facility Agreement with Marshall Investments MIG Pty Ltd." that "matures in 2023.").  Even more significantly, Mawson accounted for the Secured Loan Facility Agreement as a valid liability on its balance sheet (*id.* at F-4, F-26), which Mawson's certified public accountant opined "present fairly, in all material respects, the financial position of the Company" (*id.* at F-2).

29.     Similarly, on March 23, 2023 and April 1, 2024, Mawson subsequently filed Form

10-Ks with the SEC, disclosing its audited financial statements for the fiscal year ending December

31, 2022 and December 31, 2023, respectively, that describe the Marshall Loan and the W Capital

Loans as "Outstanding Loans" with no mention of any dispute regarding the validity of the

indebtedness.  *See* Ex. B ("2022 Form 10-K") at 35, F-29 (listing Marshall and W Capital as valid

loan obligations and noting that in 2022 Mawson "repaid $28.0 million of principal payments

against the historical facilities provided by," among others, Marshall and W Capital); Ex. C ("2023

Form 10-K") at F-31 (reporting Marshall Loan and W Capital Loans as outstanding obligations of

Mawson).  Moreover, Mawson's 2023 Form 10-K acknowledges that the Secured Loan Facility

Agreement and the Secured Loan Deed were "in default" as of December 31, 2023.  *See* Ex. C

(2023 Form 10-K) at 35.  Again, Mawson accounted for the Secured Loan Facility Agreement and

the Secured Loan Deed as a valid liability on its balance sheet (Ex. B at F-4; Ex. C at F-6), which

Mawson's certified public accountant opined "present fairly, in all material respects, the financial

position of the Company" (Ex. B at F-2; Ex. C at F-2).

30.     Moreover, as reflected in its 2022 Form 10-K and 2023 Form 10-K, Mawson had

previously made regular payments on the Marshall and W Capital Loans without protest.  *See*

Ex. B (2022 Form 10-K) at 35 ("During the year ended December 31, 2022, we repaid $28.0

million of principal payments against the historical facilities provided by Foundry, Celsius,

Marshall, W Capital and the convertible notes."); Ex. C (2023 Form 10-K) at 34 ("During the year

ended December 31, 2023, we repaid $12.46 million of principal payments against the historical

facilities provided by Celsius, Marshall and W Capital Advisors Pty Ltd.").

31.     Mawson's 2022 Form 10-K and 2023 Form 10-K also make clear that the Marshall

and W Capital Loans were offered on the ***same economic terms*** as Mawson's other sources of

financing.  *See, e.g.*, Ex. C (2023 Form 10-K) at 36 (noting that the Marshall Loan, W Capital Loans, and the secured promissory note issued by a Mawson subsidiary, Luna Squares LLC, to Celsius Mining LLC, all accrue interest at the same rate of 12% per annum).

32.     Only after Manning's resignation as CEO of Mawson in May 2023, and after Marshall and W Capital initiated collection efforts on their Marshall Loan and W Capital Loans in Australia, did Mawson's narrative begin to shift.  In its 2023 Form 10-K, Mawson disclosed that its audit committee ("Audit Committee") conducted an internal investigation into Manning's alleged failure to *properly disclose* what Mawson contends were "related party" transactions. Ex. C (2023 Form 10-K) at F-40–F-41.  However, the 2023 Form 10-K failed to articulate *any* basis for disputing the validity of the Marshall Loan and W Capital Loans.  *Id*. at F-41.  That is no surprise.  The March 11, 2024 letter memorializing the Audit Committee's investigation does not even address, much less challenge, the validity of the Marshall Loan and the W Capital Loans. *See* Ex. D ("March 11, 2024 Letter").

33.     In its 2024 Form 10-K, filed on March 28, 2025, Mawson asserted that it supposedly had "significant concerns" based on its speculation that "W Capital and James Manning" *might be* "related parties." Ex. E ("2024 Form 10-K") at F-31.  Notwithstanding that speculation, Mawson expressly acknowledged that the Marshall Loan and the W Capital Loans were "classified as [] current liabilit[ies]" on its audited balance sheet.  *Id*. at F-35.

34.     In its March 27, 2024 Form 507 (Report on Company Activities and Properties), *a statutory report of company debts and liabilities filed with ASIC*, Michael Hughes and Greg Martin—who were directors of both MIG1 and Mawson (Martin remains a director today)— explicitly identify the Marshall Loan of $13.8M as "Amounts the Company owes to its creditors"

and the MIG1 Loan of $3,672,445 as "Money owed to the Company" from Mawson.  *See* Ex. F ("ASIC Form 507, Part A Appendix") at 2–3.

35.     Similarly, in Mawson Services' May 13, 2024 Form 507 (Report on Company Activities and Properties) the very same directors identified Mawson Services' intercompany loan to Mawson as "Money owed to the Company" by Mawson.  *See* Ex. G (ASIC Form 507, Part A Appendix) at 3.

36.     Mawson's admissions in formal regulatory filings in both the United States and Australia constitute clear acknowledgment of the validity of the Marshall Loan and the MIG1 Loan and refute any post hoc suggestion of a bona fide dispute.  To date, Mawson has failed to produce a single document identifying, reflecting, or substantiating any genuine dispute regarding the validity of the Petitioning Creditors' underlying debts.  Instead, the Alleged Debtor has pivoted to relying on unsubstantiated allegations of "bad faith" on the part of the Petitioning Creditors, alleging that, despite holding legitimate debts that have gone unpaid for more than two years, the Petitioning Creditors initiated this Chapter 11 case at the behest of James Manning as part of some nefarious scheme to destroy the company.  Besides being unsupported by any evidence other than the Alleged Debtor's own conspiratorial musings, it strains credulity to believe that sophisticated investors whose debts have been past due for more than two years, and who have attempted to collect such debts through all other avenues available to them with no success, would commence an involuntary Chapter 11 case for the purpose of harassing the company, rather than for the legitimate purpose of ensuring that their debts will be repaid.

IV.    **The Petitioning Creditor Seek A Consensual Resolution.**

37.     Despite having matured debt and obtaining judgments against the Alleged Debtor, the Initial Petitioning Creditors did not file an involuntary petition without trying to achieve a

consensual resolution.  Thus, on October 23, 2024, counsel to the Initial Petitioning Creditors sent the Alleged Debtor a letter seeking to discuss whether the Alleged Debtor had any plan or intention of repaying the debts owed to the Initial Petitioning Creditors.  *See* Ex. H.

38.    Despite the fact that the Marshall debt matured in February 2024 and the W Capital Loans matured in mid-2023, the Alleged Debtor did not offer any proposal or alternatives to pay the debts.  Instead, during this timeframe, the Debtors used their meager resources to pay their CEO a massive bonus while ignoring payment of overdue taxes.

**V.    The Alleged Debtor Ignores the Petitioning Creditors, Pays Its CEO Millions of Dollars and Admits Insolvency.**

39.    While baselessly accusing the Petitioning Creditors of acting in bad faith, the Alleged Debtor has simultaneously acknowledged its insolvency and inability to pay its debts as they become due in multiple public filings.  As reported in Mawson's 2024 Form 10-K filing, the Alleged Debtor's reported liabilities exceed its assets, and the company was accordingly balance-sheet insolvent as of the Petition Date.

40.    Moreover, in a complaint filed on July 14, 2025 against the Alleged Debtor's now-former CEO, Rahul Mewawalla, the Alleged Debtor revealed that as of November 14, 2024, it had only $1.7 million in cash available, which was insufficient to satisfy an approximately $2.5 million outstanding tax obligation (the "Tax Bill") to the IRS as well as the company's ongoing monthly operating expenses.[3]

41.    Furthermore, the Complaint reveals that while aware of the looming Tax Bill, the Alleged Debtor's board of directors (the "Board") approved the payment of a bonus in the amount of $2,578,125 (the "Bonus") to Mr. Mewawalla, on the basis of alleged affirmative

---

[3]     *See* Complaint ¶¶ 16, 30-31, *Mawson Infrastructure Group, Inc. v. Mewawalla*, C.A. No. 2025-0789-JTL (Del. Ch. 2025), a copy of which is attached as Ex. I.

misrepresentations made by Mr. Mewawalla to the board regarding Mawson's financial condition and ability to concurrently satisfy the Tax Bill and monthly operating expenses while paying the Bonus.[4]  In reality, Mawson's finance department had apparently advised Mr. Mewawalla multiple times that Mawson did not have the liquidity to pay for monthly operating expenses, the Bonus, and the Tax Bill concurrently.[5]  The Complaint goes on to allege that Mr. Mewawalla "never instructed the Company's finance department to set aside or reserve funds to pay any part of the Tax Bill," instead eagerly accepting the Bonus payment while "knowing (and concealing from the Board) that the Company did not have the funds to pay for monthly operating expenses, the Bonus, and the Tax Bill."[6]

## VI.    The Winding-Up Proceeding.

42.    On October 2, 2024, two months before the Petition Date, W Capital initiated a judicial winding-up application (the "Winding-up Application") in the New South Wales Registry, Federal Court of Australia (the "Australian Court") under the Corporations Act 2001 (Commonwealth of Australia) (the "Corporations Act") for the purpose of commencing a winding-up proceeding pursuant to Sections 583(c)(i) and 585 of the Corporations Act (such proceeding, the "Winding-Up Proceeding").  The Winding-up Application is registered under the case number NSD1395/2024.

43.    On February 11, 2025, the Australian Court issued an order (the "Application Order"), inter alia, granting the Winding-up Application against Mawson and appointing Cameron Hamish Gray as the liquidator of Mawson.  *See* Application Order (Ex. J).  In the Application Order, the Australian Court found that:

---

[4]      *Id.* ¶¶ 2, 22-23.

[5]      *Id.*  ¶¶ 29-31.

[6]      *Id.* ¶ 31.

> For the purposes of ss 583(c)(i) and 585 of the Corporations Act 2001 (Cth) that: Mawson Infrastructure Group Inc.: (a) is unable to pay its debts; and (b) has ceased to carry on business in this jurisdiction.

*Id.*

44.     Pursuant to the Application order, the MIGI Liquidator has been duly appointed to wind up Mawson pursuant to Section 583(c)(i) of the Corporations Act.  The duties and powers of the Liquidator are governed by the Corporations Act and are, broadly speaking, to administer and wind up the affairs of the insolvent company to which the MIGI Liquidator has been appointed.

45.     In the Winding-up Proceeding, Mawson belatedly sought to challenge the Winding-up Application for allegedly violating the automatic stay under the Bankruptcy Code.  As this Court has recognized, however, Mawson has never truly sought the protection of the automatic stay.  On the contrary, Mawson has consistently maintained that it does not need the protection of Chapter 11 of the Bankruptcy Code and has vigorously opposed the Involuntary Petition.

46.     In response to the arguments raised by Mawson in connection with the Winding-up proceeding, on May 2, 2025, the Initial Petitioning Creditors, the Receivers, and the MIGI Liquidator filed the *Motion of the Petitioning Creditors and the Liquidator for Limited Relief from the Automatic Stay, Nunc Pro Tunc to December 4, 2024, Pursuant to 11 U.S.C. § 362(d)* [Dkt. No. 84] (the "Stay Relief Motion"), seeking limited relief from the automatic stay, *nunc pro tunc* to the Petition Date, to permit the continuation of the Winging-up Proceeding for the limited purposes of (i) confirming the appointment of the MIGI Liquidator, and (ii) authorizing the MIGI Liquidator to file a Chapter 15 petition for recognition and his own involuntary Chapter 11 petition against Mawson.  As set forth in detail in the Stay Relief Motion, the Initial Petitioning Creditors, MIG1, and the Liquidator brought the Stay Relief Motion not to harass or otherwise "bleed" Mawson, as Alleged Debtor erroneously alleges (Mot. at 46), but rather to "streamline the

resolution of Mawson's insolvency by dispensing with the need to litigate the allegations made by Mawson against the Petitioning Creditors (which are erroneous)." *See* Stay Relief Motion ¶ 7.

**VII.   The Common Interest Agreement.**

47.     In April 2024, long after their debts had matured following Mawson's default, Marshall approached W Capital to discuss the debts owed by the Alleged Debtor to both W Capital and Marshall.  Marshall subsequently invited W Capital to participate in an information-sharing agreement together with Mr. Manning.  As a former director and creditor of the Alleged Debtor, Mr. Manning was an obvious choice to include as an additional member for the purpose of sharing any information regarding the Alleged Debtor.  The nature of the alleged debts owed by the Alleged Debtor to Mr. Manning is publicly available information.

48.     On or around July 18, 2024, Marshall, W Capital, and Mr. Manning entered into a common interest agreement ("Common Interest Agreement").  On or around January 16, 2025, the Receivers, each in their capacity as Receivers and Managers of MIG1, joined the Common Interest Agreement.  On or around March 27, 2025, the MIGI Liquidator joined the Common Interest Agreement.  The sole purpose of the Common Interest Agreement is to share information among its members and to ensure that any such information is covered by the common interest privilege.  Mr. Manning is in no way involved in any of the decisions made by Marshall, W Capital, the Receivers, the Mawson Services Liquidators, or the MIGI Liquidator in their pursuit to secure repayment of Mawson's debts.

## ARGUMENT

**I.   THE ALLEGED DEBTOR HAS NOT MET ITS BURDEN TO SHOW THAT A BOND IS WARRANTED.**

49.     The Alleged Debtor has not met its burden to show that a bond from the Petitioning Creditors is warranted in this case. Section 303(e) of the Bankruptcy Code provides that, after

notice and hearing, a court *may* require the petitioning creditors "to file a bond to indemnify the debtor for such amounts as the court may later allow under subsection (i) of this section." 11 U.S.C. § 303(e). The purpose of the bonding provisions is "to discourage frivolous petitions as well as the more dangerous spiteful petitions, based on a desire to embarrass the debtor ... or to put the debtor out of business without good cause." *In re Ransome Grp. Investors I, LP*, 423 B.R. 556, 558 (Bankr. M.D. Fla. 2009) (quoting *In re Reed*, 11 B.R. 755, 757 (Bankr. S.D.W.Va. 1981)). As the Alleged Debtor's own caselaw acknowledges, requiring petitioning creditors to post a bond upon the alleged debtor's request is an *extraordinary remedy* that is far from routinely required. *In re Apollo Health Street, Inc.*, 2011 WL 2118230, at *2 (Bankr. D.N.J. May 23, 2011) ("[p]etitioning creditors in involuntary cases should not be routinely required to post a bond upon the alleged debtor's request ... because the Bankruptcy Code does not impose a mandatory bond requirement.") (internal quotations omitted); *see also In re Sec. Equip. Tr. of Eastern Airlines, Inc.*, 1992 WL 295943, at *6 (S.D.N.Y. Oct. 8, 1992) (same); *In re Reed*, 11 B.R. at 757 (same); NORTON BANKR. L. & PRAC. 3D § 22:15 ("The use of the term 'for cause' indicates that indemnity bonds are not granted in involuntary cases as a matter of routine."). Indeed, a court may do so only upon a finding of "cause." *In re Apollo Health Street, Inc.*, 2011 WL 2118230, at *2.

50. While the statute does not specifically define "cause," courts have generally not found "cause" to require the posting of a bond unless the involuntary petition is facially deficient, or there is evidence that the petitioning creditors have acted in bad faith in bringing the involuntary petition. *See In re Contemporary Mission, Inc.*, 1983 Bankr. LEXIS 6916, at *5 (Bankr. D. Conn. Jan. 31, 1983) ("[T]he determination of whether to require a bond should not be turned into a de facto hearing on the merits; instead, *the involuntary petition's lack of merit must be relatively*

*clear.*") (emphasis added); *In re Sec. Equip. Tr. of Eastern Airlines, Inc.*, 1992 WL 295943, at *6 ("[T]he putative debtor must establish a prima facie case of bad faith before petitioning creditors may be required to post a bond under § 303(i)(2)."). The burden of proof is on the Alleged Debtor, as the party requesting the posting of a bond, to prove that "cause" exists. *In re Sec. Equip. Tr. of Eastern Airlines, Inc.*, 1992 WL 295943, at *7 (noting that debtor bears the burden of proof); *In re Hutter Assoc., Inc.*, 138 B.R. 512, 516 (W.D. Va. 1992) (same). Moreover, where, as here, the petitioning creditors are of substantial means, courts have generally declined to impose a bond requirement. *See, e.g.*, *In re Reed*, 11 B.R. at 757 (declining to require bond where petitioning creditors were "all business entities which could respond to an award of damages made against them."); *In re Dill*, 13 B.R. 9, 11 (Bankr. D. Nev. 1981) (declining to require a bond where "[p]etitioners appear to be men of some substantial means, who seem to have filed their present Petition in good faith.").

51.     As explained below, the Alleged Debtor has not met its burden to show "cause" for requiring the Petitioning Creditors to post a bond in this case because (i) the Petitioning Creditors have met the statutory requirements of Section 303(b), and (ii) are presumed to have filed the Involuntary Petition in good faith, which presumption the Alleged Debtor has not offered sufficient evidence at this stage to rebut.

**A. The Petitioning Creditors Have Met the Requirements of 11 U.S.C. § 303(b).**

52.     The Alleged Debtor argues that a bond is appropriate in the first instance as, according to the Alleged Debtor, the Petitioning Creditors have not met the statutory requirements of 11 U.S.C. § 303(b) to commence an involuntary Chapter 11 case. Mot. at 38. The Alleged Debtor is wrong.

53.     The Petitioning Creditors have indeed met the statutory requirements of 11 U.S.C. § 303(b). Section 303(b) of the Bankruptcy Code provides that "[a]n involuntary case against a

person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title . . .by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims." 11 U.S.C. § 303(b)(1).

54.     Section 303(h) provides that "[i]f the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed." *Id.* § 303(h).  If the petition is controverted by the debtor, Section 303(h) requires the court to order relief against the debtor under the chapter under which the petition was filed, only if (1) the debtor is generally not paying its debts as such debts become due, unless such debts are the subject of a bona fide dispute as to liability or amount; or (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession. *Id.*

55.     The petitioning creditors bear the initial burden of establishing a prima facie case that the amounts claimed are free of any "objective basis for either a factual or a legal dispute as to the validity of the debt."  *In re Diamondhead Casino Corp.*, 2016 WL 3284674, at *9 (Bankr. D. Del. June 7, 2016); *see also In re AMC Invs., LLC*, 406 B.R. 478, 483 (Bankr. D. Del. 2009) ("[t]he burden is on the petitioning creditor to first establish a prima facie case that no bona fide dispute exists").  Once that threshold is met, the burden shifts to the Debtor to show that the dispute is indeed bona fide. *Diamondhead Casino Corp.*, 2016 WL 3284674, at *9

56.     When determining whether a bona fide dispute exists, courts in the Third Circuit apply an objective test.  *In re AMC Invs., LLC*, 406 B.R. at 483.  Courts have stated that "[t]here is a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts. *B.D.W. Assocs. Inc. v. Busy Beaver Bldg. Ctrs., Inc.*, 865 F.2d 65, 66 (3d Cir.1989).

57.     Mere allegations denying the amount of a claim are insufficient to establish a bona fide dispute.  *See In re Lever Dev., LLC*, 2012 WL 5053441, at *6 (Bankr. D. Mass. Oct. 18, 2012); *In re Vitaminspice*, 472 B.R. 282, 296 (Bankr. E.D. Pa. 2012) ("[A]n unsupported denial is not sufficient to create a bona fide dispute."); 2 COLLIER ON BANKRUPTCY ¶ 303.11[1] ("Needless to say, a debtor's simple refusal to pay does not give rise to a bona fide dispute.").  Moreover, any suggestion of setoff or counterclaim by the Debtor is insufficient in and of itself to create a bona fide dispute.  Indeed, courts have routinely found that "a dispute as to the amount of a claim is not a bona fide dispute if it is based on a counterclaim arising from a wholly separate transaction." *In re Mylotte, et al.*, 2007 WL 2033812, at *7 (Bankr. E.D. Pa. July 12, 2007) (finding that alleged debtor's pending counterclaim based on a transaction unrelated to the petitioning creditor's claim did not render the petitioning creditor's claim the subject of a bona fide dispute).  Similarly, a dispute as to the proper rate or calculation of interest on a petitioning creditor's debt does not create a bona fide dispute.  *See In re Food Gallery at Valleybrook*, 222 B.R. 480, 489 (Bankr. W.D. Pa. 1998) (Alleged debtor's dispute as to proper amount of interest and amortization schedule did not render creditor's entire claim subject to "bona fide dispute.").

58.     Here, the Petitioning Creditors have met their burden to establish the *prima facie* validity of their claims by providing documentary evidence of the Marshall and W Capital Loans, both of which were executed by representatives of the Debtor, as well as evidence of the validity

of the intercompany loans from MIG1 and Mawson Services, as acknowledged by the Alleged Debtor's own directors in ASIC filings. *See, e.g.*, *In re Diamondhead Casino Corp.*, 2016 WL 3284674, at *9 (petitioning creditors met burden to establish *prima facie* validity of claims where they "establish[ed] the existence of a contract obligating [the debtor] to repay the amount borrowed."); *In re Vitaminspice*, 472 B.R. at 298-99 (loan agreements signed by authorized representative of putative debtor, coupled with the debtor's "records acknowledging the loan as a valid liability" were sufficient to establish *prima facie* validity of the petitioning creditors' claims).

59.     By contrast, the Alleged Debtor has never articulated any bona fide basis to challenge the validity of its obligations to the Petitioning Creditors.  Nor could Mawson do so credibly when it has repeatedly affirmed the validity of the Petitioning Creditors' debts in public filings with the SEC and ASIC.  Put simply, the Alleged Debtor's admissions in formal regulatory filings in both the United States and Australia constitute clear acknowledgment of the validity of the Petitioning Creditors' debts and refute any *post hoc* suggestion of a bona fide dispute.

60.     Moreover, to the extent that the Alleged Debtor asserts that the Petitioning Creditors do not meet the numerosity requirement of Section 303(b) because of Rayra's acquisition of its claim from Marshall prior to the Petition Date (a contention which, for the avoidance of doubt, the Petitioning Creditors dispute), the Petitioning Creditors nonetheless continue to meet the numerosity requirement of Section 303(b)(1) with the claims of W Capital, MIG1, and Mawson Services.

61.     Accordingly, the Petitioning Creditors have met the statutory requirements of Section 303(b), and Mawson has not met its burden to show otherwise.

**B.  The Petition Was Not Filed in Bad Faith.**

62.    Alternatively, Mawson contends that a bond is appropriate because the Involuntary Petition was, it argues, filed in bad faith.  Mot. at 41.  Here again, Mawson fails to carry its burden.

63.    While bad faith may be an independent cause for dismissal of an involuntary petition under Section 303(b) of the Bankruptcy Code, Mawson has not alleged, much less proven, any of the accepted indicia of bad faith.  In the Third Circuit, bad faith is assessed under the "totality of the circumstances," focusing on whether: (i) the petition was filed for a valid bankruptcy purpose; or (ii) the petition was filed merely to gain a tactical litigation advantage.  *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 335-36 (3d Cir. 2015).  Further, there "is a ***presumption of good faith*** in favor of the petitioning creditor, and thus the alleged debtor has the burden of proving bad faith."  *In re Sec. Equip. Tr. of Eastern Airlines, Inc.*, 1992 WL 295943, at *6 ("the putative debtor must establish a prima facie case of bad faith before petitioning creditors may be required to post a bond under § 303(i)(2).") (emphasis added).  "In considering petitioning creditors' motivation[s], courts have generally required nearly unconscionable behavior before finding bad faith."  *U.S. Fidelity & Guar. Co. v. DJF Realty & Suppliers, Inc.*, 58 B.R. 1008, 1011 (N.D.N.Y.) (collecting cases and observing that courts have generally found bad faith where the petitioning creditor(s) were "consciously and wickedly indifferent to the truth or falsity of allegations contained in the petition," or where there was evidence that petition was filed for no reason other than "to harass, vexatiously or oppressively.").

64.    At bottom, the crux of Mawson's argument as to the alleged "bad faith" of the Petition Creditors continues to be that the filing of the Involuntary Petition was "motivated by ill will and a desire to harass as an extension of [James] Manning's vendetta against the company." Mot. at 36.  But there is simply no basis in fact or reality for this contention.  The purported

evidence proffered by Mawson does not even suggest—let alone prove—that Manning orchestrated the filing of this Involuntary Petition. That Manning may be "an intended recipient in the waterfall of proceeds" (Mot. ¶ 65) does not establish any improper influence or control over the Involuntary Petition. Manning is simply one of Mawson's creditors, with an alleged $3 million claim. By Mawson's logic, any creditor initiating or supporting an involuntary petition would automatically be suspect of bad faith—an argument that, if accepted, would render the statutory framework for creditor-initiated involuntary proceedings effectively unworkable.

65. Further, Mawson's reference to a text message from Manning containing an "image of a house on fire," sent on the same day the statutory demands for loan repayment were issued in Australia, is irrelevant. Neither does the Manning's Twitter post made after the Involuntary Petition cited by Mawson—featuring a screenshot of Mawson's declining stock price with a caption "terminal decline on the back of insolvency"—offer credible evidence of the **Petitioning Creditors' bad faith**, especially because the debtor is insolvent by its own admission in both its SEC filings, as well as in its publicly filed complaint against Mr. Mewawalla.

66. The Alleged Debtor spills much ink recounting Manning's alleged self-dealing and alleged threats made by Manning against Mawson following his resignation from the Board despite the fact that the Alleged Debtor gave Manning a full release on his departure. But the fact remains that the Alleged Debtor can provide *no evidence* that the Petitioning Creditors are colluding with Manning to exact some kind of vengeance on Mawson, or that the Initial Petitioning Creditors filed the Involuntary Petition for such purpose. And indeed, the Alleged Debtor can provide no such evidence, because **none exists**. As the Initial Petitioning Creditors have repeatedly made clear, they filed the Involuntary Petition as a matter of last resort after exhausting numerous other methods of collecting on their debts and having effectively been ignored by the Alleged Debtor

for *years*.  The Petitioning Creditors are committed to working with the Alleged Debtor's stakeholders to maximize the value of Mawson's estate for the benefit of all creditors, not to advance the alleged "vendetta" of a former CEO.

67. Moreover, to the extent that the Alleged Debtor relies upon the Stay Relief Motion as evidence of the Petitioning Creditors' bad faith (Mot. ¶¶ 103, 105), nothing could be further from the truth.  Rather than being borne out of a desire to harm the company and to "bleed Mawson" (Mot. at 46), as explained in the Stay Relief Motion, the Petitioning Creditors' primary motivation in seeking the relief requested therein was to *avoid* the protracted and expensive litigation that the Alleged Debtor appears determined to engage in, despite having publicly acknowledged the validity and amount of the Petitioning Creditors' debts and admitting in its own court filings that it lacks the ability to pay its debts as they become due.  *See* Stay Relief Motion ¶¶ 7-8.

68. Accordingly, the Alleged Debtor cannot meet its burden to establish a *prima facie* case that the Initial Petitioning Creditors acted in bad faith in filing the Involuntary Petition, and it's request for a bond should be rejected for this independent reason.

## II. SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY ARE NOT WARRANTED.

69. In addition to requesting a bond pursuant to Section 303(e) of the Bankruptcy Code, Mawson additionally asks the Court to impose sanctions on the Petitioning Creditors and the MIGI Liquidator for violation of the automatic stay in continuing the Winding-up Proceeding following the Petition Date.  Mot. at 50.  As an initial matter, because the Stay Relief Motion, wherein the MIGI Liquidator, MIG1, and the Initial Petitioning Creditors sought relief from the automatic stay *nunc pro tunc* to the Petition Date, remains pending, any request for sanctions for violation of the automatic stay is premature.

70.     Moreover, as set forth more fully in the Stay Relief Motion, there exists good cause to grant relief from the automatic stay in this case to prevent the Alleged Debtor from continuing to wield the automatic stay as both sword and shield.  As the Court is aware, despite vigorously contesting the Involuntary Petition itself, Mawson has attempted to invoke the automatic stay to halt or delay separate claims brought by other parties.  As the Court noted in in the associated adversary proceeding (the "Celsius Adversary Proceeding") commenced by the Debtor against Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC (collectively, "Celsius"), Mawson's dual stance—challenging the involuntary proceeding's legitimacy while seeking to benefit from it—raises questions of good faith and fairness.  *See* Jan. 22, 2025 Hr'g Tr. 30:18-23, *Mawson Infrastructure Group Inc. v. Celsius Network Ltd., Celsius Mining LLC and Ionic Digital Mining LLC*, Adv. Proc. No. 25-50008 (MFW) [Dkt. No. 41] ("I also have not found any cases where a purported debtor has sought to extend the automatic stay to its subsidiaries while it fights, opposes an involuntary petition.  And I agree that it seems to be counter to its argument that there is a purpose to staying these actions, while it fights an involuntary.").  And indeed, courts have recognized that the automatic stay should not be wielded in such a manner.  *See, e.g.*, *In re Scarborough-St. James Corp.*, 535 B.R. 60, 67 (Bankr. D. Del. 2015) (the automatic stay is intended to be "a shield, not a sword").

71.     Finally, sanctions here are not warranted because there has been no identifiable harm to the Alleged Debtor as a result of the continuation of the Winding-up Proceeding.  Indeed, all of the "harms" that Mawson identifies (*e.g.*, the drop in Mawson's stock price), to the extent that they can be attributed to one cause at all, are a result of the commencement of the Chapter 11 case itself, not the continuation of the Winding-up Proceeding in Australia.  Additionally, sanctions against the MIGI Liquidator are inappropriate in particular because the MIGI Liquidator had no

involvement in the Winding-up Proceeding prior to his appointment by the Australian Court, and was not aware of any involuntary Chapter 11 petitions filed in the United States against the Alleged Debtor prior to his appointment by the Australian Court. The Liquidator did not undertake to violate the stay and has since sought clarification from this Court through the Stay Relief Motion.

72.     Accordingly, the Alleged Debtor's request for sanctions should be denied.

## **CONCLUSION**

WHEREFORE, for the reasons set forth above, the Petitioning Creditors and the MIGI Liquidator request that the Court enter an order denying the Motion and awarding such other and further relief as the Court deems just and proper.

Dated: July 25, 2024

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Luke Brzozowski*
Robert J. Dehney, Sr. (No. 3578)
Tamara K. Mann (No. 5643)
Luke Brzozowski (No. 7377)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
      tmann@morrisnichols.com
      lbrzozowski@morrisnichols.com

– and –

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Trevor J. Welch (*pro hac vice* forthcoming)
Margaret J. Lovric (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
      twelch@glennagre.com
      mlovric@glennagre.com
      ehong@glennagre.com

*Counsel to the Petitioning Creditors and the MIGI Liquidator*