**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Alleged Debtor. | |

**REPLY OF MAWSON INFRASTRUCTURE GROUP INC. IN SUPPORT OF ITS MOTION (I) FOR A BOND PURSUANT TO 11 U.S.C. § 303(e), AND (II) FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY**

Mawson Infrastructure Group, Inc. ("Mawson" or the "Alleged Debtor" or the "Company"),[1] respectfully submits this reply (the "Reply") in support of its motion (the "Motion")[2] for entry of an order (i) requiring W Capital Advisors Pty Ltd ("W Capital"), Marshall Investments MIG Pty Ltd ("Marshall Investments"), Rayra Pty Ltd ("Rayra" and together with W Capital and Marshall Investments, the "Initial Petitioning Creditors"), and Liam Healey and Quentin Olde in their capacity as Receivers and Managers of MIG No.1 Pty Ltd (in Liq.) (Receivers and Managers Appointed) (the "MIG1 Receivers" together with the Initial Petitioning Creditors, the "Petitioning Creditors" and each a "Petitioning Creditor") to post a bond for the duration of the involuntary chapter 11 case prior to the entry of an order for relief, if any, pursuant to 11 U.S.C. § 303(e), and (ii) imposing sanctions against the Petitioning Creditors and Cameron Hamish Gray (the "Liquidator") for violation of the automatic stay pursuant to 11 U.S.C. §§ 362(k) and 105(a). In support hereof, the Alleged Debtor submits the (i) *Declaration of Ryan Costello in Support of Mawson Infrastructure Group Inc.'s Motion (i) for a Bond Pursuant to 11 U.S.C. §*

---

[1]     Mawson is a Delaware corporation publicly traded on the NASDAQ under MIGI.

[2]     Sealed copies of the Motion and supporting declarations were originally filed on May 4, 2025 at docket numbers 88-91, and redacted versions were filed on May 7, 2025 at docket number 101-104.

*303(d), and (ii) for Sanctions for Willful Violation of the Automatic Stay* (the "Costello

Declaration"); (ii) *Supplemental Declaration of Bill Regan in Support of Mawson Infrastructure*

*Group Inc.'s Motion (i) for a Bond Pursuant to 11 U.S.C. § 303(d), and (ii) for Sanctions for*

*Willful Violation of the Automatic Stay* (the "Supplemental Regan Declaration"); and (iii)

*Declaration of Counsel in Support of Mawson Infrastructure Group Inc.'s Motion (i) for a Bond*

*Pursuant to 11 U.S.C. § 303(d), and (ii) for Sanctions for Willful Violation of the Automatic Stay*

(the "Herz Declaration") and in support of its Motion and this Reply, the Alleged Debtor

respectfully states as follows:

## PRELIMINARY STATEMENT[3]

1.      The Petitioning Creditors and Liquidator's response (the "Response")[4] to the

Motion attempts to deflect from the weight of the evidence and case law cited in the Motion in

support of the issuance of a bond and the imposition of sanctions for violating the automatic stay.

The Response further glosses over the various items in the Motion indicating that this involuntary

proceeding was borne out of collusion between the Petitioning Creditors and Mawson's former

CEO, James Manning, as part of a vendetta to dismember Mawson rather than promote a

bankruptcy estate for Mawson's creditors.  Indeed, the Court already observed at the hearing on

Mawson's Discovery Motions on May 9, 2025, that Mawson has already presented "some

evidence that there may be bad faith on the part of Mr. Manning" and entered an order directing

the issuance of letters rogatory under the Hague Convention for Manning's deposition.

2.      While the Petitioning Creditors attempt to downplay Manning's participation,

developments since the filing of the Motion have only further confirmed Manning's involvement

---

[3]      Capitalized terms used but not defined in this Reply shall have the meaning ascribed to them in the Motion.

[4]      *See* D.I. 139.

and the bad faith motivations behind this involuntary case.  For instance, on the eve of the May 9, 2025 hearing, the Petitioning Creditors produced a privilege log of emails, including approximately thirty-six (36) emails with Manning, including with Petitioning Creditors' counsel. It has also come to light that Manning and the Petitioning Creditors are parties to a common interest agreement, which they have not produced, and continue to hide behind under bald assertions of "privilege," including with respect to questions about Manning.  Further, the parties have engaged in settlement discussions since the May 9, 2025 hearing, including with the court-appointed Judicial Settlement Officer, Judge Clarkson.  Manning, without separate U.S. counsel, predominantly led these discussions on behalf of the Petitioning Creditors and even attempted to reach out directly to Mawson directors.  These actions (among many others) leave no doubt as to Manning's central involvement behind this involuntary case.  Additionally, according to the Response, Manning is allegedly also a creditor, but curiously, he has not joined the Involuntary Petition.  Mawson has been advised that Manning will not be voluntarily deposed, and thus Mawson will have to procure Manning's deposition through the Hague Convention.

3.    The Response also glosses over, both legally and factually, the various indicia of bad faith and the immense financial harm that the Involuntary Petition has caused to Mawson. Among other things, (i) the Petitioning Creditors manufacturing of a third creditor, Rayra, to meet the Bankruptcy Code's numerosity requirement for filing the Involuntary Petition, and then attempted to "cure" that defect by adding new creditors from their Australian cabal in the form of the MIG1 Receivers and the liquidators (the "Mawson Services Liquidators") for Mawson Services Pty Ltd ("Mawson Services");[5] (ii) the suspicious timing of the filing of the Involuntary

---

[5]    As discussed below, the defect likely cannot be cured due to the bad faith implications, and the MIG1 Receivers and Mawson Services Liquidators are also effectively insiders given that MIG1 and Mawson Services are subsidiaries of Mawson, and likely ineligible to join the Involuntary Petition under section 303(b)(2) of the Bankruptcy Code.

Petition, just days before Mawson was set to raise millions through its ATM; (iii) the various evidence included in the Motion reflecting Manning's self-dealing ill will towards Mawson; (iv) the Petitioning Creditors' continuing failure to satisfy outstanding discovery requests, including items they were directed to produce by either the Court or as part of the Judicial Settlement Conference with Judge Clarkson; (v) the apparently failure of the Petitioning Creditors to make an adequate inquiry into the relevant facts and pertinent law (and their Response continues to misunderstand certain aspects of the law); (vi) the Petitioning Creditors, all from Australia, are working in tandem while represented by the same counsel;[6] (vii) the Petitioning Creditors' admitted violation of the automatic stay, done with the assistance of an affidavit from their counsel providing the Australian tribunal with an incorrect statement on the application of the automatic stay; and (viii) and their desperate attempt in their Stay Motion to pivot to an alternative strategy conceived in violation of the automatic stay, because they now believe that litigating the merits of the involuntary case that they commenced "is a waste of resources."  Stay Motion at ¶ 28.

4.     The evidence continues to mount that this involuntary case has been a charade commenced by the Petitioning Creditors with in collaboration with Manning to damage Mawson, such that an award for attorneys' fees, costs, and actual and punitive damages may ultimately be awarded to Mawson under section 303(i) of the Bankruptcy Code.  This has all been an elaborate and expensive game devised by the Petitioning Creditors, and they should now be required to ante up through the requirement of a bond pursuant to section 303(e) of the Bankruptcy Code.  Further discovery is needed to root out the full extent of the Petitioning Creditors' machinations, particularly given the Petitioning Creditors' discovery deficiencies thus far and Manning's

---

[6]     On this point, it is notable that no creditors outside of the Australian group, including in Mawson's home of the United States, have joined the Involuntary Petition during eight (8) months since the Petition Date.

unwillingness to be deposed.  It is likely that further motion practice will be needed, and that is part of the reason why a bond is warranted.

5.        With respect to Mawson's request that the Petitioning Creditors and Liquidator be sanctioned for violating the automatic stay, the Response belies a misunderstanding of the application of the automatic stay.  The automatic stay is in effect in this involuntary case pursuant to the plain language of section 362(a) of the Bankruptcy Code.  Its application has world-wide effect.  In their Stay Motion, the Petitioning Creditors admit that they violated the automatic stay for months by continuing proceedings in Australia notwithstanding the filing of the Involuntary Petition.  It is not a coincidence that the Stay Motion was filed just one week before the hearing on the Discovery Motions and eleven (11) days before the previously scheduled trial date.  Perhaps most glaringly, the Petitioning Creditors violated the stay with the assistance of their bankruptcy counsel, who incorrectly advised the Australian tribunal in an affidavit that the "Bankruptcy Court has jurisdiction to grant stays of legal proceedings against the Chapter 11 debtor."  This statement ignores the automatic application of the stay under section 362(a).  Sensing the noose tightening, the Petitioning Creditors then made the extraordinary request that they be granted *nunc pro tunc* relief from the stay to facilitate their pivot to an alternative strategy—filing a chapter 15 petition through the Liquidator—that was conceived in blatant violation of the stay.  The Petitioning Creditors purported reason in the Stay Motion is that continuing this proceeding—which they initiated—would be a "waste of resources."  This conduct is egregious and epitomizes the Petitioning Creditors' bad faith.  This conduct should not be countenanced.

## EVENTS SINCE FILING MOTION

6.      The Motion was filed on May 4, 2025.  It was filed in response to the Petitioning

Creditors and the Liquidator filing the Stay Motion on May 2, 2025.  Due to recent developments,

Mawson determined to file a notice of hearing for the Motion on July 11, 2025 [D.I. 138].

7.      Several notable events have occurred since the Motion was filed, including:

- On May 8, 2025, the eve of the hearing on Mawson's Discovery Motions, the
  Petitioning Creditors produced a privilege log (the "Privilege Log") listing several
  purportedly privileged emails among the Petitioning Creditors and others between
  July 17, 2024 and the Petition Date.[7]  Manning was included on approximately
  thirty-six (36) emails, including emails with Petitioning Creditors' counsel.

- A hearing on the Discovery Motions was held on May 9, 2025.  During the hearing,
  the Court stated:

  … I am convinced, based on the allegations, that there is some
  relevance to [Manning's] role in any debt owed to the Petitioning
  Creditors and into the decision to file an involuntary petition here
  and perhaps with respect to the filing of any action or any pleading
  in the Australian action.  The debtor is asserting bad faith.  They
  have presented some evidence that there may be bad faith on the part
  of Mr. Manning, whether it involves your clients or not.  I think it is
  relevant or likely to lead to relevant information.  So, on the
  deposition of Mr. Manning we can go one of two ways.  And if you
  have no ability to control or persuade Mr. Manning to appear for a
  deposition then I am left with the Hague Convention.

  *See* May 9, 2025 hearing transcript at 29:17-25 and 30:1-15 annexed as Exhibit B to

  the Herz Declaration.

---

[7]      The Privilege Log was filed as Exhibit 1 to the Supplemental Declaration of Seth A. Niederman filed in in
support of the Discovery Motions.  The declaration was originally filed under seal [D.I. 107] and was
subsequently filed with just the Privilege Log under seal [D.I. 108].

- On May 20, 2025, the Court entered an order [D.I. 122] granting Mawson's Motion to Compel, directing the Initial Petitioning Creditors, within fourteen (14) days of entry of the order (the "Discovery Order"), to supplement their responses to certain discovery demands, as enumerated in the order, with respect to issues pertaining to Manning.  As of the date hereof, the Initial Petitioning Creditors have not provided supplemental responses to several of the discovery requests listed in the order.  In Particular, the Discovery Order compelled the Initial Petitioning Creditors to supplement their responses to the following discovery demands as necessary to comply with the Court's Ruling that issues with respect to Mr. Manning are relevant or likely to lead to relevant information:

  o Marshall Investments to supplement its responses to interrogatory numbers 1, 2, 3, 5, 8, 9, 10, 12, and responses and non-privileged documents in response to document requests numbers 10, 11, 21, 22, 23, 27, 36, 37, and 38.  To date, Marshall Investments has only provided supplemental responses to interrogatories 5 and 9. Marshall Investments has not provided supplemental responses to any document requests and has only provided minimal documentation in response to the outstanding document requests.

  o W Capital to supplement its responses to interrogatories numbers 2, 3, 5, 7, and 10, and responses and non-privileged documents in responses to request numbers 17, 18, 22, and 30-32.  To date, W Capital has only provided supplemental responses to interrogatories 5 and 7 and has not provided any supplemental responses or documents to the outstanding document requests.

- o Rayra to supplement responses to interrogatories numbers 2, 3, 9, 10, and 12, and responses and non-privileged documents in response to document requests 7, 18, 20, 21, 22, 26, and 33-35. To date, Rayra has not provided any supplemental discovery responses or documents to the outstanding document requests.

- On May 21, 2025, the Court entered an *Order Directing Issuance of Letter of Request Under the Hague Convention* [D.I. 124] for Mawson to obtain the depositions of David Marshall of Marshall Investments and Manning. *See* D.I. 124. On June 11, 2025, the Court docketed a *Request for International Judicial Assistance Pursuant to the Hague Convention of 18 March 1970 On The Taking of Evidence Abroad in Civil or Commercial Matters* [D.I. 129].

- On May 27, 2025, the Mawson Services Liquidator filed a joinder to the Involuntary Petition [D.I. 126]. As previously discussed in the Motion, realizing that Rayra and Marshall Investments are likely disqualified as petitioning creditors under Bankruptcy Rule 1003(a), the Petitioning Creditors have created replacement petitioning creditors in the form of receivers and liquidators in Australian whom they control. The Motion noted that the Petitioning Creditors were actively attempting to replace one such fiduciary, David Webb, with Grant Thornton, because Mr. Webb would not join the Involuntary Petition. Mawson understands that Mr. Webb was indeed replaced by John McInerney and Philip Campbell-Wilson of Grant Thornton as liquidators for Mawson Services, Mawson AU Pty

Ltd, and MIG1 in May 2025, and, upon information and belief, the vote to replace Mr. Webb included proxy votes by Manning and Wolter.[8]

- On June 3, 2025, Marshall Investments produced its *Second Supplemental Responses and Objections to the Alleged Debtor's First Set of Interrogatories*. In response to interrogatory number 5, Marshall Investments provided more details with respect to the interests of Manning-related entities in Marshall Investments' funds. A copy of Marshall Investments' Second Supplemental Responses and Objections to the Alleged Debtor's First Set of Interrogatories is attached as Exhibit E to the Herz Declaration.

- On June 12, 2025, Mawson issued discovery requests to the Liquidator. As of the date hereof, the Liquidator has not responded to the requests. A copy of the discovery requests are attached as Exhibit F to the Herz Declaration.

- By email on June 19, 2025, Petitioning Creditors' counsel, Andrew Glenn, advised that he understands that Manning "is prepared to be deposed." A copy of Mr. Glenn's June 19, 2025 is attached as Exhibit C to the Herz Declaration.

- On June 19, 2025, Mr. Glenn sent the following text to one of Mawson's attorneys at Fox Rothschild (Michael Herz): "Didn't want to mention this. But the word I'm getting is that you guys may be fired because of your connections to this mess. You can turn that around if it's true by resolving this promptly." A screenshot of Mr. Glenn's text is attached as Exhibit A to the Herz Declaration.

---

[8]     Both receivers and liquidators have been appointed for MIG1, with the MIG1 Receivers having joined the Involuntary Petition.

- On June 24, 2025, the Court entered an *Agreed Order Assigning Matter to Judicial Procedure* [D.I. 135], appointing The Honorable Scott Clarkson, Judge of the United States Bankruptcy Court for the Central District of California as Judicial Settlement Officer.

- The parties have engaged in ongoing settlement discussions since late June 2025, including lengthy calls on June 25, 2025 and June 26, 2025 with counsel. Notably, Manning was not only present during these calls but led the discussions on behalf of the Petitioning Creditors. At one point, shortly after the parties appeared to have reached an impasse on July 2, 2025, Manning unilaterally and unsolicited emailed Ryan Costello, Chairman of Mawson's Board of Directors, suggesting that they have a call, or otherwise he would reach out to another Mawson director, Greg Martin. A copy of the July 2, 2025 email from Manning is attached as Exhibit A to the Costello Declaration.

- The Judicial Settlement Conference was held with Judge Clarkson on July 14, 2025. Representatives of Mawson, the Petitioning Creditors, Celsius, and Ionic attended. Unfortunately, the Judicial Settlement Conference did not result in a settlement.

- By email on July 22, 2025, Petitioning Creditors' counsel advised that "Mr. Manning now refused to be deposed (even if fee advancement is offered)." A copy of the email is attached as Exhibit D to the Herz Declaration.

- On July 22, 2025, the parties submitted to Judge Clarkson an Agreed Stipulation (i) setting forth a schedule for depositions;[9] (ii) listing documents to be produced by

---

[9]     The deposition schedule did not include a deposition of Andrew Glenn. Mawson reserves its right to seek testimony from Mr. Glenn in connection with the affidavit he provided in Australia in support of the Liquidator's appointment.

each of Mawson, the Petitioning Creditors, and Manning; and (iii) listing disputed documents. As of the date hereof, neither the Petitioning Creditors nor Manning have produced to Mawson any of the materials that they are required to produced pursuant to the Agreed Stipulation. *See* D.I. 141 ("Agreed Stipulation").

- On July 28, 2025, Mawson's counsel deposed David Marshall and Andrew Martin of Marshall Investments. Mr. Marshall and Mr. Martin and/or their counsel frequently invoked privilege including with respect to the common interest agreement among the parties, and even in situations where it did not appear that their attorneys were involved in the underlying discussions. Among other things, the privilege objections were used as a shield to avoid answering questions regarding (i) communications with Manning, even though Manning is not a petitioning creditor and is not represented by the Petitioning Creditors' counsel (as far as Mawson is aware), (ii) the application of the automatic stay in the Australian liquidation, (iii) the cost sharing among the Petitioning Creditors, and (iv) correspondence between Marshall Investments and the MIG1 Receivers exchanged prior to the MIG1 Receivers joining the common interest agreement in January 2025. Attached hereto as Exhibit A are excerpts from the depositions reflecting certain questionable assertions of privilege under the common interest agreement. Copies of the relevant portions of the transcripts of the depositions of Mr. Marshall and Mr. Martin are attached as Exhibits G and H to the Herz Declaration.

- Only July 29, 2025, Mawson's counsel deposed Darron Wolter of W Capital. Like Mr. Marshall and Mr. Martin, several objections were interposed during Mr. Wolter's deposition based on "privilege" under the common interest agreement.

*See* excerpts in Exhibit A hereto. Copies of the relevant portions of the transcript of Mr. Wolter's deposition are attached as Exhibit I to the Herz Declaration.

- Pursuant to the agreed stipulation, Ray Itaoui was supposed to be deposed on July 30, 2025 but had to reschedule.

8. As of the end of trading on July 29, 2025, Mawson's stock is trading at $0.46, a decline of approximately 75.92% from the $1.91 share price on December 3, 2024, the day before the Petition Date.

## REPLY REGARDING REQUEST FOR A BOND

9. The Motion requests that the Court require the Petitioning Creditors post a bond pursuant to section 303(e) of the Bankruptcy code to indemnify Mawson for such amounts as the Court may later allow under section 303(i) of the Bankruptcy Code.[10] As discussed in the Motion, the Congressional Record and case law clearly establish that involuntary petitions are not to be taken lightly and are not meant to be a tool for creditors to wield for improper purposes, such as out of spite or to embarrass or harass the debtor. *See In re Apollo Health Street, Inc.*, 2011 WL 2118230, at *3 ("Section 303(e) was enacted to discourage frivolous petitions as well as the more dangerous spiteful petitions, based on a desire to embarrass the debtor … or to put the debtor out of business without good cause…"[11] The record in this case, including the evidence contained in the Motion and the recent events set forth herein, strongly call into question the propriety of the Involuntary Petition and the motives of the Petitioning Creditors, such that the Involuntary Petition will ultimately likely be dismissed either for the Petitioning Creditors' failure to satisfy the

---

[10] The full text of section 303(e) states: "After notice and a hearing, and for cause, the court may require the petitioners under this section to file a bond to indemnify the debtor such amounts as the court may later allow under subsection (i) of this section. 11 U.S.C. § 303(e).

[11] *See also* discussion in Motion at ¶s 87-88.

requirements of section 303(b) of the Bankruptcy Code and/or for having filed the Involuntary Petition in bad faith.  As detailed in the Motion, Mawson has suffered significant financial harm due to the Involuntary Petition.

10.    Moreover, while the Petitioning Creditors continue to attempt to downplay Manning's involvement, recent events, including (i) his frequent reference in the Privilege Log, (ii) the mystery common interest agreement that he and the Petitioning Creditors are parties to and which the Petitioning Creditors continue to hide behind under claims of "privilege", (iii) his lead participation during settlement discussions and the Judicial Settlement Conference, and (iv) his unilateral attempt to contact Mawson directors, leave no question as to his central involvement. As noted, the Court already observed during the May 9, 2025 hearing that there was already "some evidence that there may be bad faith on the part of Mr. Manning" and that did not include consideration of the recent developments highlighted herein.

11.    Additionally, the Petitioning Creditors continue to fail to comply with discovery, including as ordered by the Court in the Discovery Order and as agreed to in the Agreed Stipulation in the Judicial Settlement Conference.  Mawson has also been advised that Manning will not voluntarily appear for deposition, meaning that Mawson will have to obtain Manning's deposition through the Hague Convention, a process that is underway and expected to take months.  The discovery process is clearly going to be protracted and expensive, all the while, Mawson's business will still be hampered by the specter of the involuntary case.  A bond is thus necessary to indemnify Mawson through this process.  *See, e.g.*, *In re Commonwealth Securities Corp.*, 2007 WL 309942 (Bankr. N.D. Tex. Jan 25, 2007) (requiring a bond when significant time is required to litigate, including discovery).  The cases cited in the Response regarding "cause" for imposition of a bond

are all more than three decades old and all from outside of the Third Circuit.  *See* Response at ¶ 50.

### A.  Disputed Nature of Claims

12.     The Petitioning Creditors assert that their claims are not disputed.  This overlooks the dispute summaries contained in the Motion and prior communications from Mawson.[12]  The Response also attempts to make much of Mawson's SEC and ASIC filings.  However, pursuant to SEC requirements and GAAP, the Company is required to disclose potential and disputed liabilities in its SEC filings until resolved and the filings are not intended to be admissions regarding the legitimacy or amount of the debts.[13]  *See* Supplemental Regan Declaration at ¶ 2.

13.     The Third Circuit has observed that "if the three filing requirements [of section 303(b)] are not satisfied, we agree the bankruptcy court must dismiss the case; but if the three requirements are satisfied, that doesn't mean the bankruptcy court can't dismiss the case." *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 334 (3d Cir. 2015); *see also In re Luxeyard, Inc.* 556 B.R. 627, 638-39 (Bankr. D. Del. 2016) (observing that a court must dismiss an involuntary petition if it does not meet the prerequisites of section 303 of the Bankruptcy Code); *In re Metrogate*, 2016 WL 3150177, at *8 (Bankr. D. Del. May 26, 2016) ("The § 303 claims cannot be 'contingent as to liability or the subject of a bona fide dispute as to liability or amount.'").

14.     With respect to the language in section 303(b) requiring that petitioning creditors' claims not be contingent as to liability or subject of a bona fide dispute as to liability or amount, since that language was added to the Bankruptcy Code through the Bankruptcy Abuse Prevention

---

[12]     The Response also states that Mawson "did not offer any proposal or alternatives to pay the debts" of Marshall Investments and W Capital.  The parties engaged in settlement discussions approximately one year ago.  Mawson believed at one point that a settlement might be reached, but Marshall Investments and W Capital kept moving the goal posts during the discussions.

[13]     The Response references SEC Form 10-K filings going back to 2021.  Of note, the filings in 2021, 2022, and the first quarter of 2023 were signed by Manning.

and Consumer Protection Act of 2005 ("BAPCPA"), "the majority of courts have concluded that the 2005 amendment changed the analysis such that now *any* dispute as to amount (whether implicating the statutory threshold or not) renders a creditor ineligible." *In re Metrogate*, 2016 WL 3150177, at *10 (*citing Farmers & Merchants State Bank v. Turner*, 518 B.R. 642, 651-54 (N.D. Fla. 2014)); *see also In re Park Place Development Primary, LLC*, 2021 WL 5072976 at *10 (Bankr. D. Del. November 2, 2021) ("the existence of a *bona fide* dispute 'as to the amount of the debt is sufficient to deny a creditor standing to bring an involuntary petition'") (quoting *In re Green Hills Dev. Co., LLC*, 741 F.3d 651, 658 (5th Cir. 2014)); *In re Elverson*, 492 B.R. 831, 842 (Bankr. E.D. Pa. 2013) ("a petitioning creditor lacks standing even if only a portion of her claim is subject to a bona fide dispute") (citing *In re Taub*, 438 B.R. 761, 773-74 (Bankr. E.D.N.Y. 2010); *and In re Hentges*, 351 B.R. 758, 777 (Bankr. N.D. Okla. 2006)); *In re Regional Anesthesia Associates PC*, 360 B.R. 466, 469-70 (Bankr. W.D. Pa (2007) ("Any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a bona fide dispute") (*quoting In re Euro-American Lodging Corp.*, 357 B.R. 700, n. 8 (Bankr. S.D.N.Y. 2007)).

15.    The Third Circuit has adopted the "objective" standard for determining whether a petitioner's claim is subject to a bona fide dispute. A claim is disqualified "'if there is a genuine issue of a material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.'" *B.D.W. Associates, Inc. v. Busy Beaver Bldg. Centers, Inc.*, 865 F.2d 65, 66 (3d Cir. 1989) (quoting and adopting the test from *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986)). Petitioners must first demonstrate that "the amounts claimed . . . are free of any 'objective basis for either a factual or legal dispute as to the validity of the debt;'" the burden then shifts to the alleged debtor, who must "show that the dispute is indeed bona fide."

*In re Metrogate*, 2016 WL 3150177, at *8 (*citing In re AMC Inv'rs¸*406 B.R. 478, 483-84 (Bankr.

D. Del. 2009)).  A court's analysis involves determining "if 'there is an objective basis for either

a factual or a legal dispute as to the validity of the debt.'" *In re Park Place Development Primary,*

*LLC,* 2021 WL 5072976, fn. 78 (quoting *In re Sims*, 994 F.2d 210, 221 (5th Cir. 1993), *cert.*

*denied*, 510 U.S. 1049 (1994). Additionally, a court's objective is to "'ascertain the existence of a

dispute, not to actually resolve the dispute.'  The existence of affirmative defenses may suggest

that a bona fide dispute exists." *In re Metrogate*, 2016 WL 3150177, at * 8 (*quoting In re AMC*

*Inv'rs*, 406 B.R. at 484, and *citing In re Zapas*, 530 B.R. 560, 567 (Bankr. E.D.N.Y. 2015) and *In*

*re Vortex FishingSys., Inc.*, 277 F.3d 1057, 1067 (9th Cir. 2001))

      16.     To summarize the disputes with each Petitioning Creditor:

             *W Capital*

      17.     There are a number of close connections between Manning and W Capital, as

outlined in the Motion, and Mawson understands that Manning and Darron Wolter of W Capital

share a long-standing close personal relationship.  Mawson contests W Capital's asserted claim

and the validity of the underlying loans made by W Capital, including the terms and provisions,

which contain various ambiguities, as well as the need for the W Capital debts, because they appear

to be the product of Manning's self-dealing. It is also unclear what, if any, consideration was

received from W Capital in exchange for Mawson, at Manning's direction, providing a corporate

guarantee on September 29, 2022 for a prior loan dated September 2, 2022.  Mawson also disputes

W Capital's interest calculations and believes that W Capital has overstated interest by hundreds

of thousands of dollars.  W Capital further claims that Manning promised it at least 1,500,000

restricted stock units (RSUs) in Mawson; however, Mawson does not have any authorized board

approvals supporting W Capital's alleged claim and there are no SEC filings noticing the

arrangement.  Mawson advised W Capital of the various disputes by letter dated June 26, 2024.
*See* Exhibit A to Mawson's Answer.

### *Marshall Investments*

18.     Mawson disputes the amount of Marshall Investments' claim, including the
calculation of penalty interest, potential offsets, improperly treating a force majeure event (a flood)
as a material default, and a refusal by Marshall Investments (through the MIG1 Receivers, as
discussed below) to collect collateral that would reduce the balance of its claim.  With respect to
the disputed interest calculation, Marshall Investments issued a statutory demand in Australia on
or about May 28, 2023.  However, instead of applying the standard commercial interest rate,
Marshall Investments has improperly applied penalty interest beginning several months prior to
issuing the statutory demand.  Mawson advised Marshall Investments of these disputes by letter
dated June 17, 2024.  *See* Exhibit B to Mawson's Answer.

19.     Additionally, Marshall Investments' loan is subject to a security agreement with
MIG1 dated December 9, 2021 (which was guaranteed by Mawson). The collateral, consisting of
cryptocurrency mining equipment, is being held in storage in Midland, Pennsylvania. Through
multiple communications in or around May 2024, Mawson advised the MIG1 Receivers that they
can collect the collateral "as soon as possible."  *See* Exhibit A attached to the Supplemental Regan
Declaration. To date, the MIG1 Receivers have refused to collect this collateral and apply it to
Marshall Investments' claim. In the meantime, the collateral has depreciated in value and Mawson
has incurred significant storage fees and insurance charges, while Marshall Investments' asserted
claim continues to accrue interest.

20.     Finally, as noted in the Motion, Mawson entered into the W Capital and Marshall Investments' loans at the direction of Manning while he was CEO of the Company.[14] There are real questions about the propriety of the loans. In particular, from 2021 to 2023, Manning caused Mawson to remit over A$11.4 million to his company, Flynt ICS, for unnecessary shipping services that took extremely circuitous and expensive routes across the globe.  The principal combined balance of the Marshall Investments and W Capital loans is approximately $8.7 million. These are funds the company may not have needed in the first instance but for Manning's desire to utilize Mawson to line the pockets of his other enterprises.

### *Rayra*

21.     Rayra acquired its claim from Marshall Investments and is therefore subject to the same disputes.  Additionally, as discussed at length in the Motion, the evidence strongly indicates that Rayra acquired its small claim, constituting just 0.41% of Marshall Investment's overall claim, shortly before the Petition Date for the purposes of commencing this involuntary case in contravention of Bankruptcy Rule 1003(a).  Mawson submits that both Marshall Investments and Rayra are therefore disqualified as petitioning creditors.

### *MIG1 Receivers*

22.     Notably, the insolvency proceedings against MIG1 were initiated by Manning's company, Flynt ICS.  *See* Response at ¶ 24.  The MIG1 Receivers were thereafter appointed at the direction of Marshall investments in March 2024.  *See* Exhibit 8 to Declaration of Greg Martin filed in support the Motion [D.I. 102-8].  The MIG1 Receivers claim that certain intercompany transactions between MIG1 and Mawson as the parent company show that Mawson "owes"

---

[14]     As noted above, it was recently disclosed that Manning-related entities acquired a small interest in one of Marshall Investment's funds in January 2023 while Manning was CEO of Mawson.

$3,762,445.41 to MIG1. This position ignores the nature of the intercompany transactions between Mawson and MIG1, including the immense value that MIG1 received from Mawson. In particular, Mawson provided MIG1 with at least approximately $32 million in cryptocurrency mining equipment and paid for the costs to operate the equipment. *See* Supplemental Regan Declaration at ¶ 3. MIG1 never reimbursed Mawson for these expenses, which were written down on Mawson's books in accordance with GAAP. *Id.* Without the equipment and Mawson's payment of operational expenses, MIG1 would not have been able to generate any revenue, including any revenue that upflowed to its parent company, Mawson. If anything, Mawson has a substantial claim against MIG1 Mawson. Indeed, on February 14, 2025, Mawson submitted a Formal Proof of Debt Claim in the Australian Deed of Arrangement proceedings of its subsidiary, Mawson Infrastructure Group Ptd Ltd, reflecting, among other things, an intercompany receivable due from MIG1 for A$47,270,870.23. A copy of the Formal Proof of Debt Claim is attached as Exhibit B to the Supplemental Regan Declaration.

23.     Additionally, as discussed above, Marshall Investments' loan is subject to a security agreement with MIG1. The MIG1 Receivers have refused to collect the collateral, which could be used to reduce Marshall Investment's asserted claim.

### *Mawson Services Liquidators*

24.     The Response asserts that Mawson has not asserted any factual or legal dispute with respect to the Mawson Services Liquidators' claim. This ignores the fact that the Mawson Services Liquidators only joined the Involuntary Petition on May 27, 2025. Like the MIG1 Receivers, the Mawson Services Liquidators assert a claim against Mawson from an intercompany loan for A$299,116.08. Like the dispute with the MIG1 Receivers, this purported claim is the result of a mischaracterization of the entities' books and records. There is no documentation memorializing

a loan transaction between Mawson and Mawson Services. Instead, in accordance with GAAP, general ledger entries were made with respect to intercompany transactions. Such book entries were recorded following GAAP, reconciled in the ordinary course of business and eliminated in the consolidated financials, resulting in a zero-balance between the entities. Like the alleged claim of MIG1, to characterize certain intercompany transactions between Mawson and Mawson Services as resulting in a "loan repayable" is to ignore the offsetting ledger entries that reconcile such transactions—all of which were done in accordance with GAAP.

### B.  Lack of Numerosity and Inability to Cure

25.    The Motion addresses in detail the likely disqualification of Marshall Investments and Rayra as petitioning creditors under Bankruptcy Rule 1003(a) due to the evidence indicating that Rayra acquired a minute portion of Marshall Investments' claim ostensibly for the purpose of filing the Involuntary Petition.

26.    The Petitioning Creditors effectively admit in discussions (as detailed in the Motion) and their Response that the MIG1 Receivers and Mawson Services Liquidators were added as petitioning creditors in an attempt to "cure" potential disqualifications of Marshall Investments and Rayra.  MIG1 and Mawson Services are both subsidiaries of Mawson and, upon information and belief, the respective receivers and liquidators were appointed by and act at the direction of the Petitioning Creditors.

27.    Notably, section 303(b)(2) of the Bankruptcy Code specifically excludes insiders from being petitioning creditors.[15]  *See, e.g.*, *In re Gills Creek Parkway Assocs. LP*, 194 B.R. 59, 62 (Bankr. D.S.C. 1995) (holding that insiders cannot be a petitioning creditor); *accord In re*

---

[15]    Section 303(b)(2) states in relevant part: "An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title – (2) if there are fewer than 12 such holders [of claims], *excluding any employee or insider of such person*…" 11 U.S.C. § 303(b)(2) (emphasis added).

*Runaway II, Inc.*, 168 B.R. 193, 196 (Bankr. W.D.Mo. 1994) ("Thus, to file a petition under (b)(2), a creditor must not hold a claim that is not contingent, subject to a bona fide dispute, nor be the claim of an employee, insider, or transferee of an avoidable transfer."); *In re Colon*, 474 B.R. 330 (Bankr. D.P.R. 2012).   Mawson submits that the MIG1 Receivers and the Mawson Services Liquidators, as extensions of MIG1 and Mawson Services, subsidiaries of Mawson, cannot be a petitioning creditors.

28.     Furthermore, although section 303(c) of the Bankruptcy Code allows for creditors holding non-contingent unsecured claims to join an involuntary petition, Judge Silverstein in *In re Luxeyard* discussed the potentially troubling aspects of the joinder provisions in instances where there are deficiencies or potential bad faith:

> The joinder permitted by section 303(c) creates a potentially troubling scenario where a petition as originally filed is deficient, but is later cured by the addition of a joining creditor. Some courts have expressed concern at this situation, noting that a creditor might attempt to "circumvent" the prerequisites of an involuntary bankruptcy by knowingly filing a deficient, original petition and then later curing the deficiency with a joinder. Courts have noted that the filing of a deficient petition is problematic because the prerequisites to an involuntary case are not "meaningless formalities," but rather serve to protect an alleged debtor from the negative effects of bankruptcy.
>
> In light of this concern, some courts have limited joinders using the judicially created bar to joinder doctrine. The doctrine provides that if a party files a petition in bad faith, a court will prohibit other creditors from curing the petition by later joining under section 303(c). The cases cited by the parties as well as the cases reviewed by the Court reveal that courts have applied the doctrine to one type of bad faith filing: when a petitioner knows at the time of filing that the petition does not satisfy the prerequisites of section 303. Application of the doctrine in such circumstances is consistent with the purpose of the doctrine, which is to protect the integrity of the statutory prerequisites.

*In re Luxeyard*, 556 B.R. at 639 (internal citations omitted).

29.     The Third Circuit has also observed that "[m]ost courts" have found that an involuntary petition filed in bad faith cannot be cured by joining of good-faith creditors. *In re Forever Green Athletic Fields*, 804 F.3d at 337-38; *see also In re Elsub, Corp.*, 70 B.R. 797, 815 (Bankr. D. N.J. 1987) ("intervention [of additional creditors] may be disallowed where the court finds that the petition was filed in bad faith or for the purpose of improperly invoking the bankruptcy court's jurisdiction."). Courts in this jurisdiction have expressed concerns where recalcitrant creditors recruit creditors that they effectively control for the purpose of meeting the numerosity requirement. *See In re PTGi International Carrier Services, Inc.*, 2025 WL 825248, at *3 (Bankr. D. Del. March 14, 2025) (the purpose of the numerosity requirement is to avoid a "recalcitrant creditor who is more concerned with a collection action than with the alleged debtor's well-being as a going concern."); *In re Metrogate*, 2016 WL 3150177, at *13.

30.     Given the mounting evidence of the Petitioning Creditors' bad faith in initiating this involuntary case, including in manufacturing creditors from their tightly controlled cabal in Australia, beginning with Rayra and then through the joinders of the MIG1 Receivers and Mawson Services Liquidators (and going so far as having a fiduciary replaced that would not agree to join the Involuntary Petition), who are all represented by the same counsel, the lack of numerosity cannot be cured here even if the joining creditors were good faith creditors and not insiders of Mawson.

**C. Bad Faith**

31.     As noted in the Motion, the Third Circuit has observed good faith as "an independent basis for dismissing an involuntary petition," applying even when petitioning meet the statutory requirements of section 303(b). *In re Forever Green Athletics Fields, Inc.*, 804 F.3d 328, 330 (3d Cir. 2015); *see also In re PTGi International Carrier Services, Inc.,* 2025 WL 825248.

For instance, "[c]reditors who file petitions 'as a litigation tactic in pending proceedings' act in bad faith.'" *In re Metrogate*, 2016 WL 3150177, at *12 (*quoting In re Forever Green*, 804 F.3d at 334).

32.     The Petitioning Creditors' response again glosses over the wealth of evidence thus far indicating that the Involuntary Petition was likely filed in bad faith as part of the Petitioning Creditors and Manning's vendetta against Mawson.  The Petitioning Creditors go so far as to state that that "the fact remains that the Alleged Debtor can provide no evidence that the Petitioning Creditors are colluding with Manning to exact some king of vengeance on Mawson, or that the Initial Petitioning Creditors filed the Involuntary Petition for such purpose."  Response at ¶ 66.  As noted, the Court already observed at the May 9, 2025 hearing that it is "convinced … that there is some relevance to [Manning's] role" and that Mawson has "presented some evidence that there may be bad faith on the part of Mr. Manning, whether it involves [the Petitioning Creditors] or not."  This led the Court to entering the Discovery Order compelling the Petitioning Creditors to respond to various discovery requests and directing the issuance of letters rogatory under the Hague Convention for Manning's deposition.  Recent events, including Manning's frequent reference in the Privilege Log, his lead participation during settlement discussions and the Judicial Settlement Conference, attempts to unilaterally contact Mawson directors, and the common interest agreement that has not been produced but that the Petitioning Creditors hide behind on assertions of "privilege" reflect concerted efforts among the Petitioning Creditors and Manning.[16]

---

[16]     The Petitioning Creditors' Response states that common interest agreement is just an "information-sharing agreement" that includes Manning.  *See* Response at ¶s 47-48.  If that is the case, it is unclear why it cannot be produced and what grounds the Petitioning Creditors have to use it as a shield to assert privilege protections.

33.     Additionally, like Judge Horan's recent opinion in the *PTGi International Carrier Services* case as highlighted in the Motion, Judge Carey's decision in *In re Metrogate LLC* is instructive, as the court dismissed the involuntary petition based on the fact that: (1) the petitioning creditors did not meet the statutory requirements of section 303; (2) the petitioning creditors' inquiry into the facts and pertinent law before filing was lacking; (3) the involuntary petition was invoked to obtain a tactical advantage in an ongoing dispute through forum shopping; and (4) the involuntary petition was suspiciously timed. *See generally In re Metrogate LLC*, 2016 WL 310177 (Bankr. D. Del. May 26, 2016).

34.     Each of the aforementioned factors are present here.  Most notably, the Petitioning Creditors at several turns have apparently not ascertained the facts and pertinent law.  This is evident in manufacturing Rayra as a creditor in violation of Bankruptcy Rule 1003(a) and then attempting to replace Marshall Investments and Rayra with creditors that are controlled by the Petitioning Creditors (to the point where they replaced a receiver that would not join the Involuntary Petition) and whose claims are subject to disputes and who are likely ineligible to join as insiders and due to bad faith.  This is further evident in the Petitioning Creditors' blatant violation of the automatic stay, which despite the misstatement of their counsel in his affidavit in Australia, clearly applies in involuntary proceedings based on the plain language of section 362(a) of the Bankruptcy Code.  The Petitioning Creditors still do not appear to appreciate the application of the automatic stay as they state in the Response that its premature for the Court to consider sanctions at this point because their Stay Motion has not yet been heard.

35.     The Involuntary Petition was also suspiciously timed, as it was filed just days before Mawson was to make its ATM offering, and after the Petitioning Creditors had already commenced a proceeding in Australia against Mawson.  It is anticipated that further discovery,

including Manning's eventual deposition, will only add to the existing evidence of bad faith and collusion.

36.      Finally, it is notable that in the nearly eight (8) months since the Petition Date, no creditors have joined the Involuntary Petition outside of the Petitioning Creditors' closely knit cabal in Australia, and that the Petitioning Creditors are all represented by the same counsel.

37.      All told, there is ample evidence that the Involuntary Petition should be ultimately dismissed either due to the Petitioning Creditors failure to satisfy the requirements of section 303(b) of the Bankruptcy Code and/or due to bad faith.  The economic harm Mawson has suffered due the skuttling of the ATM, the decrease in stock price and potential NASDAQ delisting, and general impact on business due to the involuntary case, has been substantial.  Moreover, the Petitioning Creditors have repeatedly exhibited a reluctance to comply with discovery and hide behind phantom assertions of privilege.  It is likely that significant additional motion practice will be needed to obtain discovery, in addition to whatever further efforts will likely be needed to obtain Manning's deposition.  The costs to Mawson have been immense, and a bond is warranted given the conduct of the Petitioning Creditors.

## REPLY REGARDING REQUEST FOR SANCTIONS FOR VIOLATION OF THE AUTOMATIC STAY

38.      The Motion further seeks the imposition of sanctions against the Petitioning Creditors and the Liquidator under sections 363(k) and 105(a) of the Bankruptcy Code for violating the automatic stay in continuing the Australian liquidation proceedings against Mawson for months after the Petition Date, culminating in the Liquidator's appointment in February 2025.

39.      The Petitioning Creditors' Response appears to misunderstand the scope and application of the automatic stay.  The Response states, "[a]s an initial matter, because the Stay Relief Motion … remains pending, any request for sanctions for violation of the automatic stay is

premature." *Response* at ¶ 69.  This implies that the Petitioning Creditors believe that a violation of the stay has not yet occurred because their motion has not yet been heard.[17]  The Petitioning Creditors also attempt to argue that the fact that Mawson is disputing the Involuntary Petition somehow negates the automatic application of the stay. *Id.* at ¶s 45, 70.  The Petitioning Creditors and Liquidator offer no legal support for their positions.

40.    In contrast, as discussed in the Motion, the plain language of section 362(a) of the Bankruptcy Codes provides that "a petition filed under section … 303 of this title … operates as a stay, applicable to all entities, of (1) the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title[.]"  11 U.S.C. § 362(a)(1).  The Motion also cites a number of cases noting that the filing of an involuntary petition results in the imposition of the automatic stay, and that the automatic stay is effective with respect to parties located anywhere in the world.  *See* Motion at ¶s 117-118.  Further, "judicial actions and proceedings against the debtor [that violate the automatic stay] are void *ab initio*." *Mar Elec. Co. v. United Jersey Bank*, 959 F.2d 1194, 1206 (3d Cir. 1991).  Courts have specifically found that post-petitions appointments of a fiduciary, like a receiver, are *void ab initio* absent relief from the stay. *See, e.g.*, *Federal Home Mortg. Corp. v. Holme Circle Realty Corp.*, 146 B.R. 135, 137 (E.D. Pa. 1992 (finding that the appointment a receiver constituted "an act 'to exercise control over [a property interest] of the estate' and thus would be barred by the automatic stay…"); *Matter of Edisto Resources Corp.*, 158 B.R. 954 (Bankr. D. Del. 1993) (finding that appointment of a receiver in which debtors were majority shareholders was a violation of the automatic stay); *In re*

---

[17]    As an aside, the Petitioning Creditors have not noticed the Stay Motion.

*Bello*, 612 B.R. 389 (Bankr. E.D. Mich. 2020) (similar holding). Perhaps most apt to the present situation, "[i]t would fly in the face of the Bankruptcy Code for this Court to recognize the petitions here and authorize the post-petition appointed Receivers to proceed in the United States when they were appointed as the result of a knowing and willful violation of the stay." *In re Gold & Honey, Ltd.*, 410 B.R. 357, 368 (Bankr. E.D.N.Y. 2009). Consequently, the Liquidator's appointment is void as a matter of law.

41.     Here, the offensive act was the Petitioning Creditors continuing the Australian liquidation proceeding notwithstanding that they also commenced this involuntary case, giving rise to the automatic stay. Given the circumstances, it stretches credulity to believe that the Petitioning Creditors acted in good faith in violating the automatic stay and subsequently seeking relief in the Stay Motion.

42.     Even if the Petitioning Creditors were somehow acting in good faith when violating the automatic stay, the Third Circuit has observed that the reference to "willful violation" of the stay in section 362(k) of the Bankruptcy Code does not mean with the intention of violating the automatic stay. Rather, "[a] willful violation of the stay occur where the stay has been violated 'with knowledge that the bankruptcy petition has been filed. Willfulness does not require that the creditor intend[ed] to violate the automatic stay provision, rather it requires that the acts which violate the stay be intentional.'" *In re Toppin*, 637 B.R. 88, 109 (Bankr. E.D. Pa. 2021) (*quoting In re Lansaw*, 853 F.3d 657, 664 n. 4 (3d Cir. 2017)). *See also In re Lansdale Family Restaurants, Inc.*, 977 F.2d 826, 829 (3d Cir. 1992) (*citing In re University Medical Center*, 973 F.2d 1065, 1087-88 (3d Cir. 1992) ("It is a willful violation of the automatic stay when a creditor violates the stay with knowledge that the bankruptcy petition has been filed."); *In re Peregrine Systems, Inc.*, 314 B.R. 31, 51 (Bankr. D. Del. 2004) (reversed in part and remanded on other grounds) (*quoting*

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. General Motors Corp.*, 337 F.3d 314, 320 n. 8 (3d Cir. 2003) ("[A] 'willful' violation of the stay does not mean that the creditor have intended to violate the stay, only that the creditor acted 'with knowledge that the bankruptcy petition has been filed ... it requires that the acts which violate the stay be intentional.").[18]

43.     The Petitioning Creditors unquestionably had knowledge of this involuntary case since they commenced it.  Further, Mawson, through its general counsel, Kaliste Saloom, advised the Australian court of the existence of the automatic stay in an affidavit submitted in that proceeding on February 4, 2025.[19]  In that affidavit, Mr. Saloom stated that "[t]he Petitioners have elected to avail themselves of the personal and subject matter jurisdiction of the U.S. Bankruptcy Courts in their filing of the Petition.  The Petitioners have also subjected themselves to the authority of the U.S. Bankruptcy Court to stay any enforcement actions against the Company while the involuntary proceedings are in litigation."[20]  The affidavit further included a reproduction of section 362(a) of the Bankruptcy Code.[21]  Incredibly, the Petitioning Creditors' counsel, Andrew Glenn, submitted an affidavit in response on February 10, 2025, stating "[d]uring this pending period, the Bankruptcy Court has jurisdiction to grant stays of legal proceedings against the Chapter 11 debtor, in this case Mawson."  That is an incorrect recitation of the law of the *automatic* application of the automatic stay in this proceeding.  Mr. Glenn's affidavit misled the Australian court on the application of the automatic stay, but for which the Australian tribunal court may not have appointed the Liquidator.

---

[18]     *See also* cases cited in Motion at ¶ 119.

[19]     A copy of Mr. Saloom's affidavit (the "Saloom Affidavit") is included with materials annexed as Exhibit B to the Declaration of Andrew K. Glenn filed in support of the Stay Motion.

[20]     Saloom Affidavit at ¶ 28.

[21]     *Id*.

44.     The timing of the filing the Petitioning Creditors' Stay Motion also speaks to their bad faith motives.  The Stay Motion was filed five (5) months after the Petition Date, nearly three (3) months after the Liquidator was appointed, and more than two (2) months after Mawson's counsel first raised the issue during a hearing on February 26, 2025, yet also just seven (7) days before the hearing on the Discovery Motions and eleven (11) days before trial was scheduled. Likely realizing with the impending Discovery Motions that in filing the Involuntary Petition, the Petitioning Creditors weaved a tangled web fraught with a variety of missteps signaling their true intentions that may well lead to a dismissal of this case for bad faith and resulting sanctions, the Petitioning Creditors filed the Stay Motion in a desperate attempt to avoid being held to account and to pivot to an alternative strategy that they concocted in violation of the stay so that they can continue to harass Mawson through a chapter 15 filing.  Through the Stay Motion, the Petitioning Creditors are asking permission to have their cake and eat it too.

45.     Finally, the Petitioning Creditors and the Liquidator blithely assert that sanctions are not warranted because Mawson has not suffered any identifiable harm. First, as reflected in the cases cited above and in the Motion, identifiable harm is not part of the analysis.  It only must be shown that the Petitioning Creditors were aware of the bankruptcy filing (they were) and that they acted in violation of the stay (they did).   Nonetheless, the Petitioning Creditors' conduct is egregious.  They continued the Australian liquidation proceeding for months after the Petition Date, with a misstatement of law from their counsel, in violation of the automatic stay.  They only sought relief from the stay, five (5) months into this case, as an escape valve.  The conduct is consistent with many other actions that have been documented in Mawson's filings that reflect the Petitioning Creditors true intentions to harass and dismember Mawson.   The fact that the Petitioning Creditors would term continuing this proceeding as a "waste of resources" after

everything that has occurred is the height of hypocrisy. Mawson has been significantly harmed by the Petitioning Creditors' games and their conduct should not be countenanced. Here, they clearly violated the automatic stay and sanctions are warranted, particularly given the totality of the circumstances.

## **CONCLUSION**

WHEREFORE, as set forth herein, Mawson requests entry of an order substantially in the form attached as **Exhibit A** to the Motion (i) granting the Motion; (ii) requiring the Petitioning Creditors to post a substantial bond; (iii) finding that the Petition Creditors and the Liquidator violated the automatic stay and imposing appropriate sanctions; and (iv) granting such other and further relief as the Court deems just and proper.

Dated: July 30, 2025

**FOX ROTHSCHILD LLP**

*/s/ Seth A. Niederman*
Seth A. Niederman (No. 4588)
Stephanie Slater Ward (No. 6922)
1201 North Market Street, Suite 1200
Wilmington, DE 19801
Telephone: (302) 654-7444
Email: sniederman@foxrothschild.com
Email: sward@foxrothschild.com

 -and-

Michael A. Sweet (admitted *pro hac vice*)
345 California Street, Suite 2200
San Francisco, California 94104
Telephone: (415) 364-5540
Facsimile: (415) 391-4436
Email: msweet@foxrothschild.com

-and-

Michael R. Herz (admitted *pro hac vice*)
49 Market Street
Morristown, NJ 07960
Telephone: (973) 548-3330

Email: mherz@foxrothschild.com

*Counsel to the Alleged Debtor*

## CERTIFICATE OF SERVICE

I, Seth A. Niederman, certify that I am not less than 18 years of age, and that service of the foregoing was caused to be made on July 30, 2025, via CM/ECF upon those parties registered to receive such electronic notifications and served additionally on the attached by first-class mail or electronic mail.

Date: July 30, 2025

*/s/ Seth A. Niederman*
Seth A. Niederman

**By Electronic Mail**

**MORRIS NICHOLS, ARSHT & TUNNELL LLP**
Robert J. Dehney, Sr.
Tamara K. Mann
Luke Brzozowski
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
tmann@morrisnichols.com
lbrzozowski@morrisnichols.com

– and –

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn
Margaret J. Lovric
Esther Hong
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
 mlovric@glennagre.com
 ehong@glennagre.com

**By First-Class Mail**
U.S. Trustee
Office of the United States
Trustee J. Caleb Boggs Federal Building
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801

174979210.2