## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>MAWSON INFRASTRUCTURE GROUP, INC.<br><br>Alleged Debtor. | Chapter 11<br><br>Case No. 24-12726 (MFW) |

## DECLARATION OF MICHAEL R. HERZ IN SUPPORT OF THE REPLY OF MAWSON INFRASTRUCTURE GROUP INC. IN SUPPORT OF ITS MOTION (I) FOR A BOND PURSUANT TO 11 U.S.C. § 303(e), AND (II) FOR SANCTIONS FOR WILLFUL VIOLATION OF THE AUTOMATIC STAY

I, Michael R. Herz, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1.     I am a partner at the law offices of Fox Rothschild LLP, counsel to Mawson Infrastructure Group, Inc. ("Mawson" or the "Alleged Debtor" or the "Company"), in the above-captioned involuntary bankruptcy case.  I make this declaration in support of the *Reply of Mawson Infrastructure Group Inc. in Support of its Motion (i) for a Bond Pursuant to 11 U.S.C. § 303(e); and (ii) for Sanctions for Willful Violation of the Automatic Stay* (the "Reply").[1]

2.     Attached hereto as **Exhibit A**, is a copy of a text message I received from Andrew Glenn, counsel to the Petitioning Creditors, on June 19, 2025.

3.     Attached hereto as **Exhibit B**, is a true and correct copy of the transcript from the hearing held on May 9, 2025 in this matter.

---

[1]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in *Mawson Infrastructure Group Inc.'s Motion (I) For a Bond Pursuant to 11 U.S.C. § 303(e) and (II) for Sanctions for Violation of the Automatic Stay* [Docket No. 88 (sealed); Docket No. 101 (redacted)] (the "Motion") or the Reply, as applicable.

4.      Attached hereto as **<u>Exhibit C</u>**, is a true and correct copy of an email from Andrew Glenn dated June 19, 2025.

5.      Attached hereto as **<u>Exhibit D</u>**, is a true and correct copy of an email from Andrew Glenn dated July 22, 2025.

6.      Attached hereto as **<u>Exhibit E</u>**, is a copy of *Marshall Investments MIG Pty LTD's Second Supplemental Responses and Objections to the Alleged Debtor's First Set of Interrogatories* which were produced on June 3, 2025.

7.      Attached hereto as **<u>Exhibit F</u>** is a true and correct copy of the discovery requests which Mawson served upon Cameron Hamish Gray, as Purported Liquidator to Mawson Infrastructure Group Inc. on June 12, 2025.

8.      Attached hereto as **<u>Exhibit G</u>** is a true and correct copy of an excerpt from the deposition transcript from the deposition of David Marshall conducted on July 28, 2025.

9.      Attached hereto as **<u>Exhibit H</u>** is a true and correct copy of an excerpt from the deposition transcript from the deposition of Andrew Martin conducted on July 28, 2025.\\

10.     Attached hereto as **<u>Exhibit I</u>** is a true and correct copy of an excerpt from the deposition transcript from the deposition of Darron Wolter conducted on July 29, 2025.

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge, information, and belief.


Executed On: July 30, 2025                                   */s/ Michael R. Herz*
                                                             Michael R. Herz

# Exhibit "A"

iMessage
Today 12:56 PM

Is this Michael Herz?

Yes.  Andrew?

Delivered

Yeah.  Didn't want to mention this.
But the word I'm getting is that
you guys may be fired because of
your connections to this mess.
You can turn that around if it's true
by resolving this promptly.

The sender is not in your contact list.
Report Junk

# Exhibit "B"

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

```
IN RE:                          .  Chapter 11
                                .  Case No. 24-12726 (MFW)
MAWSON INFRASTRUCTURE           .
GROUP, INC.,                    .
                                .
                                .  Courtroom No. 4
                                .  824 Market Street
            Alleged Debtor.  .  Wilmington, Delaware 19801
                                .
                                .  Friday, May 09, 2025
. . . . . . . . . . . . .  11:30 a.m.
```

TRANSCRIPT OF ZOOM HEARING
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY JUDGE

<u>APPEARANCES</u>:

```
For the
Alleged Debtor:            Seth A. Niederman, Esquire
                           FOX ROTHSCHILD, LLP
                           919 North Market Street
                           Suite 300
                           Wilmington, Delaware 19899

                           -and-

                           Martin R. Martos II, Esquire
                           321 North Clark Street
                           Suite 1600
                           Chicago, Illinois 60654

APPEARANCES CONTINUED)

Audio Operator:            Lesa Neal, ECRO

Transcription Company:     Reliable
                           The Nemours Building
                           1007 N. Orange Street, Suite 110
                           Wilmington, Delaware 19801
                           Telephone: (302)654-8080
                           Email:  gmatthews@reliable-co.com
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1   APPEARANCES (CONTINUED):

2   For the Petitioning
    Creditors:                Andrew K. Glenn, Esquire
3                             GLENN AGRE BERGMAN FUENTES, LLP
                              1185 Avenue of the Americas
4                             22nd Floor
                              New York, New York 10036
5
    For Celsius
6   Network, Ltd. and
    Celsius Mining, LLC:      Keith H. Wofford, Esquire
7                             WHITE & CASE, LLP
                              Southeast Financial Center
8                             200 South Biscayne Boulevard
                              Suite 4900
9                             Miami, Florida 33131

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTIONS:                                                      PAGE

3    Agenda
     Item 1:    Alleged Debtor's Motion to Compel Discovery          4
4               and Depositions
                [D.I. 69; Filed April 24, 2025]
5
                Court's Ruling:                                      34
6
     Agenda
7    Item 2:    Amended Motion to Compel Petitioning Creditors       4
                to Produce James Manning and David Marshall
8               for a Deposition or Alternatively Issuing a
                Request for International Judicial Assistance
9               Pursuant to the Hague Convention of 18 March
                1970 on the Taking of Evidence Abroad in Civil
10              or Commercial Matters (Filed Under Seal)
                [D.I. 72; Filed April 24, 2025]
11
                Court's Ruling:                                      34
12
     Agenda
13   Item 3:    Motion of Celsius Network Limited for               39
                Sanctions Against Mawson Infrastructure Group,
14              Inc. Pursuant to the Court's Inherent
                Authority and 11 U.S.C. § 105(a)
15              [D.I. 73; Filed April 24, 2025]

16              Court's Ruling:                                      57

17

18   Transcriptionists' Certificate                                 60

19

20

21

22

23

24

25

1        (Proceedings commenced at 11:30 a.m.)

2            THE COURT:  Good morning, this is Judge Walrath.

3   We're here in the Mawson case.

4            Mr. Niederman, I see you're here.

5            MR. NIEDERMAN:  Good morning, Your Honor.  Nice to

6   see you.

7            THE COURT:  You, too.

8            MR. NIEDERMAN:  May I proceed?

9            THE COURT:  You may proceed.

10           MR. NIEDERMAN:  Thank you, Your Honor.

11           For the record, Seth Niederman, on behalf of the

12  alleged Debtor.  We did an amended agenda this morning.  I'm

13  going to be walking the Court through the first two items.

14  If it would be okay to proceed with those, I'll get started.

15           THE COURT:  Uh-huh.

16           MR. NIEDERMAN:  So, the first two items are the

17  two discovery motions that were filed by the alleged Debtor,

18  one being a motion to compel discovery and depositions of

19  Petitioning Creditors, the other to compel Petitioning

20  Creditors to produce James Manning for a deposition.

21           Given the overlap in the two motions, my plan is

22  to address them together, which is consistent with how the

23  Petitioning Creditors responded to the motions.  At a high

24  level, these motions were brought because although the

25  Petitioning Creditors contend that this is a simple case,

1  they ignore the broad and liberal standards attached to

2  discovery and summarily disregard the extensive and

3  legitimate factual assertions raised by Mawson in this

4  involuntary case; namely, that the Petitioning Creditors

5  failed to satisfy the requirements of Section 303(b) of the

6  Code, and that this case should be dismissed, as it was filed

7  in bad faith, as part of the Petitioning Creditors' efforts

8  to dismember the alleged Debtor, Mawson.

9        It's detailed in-depth of Mawson's recently filed

10  bond motion.  The Petitioning Creditors have been playing

11  games throughout these proceedings, beginning with the timing

12  of the filing of the involuntary petition, which was on the

13  eve of the "at the market" offering by Mawson and through

14  their continuing efforts to manufacture creditors both, pre-

15  and post-petition.  These games have continued into discovery

16  through, among other things, Petitioning Creditors' refusal

17  to provide discovery related to James Manning, which they now

18  admit Mr. Manning was involved since the inception of these

19  cases.

20        To put it simply, the Petitioning Creditors are

21  not acting like parties interested in promoting a potential

22  bankruptcy estate.  Perhaps the most glaring is the recent

23  stay motion that was filed by the Petitioning Creditors.

24  Through that motion, which was filed just 11 days before the

25  scheduled trial of this matter, they've admitted to violating

1  the automatic stay for months by continuing liquidation

2  proceedings against the alleged Debtor in Australia,

3  including with support of affidavits from their U.S.

4  bankruptcy counsel, where they argue that this involuntary

5  case that they initiated is a waste of resources.

6          Extraordinarily, they want this Court to sanitize

7  their conduct so that they can continue their harassment

8  campaign against Mawson by pivoting to an alternative

9  strategy in a desperate attempt to evade further scrutiny and

10 potential consequences of their bad faith actions.  This

11 backdrop highlights the importance of the relief requested in

12 these motions to compel.

13          Now, to frame the motions, I think it would be

14 helpful to give a little background on Mr. Manning's history

15 with Mawson.

16          THE COURT:  I don't think we need that.  I read

17 the papers.

18          MR. NIEDERMAN:  Understood.

19          Well, with that history, Your Honor -- and thank

20 you for letting me know that; I'll save my voice a little

21 bit -- Mawson, generally, denied the allegations set forth in

22 the involuntary petition and argues that the petition was

23 filed by Manning with the assistance of the Petitioning

24 Creditors in bad faith with the improper purpose to harass

25 and intimidate Mawson.

1        Mawson also alleges that the assignment agreement

2   between the Petitioning Creditors, Marshall Investments, and

3   Rayra was manufactured solely to meet the numerosity

4   requirements of 303(b) of the Code, in violation of

5   Rule 1003(a).

6        So with those allegations and the answer, as would

7   be expected, the discovery served by Mawson seeks to explore

8   these issues, among others; specifically, Mawson seeks

9   discovery relating to Manning's relationship with the initial

10  Petitioning Creditors and his involvement with the

11  involuntary bankruptcy against Mawson.  It also seeks

12  information concerning ownership and business structure of

13  the initial Petitioning Creditors, as well as the initial

14  Petitioning Creditors' decision to file the involuntary

15  petition and the relationship between Marshall Investments

16  and Rayra and their related assignment agreement.

17       The creditors and Mawson exchanged responses to

18  discovery and made some initial productions, but throughout,

19  the Petitioning Creditors have refused to answer questions

20  concerning Manning's involvement or to try to deny that

21  Manning was involved in these proceedings in an effort to

22  refuse to produce any documents relating to Manning's

23  involvement.

24       There were deficiency letters sent and meet-and-

25  confers that occurred and at some point, counsel for the

1    Petitioning Creditors eventually agreed that they will

2    include all non-privileged communications and documents

3    relating to Manning in their responsive document production;

4    however, the discovery responses remain deficient and the

5    Petitioning Creditors have not amended their request for

6    production responses to specify which request they reproduced

7    documents to, or advised how the documents were searched for,

8    or gathered for production.

9             Apparently, this process was conducted by

10   Australian counsel for the Petitioning Creditors and it's

11   unclear whether bankruptcy counsel was involved in the

12   collection or review process.  We don't have any of that

13   information.  What search terms were used and who conducted

14   that, whether it was a self-gathered collection process and

15   review process; we don't have the insight into any of that.

16            Thus far, there's been a limited number of

17   documents that have been produced by the Petitioning

18   Creditors, W Capital, and Marshall; however, none of the

19   documents include communications between Manning and the

20   Petitioning Creditors, related to the bankruptcy filing.

21   Likewise, Marshall has not produced documents related to the

22   assignment to Rayra and counsel for the Petitioning Creditors

23   advised us that the single responsive document for Rayra that

24   was located is privileged.

25            The Petitioning Creditors claim that this document

1  production remains ongoing; however, no additional documents

2  have been produced by W Capital or Marshall and, again,

3  nothing has been produced by Rayra.  Notably, the Petitioning

4  Creditors produced a privilege log last night, which we

5  docketed earlier today.  It's stamped "confidential," which I

6  don't fully grasp how a privilege log could be confidential,

7  but we filed it under seal out of an abundance of caution.

8          The privilege log, which I'll bring up in a little

9  while in my presentation, confirms our suspicion that

10  Mr. Manning has been involved in the efforts to initiate the

11  bankruptcy since its inception.  With the trial date fast

12  approaching, the deficiencies that we have received, as well

13  as Petitioning Creditors' failure to provide dates for the

14  depositions of the Petitioning Creditors, as well as a

15  request for the deposition of Manning, with all that, you

16  know, outstanding, the alleged Debtors were left with no

17  choice other than to file these motions.

18          Notably, in response to the Court's inquiry last

19  month as to whether the trial in May was still going forward,

20  the Petitioning Creditors, knowing of these deficiencies,

21  unilaterally responded that it was going forward.  The

22  Petitioning Creditors have since agreed that the discovery

23  cannot be completed before a trial date next week and new

24  dates will need to be obtained, which we can address later in

25  this hearing.

1            So, what are the discovery requests looking for?

2            Well, first, as I indicated, we're looking for

3  documents, communications, and interrogatory answers related

4  to Manning's involvement with the Petitioning Creditors in

5  filing this case.  The Petitioning Creditors have uniformly

6  refused to provide any discovery related to Manning and

7  generally object to these discovery demands on relevancy

8  grounds, in that the discovery demands seek discovery, with

9  respect to factual allegations and legal conclusions in the

10  involuntary petition that are unrelated to issues currently

11  before the Court; that's their response.

12            The Petitioning Creditors generally take the

13  position that their debts are undisputed and so this

14  discovery is not relevant to the case, but we, of course,

15  disagree that the debts are undisputed and intend to present

16  evidence at trial, including expert testimony on the point.

17  Even if the Petitioning Creditors were right, that does not

18  foreclose our ability to seek discovery on their bad faith.

19            Cases in this circuit, including Forever Green,

20  and just recently the PTGi decision by Judge Horan, hold that

21  bad faith is an independent ground for dismissal of an

22  involuntary petition.

23            Mawson alleges that the involuntary petition is an

24  extension of ongoing disputes with Manning and was filed in

25  bad faith, with the assistance of the Petitioning Creditors

1   as a means for Manning to avoid accounting for various

2   misconduct while he was a board member and/or CEO of Mawson.

3   This discovery is plainly relevant, as it directly relates to

4   Mawson's defenses, as explicitly asserted in its answer.

5           The Petitioning Creditors' broad position that

6   Manning just wasn't involved in the involuntary petition and

7   that the Petitioning Creditors are trying -- or sorry, the

8   alleged Debtor is trying to create some narrative of a

9   sideshow; however, the response to these motions reveals for

10  the first time that Manning was, in fact, involved through a

11  common interest agreement with the Petitioning Creditors and

12  the privilege log served last night confirms our suspicions

13  that he's been actively involved throughout this case and

14  preceding the case.

15          Manning is mentioned over 35 times on a 15-page

16  privilege log, including in an email with bankruptcy counsel

17  here today for the Petitioning Creditors, which calls into

18  question the argument that they do not represent or control

19  him.  And so I was going to bring up a portion of the

20  privilege log, but just wanted to confirm with counsel for

21  the Petitioning Creditors, given its confidential stamp, that

22  there's no objection to doing so in this hearing.

23          MR. GLENN:  I'm sorry, what, Mr. Niederman, are

24  you proposing to do?

25          MR. NIEDERMAN:  I wanted to bring up a portion of

1   the privilege log to illustrate for the Court.

2          MR. GLENN:  Okay.  That's fine.

3          MR. NIEDERMAN:  Okay.  If it would be possible to

4   give Ms. Ward control of the screen?

5          THE COURT:  Hold on.

6      (Pause)

7          MR. NIEDERMAN:  Sorry, I think --

8          THE COURT:  She should have it now.

9          MR. NIEDERMAN:  Okay.  Great.

10         Ms. Ward, if you could bring up page 3 of the

11  privilege log.

12         Here, we see -- and I've added the highlighting,

13  I'll acknowledge.

14         On page 3, if we could, please, or page 2, excuse

15  me.  You had it right.

16         Here, we see is an entry that has been withheld

17  where Mr. Manning is in communication with attorneys at Glenn

18  Agre, which is counsel for the Petitioning Creditors.

19         In another place --

20         MR. GLENN:  Can you put the date of that

21  communication in the record, please?

22         THE COURT:  Yeah, I --

23         MR. GLENN:  It's July 19th of 2024.  Thank you.

24         THE COURT:  Wait a second.

25         July 19th, 2024, okay.  It's split on mine.  All

1    right.  I have it.

2              MR. NIEDERMAN:  And we'd be happy to email Your

3    Honor a copy of this or deliver a copy.

4              THE COURT:  I've pulled it up on the docket, the

5    sealed one.

6              MR. NIEDERMAN:  Thank you.

7              THE COURT:  Okay.

8              MR. NIEDERMAN:  And if we could now turn to

9    page 8, this has a date of November 12th, 2024; so, a

10   month -- less than a month before the petition is filed, we

11   have a document that is being withheld, which has a title,

12   including, "funding arrangement."  And Mr. Manning is

13   communicating with Australian counsel, which begs the

14   question:  Is Mr. Manning funding this involuntary case?

15             Put simply, Manning's new admitted -- this can be

16   taken down, unless the Court needs to see it further?

17             THE COURT:  No, that's fine.

18             MR. NIEDERMAN:  Thank you.

19             Manning's now-admitted involvement in these

20   proceedings begs the question of why no documents have been

21   produced or discovery provided concerning his involvement.

22   It stains credibility for the Petitioning Creditors to assert

23   that the only communications that occurred with Manning can

24   with withheld on privilege grounds, pursuant to a common

25   interest agreement.

1            This is emphasized by the omnibus opposition to

2    the motion revealing at paragraphs 36 to 37, that the

3    Petitioning Creditors first met to discuss this common

4    interest agreement with Mr. Manning in April of '24, but the

5    agreement was not entered into until July.

6            Additionally, even if the privilege unilaterally

7    applied, did no communications occur in that period, leading

8    up to the execution in July?  Were those documents searched

9    for?

10           We deserve to know answers to these questions,

11   because they go to the bad faith assertion by the alleged

12   Debtor.

13           Additionally, the Petitioning Creditors assert

14   privilege under this common interest agreement for instances

15   where no counsel was involved, and I'll highlight that in

16   another portion of my presentation in just a few minutes.  So

17   there are some areas, like I said, that I'll show you, where

18   it's just the Petitioning Creditors talking.

19           I can't speak to Australian law, but U.S. law

20   requires the provision of legal advice for the assertion of

21   privilege to apply.  Not to mention the fact that because

22   Mr. Manning is not a Petitioning Creditor, the common

23   interest agreement likely does not protect these documents

24   because the parties do not have the same or similar legal

25   interests.

1          Judge, Petitioning Creditors are no longer hiding

2    from Manning's involvement; they are now saying that he was

3    involved since the beginning of their efforts to file this

4    case.  Because of his -- and the reason they state is,

5    because of his knowledge of information regarding the alleged

6    Debtors.  With this admission, the Petitioning Creditors

7    should not be -- should be ordered to provide responsive

8    documents and provide discovery responses on Manning's

9    involvement.

10         The next area that we seek, unless Your Honor has

11   some questions on that --

12         THE COURT:  No.

13         MR. NIEDERMAN:  -- relating to the ownership of

14   the initial Petitioning Creditors.  The Petitioning Creditors

15   also failed to provide responses to discovery relating to the

16   ownership, management, and governing instruments of the

17   Petitioning Creditors.  They've objected to these discovery

18   demands on relevancy grounds and did not produce responsive

19   documents.

20         Additionally, Marshall failed to provide an

21   adequate response to Interrogatory 1, which asks Marshall to

22   identify all persons or entities who hold any financial or

23   legal interest in Marshall and disclose the percentage of

24   each, the person or entity's interest in Marshall.

25         We got some information in the response, which

1  reveals two funds made up of one, a hundred and five and the

2  other, a hundred and one investors, but we don't get the

3  names of the investors within those.  Additionally, Rayra,

4  notably, was a member of the Marshall Investments.  How

5  could -- the discovery is relevant to establish the

6  relationship between these initial Petitioning Creditors, one

7  being Rayra, who's also an independent Petitioning Creditor,

8  as well as their relationship with Manning.  We need to know

9  who these investors are so we can determine issues related to

10  the bad faith filing.

11         The Petitioning Creditors also failed to provide

12  discovery responses and documents relating to the

13  relationship between Marshall and Rayra.  The answer that we

14  filed asserts that the circumstances and timing surrounding

15  Rayra's acquisition of its claim by assignment from Marshall

16  are highly suspect and the assignment agreement between

17  Marshall and Rayra is a sham agreement, likely, at the

18  direction of Manning, for the sole purpose of meeting the

19  involuntary petition numerosity requirements.

20         Rayra confirms these suspicions by acknowledging

21  that the assignment agreement was entered into because Rayra,

22  as an investor in Marshall, wanted to participate directly in

23  Marshall's efforts to collect the debt owed by Mawson, using

24  any means available, including, but not limited to, the

25  winding-up petition and involuntary petition against Mawson.

1 They also indicate that there was no marketing effort for

2 this assignment.  Based on these responses, it's evident that

3 Rayra, which appears to have already had a relationship with

4 Marshall, required a small portion of Marshall Investments'

5 claim for the purposes of meeting the numerosity requirement

6 to file the involuntary petition.

7        We need discovery on this to go to our bad faith

8 claim; notably, as previously mentioned, Rayra has refused to

9 produce any documents, not one, claiming that the one

10 document they have is privileged.  We learned in the

11 opposition to the motion to compel that the privilege is

12 based upon this alleged common interest agreement.  Notably,

13 the common interest agreement hasn't been produced, however,

14 we do have the privilege log that came in last night.

15        And if I could ask Ms. Ward to bring up page 3 of

16 the privilege log?

17     (Pause)

18        MR. NIEDERMAN:  Keep scrolling down.  There we go.

19        Here -- and, again, we got this last night, so

20 I've not been through everything -- but these are the entries

21 that I could find for Rayra and this is the example of what I

22 was indicating to Your Honor earlier.  It appears that these

23 are just communications among the Petitioning Creditors.

24 There's no counsel involved.  It's just labeled "Common

25 Interest Communication Re:  Enforcement Actions."

1        Again, I'm not an expert in Australian law, but my

2    understanding of U.S. law and common interest agreements, is

3    that there still needs to be legal advice given to the common

4    interest parties for these communications to be privileged.

5        This can be taken down.

6        (Pause)

7        MR. NIEDERMAN:  This is just a further example of

8    the bad faith nature in which these proceedings have been

9    going on.  Discovery as to why the assignment agreement was

10   entered into is also relevant to determine whether the

11   Petitioning Creditors satisfied the requirement of 303(b) and

12   if the petition was brought in bad faith.

13       Likewise, the Petitioning Creditors should be

14   ordered to revise their privilege log and make production of

15   the Rayra documents that do not involve the advice of counsel

16   to be produced.

17       The last topic on the written discovery relates to

18   the Petitioning Creditors' decision to file the involuntary.

19   These discovery demands are relevant to determine whether the

20   involuntary was filed in bad faith and they relate to the

21   circumstances leading up to the filing of the involuntary and

22   seek information regarding Manning's involvement prior to the

23   filing.  Notably, as I mentioned earlier, the timing of the

24   filing is relevant to the bad faith analysis, as it was filed

25   days before the "at the market" stock offering, planned and

1  publicly announced by Mawson, which would have raised

2  significant capital for Mawson; of course, we know, as I put

3  in my papers, Manning rejoiced in the drop in the value of

4  Mawson stock after the filing and likely used the filing as a

5  means to disrupt the "at the market" offering.  Petitioning

6  Creditors should be ordered to produce the information sought

7  in these requests.

8          As to the deposition of the Petitioning Creditors,

9  in addition to the discovery responses and the document

10 productions, the motion to compel was prompted by Petitioning

11 Creditors' failure to engage in the depositions of their

12 witnesses.  On April 9th, Mawson's counsel sent the

13 Petitioning Creditors' counsel email requesting depositions

14 of a number of individuals; all representatives of the

15 Petitioning Creditors that either signed the petition or

16 signed discovery responses, verifications to discovery

17 responses.  We also sought the deposition of Mr. Manning.

18         Instead of -- we sought those depositions for the

19 week of April 18th, knowing that -- sorry, April 28th --

20 knowing that the case was scheduled for trial at that time,

21 for the week of May 13th.  Instead of providing deps for the

22 week of April 28th, the Petitioning Creditors waited until

23 the 28th to advise that certain witnesses requested by Mawson

24 would be available for deposition during the week of May 5,

25 this week; so, the week before trial was scheduled, and they

1  included Mr. Walter, of W Capital; David Marshall, of

2  Marshall Investments; as well as Andrew Martin, of Marshall

3  Investments; and Liam Healey, on behalf of the MIG 1

4  receivers.

5         The Petitioning Creditors have, thus far, refused

6  to make a rep for Rayra available and refused to make

7  Mr. Manning available.  Noting the impropriety of waiting

8  until the last possible minute before trial to make these

9  witnesses available, and Petitioning Creditors' insistence on

10 moving forward with trial of an incomplete record, we

11 attempted to move forward with the depositions.

12        What happened?

13        Petitioning Creditors, this week, gave me 10

14 hours' notice on a Monday night for a proposed 5:00 a.m.

15 deposition of Mr. Walter; this was the time that they

16 proposed on Tuesday morning.  When I told them that wasn't

17 possible, they offered Mr. Walter at 7:00 p.m., instead.

18        I appeared, ready to proceed, at 7:00 p.m. on

19 Tuesday night and the Petitioning Creditors canceled the

20 deposition 15 minutes before it was scheduled to start and

21 they indicated that, instead, Mr. Walter would be made

22 available at 6:00 p.m. on Wednesday.  Again, an hour before

23 that start time, I was told, instead of 6:00, Mr. Walter

24 could start at 9:00 p.m.

25        This is the conduct of the Petitioning Creditors.

1   They've commenced this case in bad faith and are now refusing

2   to provide meaningful discovery that the alleged Debtors are

3   seeking.  We've received certain dates over the next two

4   weeks that Petitioning Creditors are planning to be made

5   available for depositions, but I'm fearful that without an

6   order compelling their appearance, they will, again, cancel

7   at the last minute.

8           Likewise, based upon their involvement in this

9   case as a Petitioning Creditor, the circumstances surrounding

10  their claim, as well as the circumstances surrounding their

11  claim, which may very likely disqualify both, Rayra and

12  Marshall for purposes of numerosity, Rayra must be ordered to

13  sit for a deposition.

14          Finally, this Court should order Petitioning

15  Creditors to produce Manning for a deposition.  I won't

16  repeat all the Manning factors because I know Your Honor has

17  read the papers --

18          THE COURT:  Thank you.

19          MR. NIEDERMAN:  -- but I have to say, despite the

20  research into the contrary, it's now revealed that Manning

21  has been involved throughout the lead-up and filing of these

22  cases and, in fact, may be funding the cases.

23          THE COURT:  All right.  I think you've already

24  gone through this.

25          Do you want to respond to their response to your

1  motions --

2              MR. NIEDERMAN:  Sure, yes.

3              THE COURT:  -- anymore?

4              MR. NIEDERMAN:  Yeah, I'll just close by making an

5  observation that the alleged Debtor's suspicion of bad faith

6  is becoming clear and confirmed.  They've pivoted to avoid

7  having to reveal their bad faith efforts and now seek to have

8  Your Honor retroactively grant relief from stay so they can

9  proceed with a 15.

10              We will oppose that motion, but it informs the

11  landscape that we've been dealing with and, we believe,

12  informs the reasons why discovery should be awarded.

13              THE COURT:  Thank you.

14              MR. NIEDERMAN:  I'm happy to answer any questions

15  or respond to their argument.  Thank you.

16              THE COURT:  Let me hear from the Petitioning

17  Creditors.

18              MR. GLENN:  Thank you, Your Honor.

19              For the record, Andrew Glenn, Glenn Agre Bergman &

20  Fuentes, on behalf of the Petitioning Creditors, which now

21  include MIG 1, which is a Debtor subsidiary, and the receiver

22  has joined the petition, as well, and that's a fact that

23  Mr. Niederman did not address.

24              Mr. Niederman went on for quite some time and I

25  would like the Court's indulgence, because I think the

1  context is very important here, and I think Mr. Niederman

2  made a number of inaccurate statements.  First and foremost,

3  the Petitioning Creditors, the four I've identified, we're

4  now relying on Marshall, W, and the MIG 1 receiver to avoid

5  any further disputes about Rayra and we, as the Petitioning

6  Creditors, are allowed to bring in new Petitioning Creditors

7  at any time before the hearing, so there's nothing wrong with

8  that.

9          The debt at issue arises from two separate credit

10  facilities and intercompany claims that are owned by MIG 1

11  against Mawson, its parent.  The debt to Marshall matured in

12  February of last year.  No payments have been made on that

13  debt by the debtor since May of 2023.  The debt to W Capital

14  matured in March of 2023.  No payments have been made on that

15  loan in years.

16          These debts have appeared on Marshall's SEC

17  financial statements for years and their failure to pay them

18  has led to going concern qualifications by Mawson's auditors

19  for the past two years on its 10-K.  None of those SEC

20  financial statements have identified any basis to dispute

21  these debts.  There is no dispute that the money was received

22  by the debtor.  There is no dispute that the commercial terms

23  were disclosed and appropriate.

24          The company just doesn't want to pay these debts

25  and now their campaign, as you heard by Mr. Niederman, is to

1  make our efforts to recover those debts, valid debts, as

2  difficult and as expensive as possible.  Mr. Manning is the

3  villain of this case and we are somehow painted as his

4  functionaries and tainted by whatever misconduct they believe

5  occurred.  I would say that Mr. Manning was given a complete

6  release upon his resignation by the company.  In his tenure

7  as CEO, he was the CEO of the company when the debts to

8  Marshall, W Capital and Celsius, who you will hear about

9  later, all extended their debts to the company.

10         At that point in time, Mr. Manning had no

11  relationship, no control over our funds.  He still doesn't

12  have any control. He was the CEO of the company.  We dealt

13  with him at arm's length.  The debt was approved by the

14  entire board of directors of Mawson and there is no

15  allegation to the contrary.

16         He has never had any interest in W Capital. He has

17  never had the ability to direct any of the Petitioning

18  Creditors and that has been stated in interrogatory

19  responses. The only thing that has happened over a year after

20  the Marshall loan closed, Mr. Manning made a .375 percent

21  investment in the AUM of the Marshall fund.  Again, over a

22  year after the debt was extended.  That can't possibly taint

23  the debt that was incurred a year before that.

24         So, what has happened since?  Manning was never

25  paid his severance by the company in a consistent pattern

1  that this company has of refusing to pay their debts.  So,

2  the debtors -- I'm sorry, strike that.  Mr. Manning and the

3  Petitioning Creditors have entered into a common interest

4  agreement and that common interest agreement governs the

5  enforcement of all their proceedings in Australia.  There is

6  nothing nefarious about that.  Creditors in this Court do it

7  all the time.  Creditors in Australia do it all the time.

8          So, what do we have?  We have a declaration by

9  Mr. Martin that was put before the Court with Mr. Manning

10  sending some kind of a picture.  Then there was a statutory

11  demand for payment that was made by one of the Petitioning

12  Creditors.  He, allegedly, tweeted at some point that the

13  company was insolvent and heading toward insolvency in

14  connection with some voluntary filing.  Well, guess what, the

15  company's audited financials show that its insolvent and

16  those communications, in and of themselves, prove absolutely

17  nothing but the debtor is amplifying them because it fits

18  into this narrative that he is a bad person, he's doing bad

19  things when the reality here, Your Honor, Mawson could

20  resolve this immediately if it wrote a check to pay our

21  debts, and we would be gone, we would be happy.

22          Instead, they're inventing this narrative that

23  creditors were owed debts on SEC financials somehow are bad

24  because they want their debts to be paid.  They have sued in

25  Australia with no success.  They have had liquidators

1  appointed for MIG 1 as a subsidiary, again, with no success.

2  They came into this Court and they were attacked for doing

3  so.

4        I want to talk about this ATM allegation because

5  it is grossly misleading.  We sent the company a proposed

6  draft of the involuntary petition and we said do you want to

7  accept service of this.  Do you want to have discussions to

8  resolve this.  We had numerous attempts at negotiating with

9  them for the year since this debt was defaulted to no avail.

10  We had a series of conversations about the involuntary

11  filing. I believe it was two or three weeks before we filed

12  it.  They never said a word about an ATM transaction.  They

13  never said a word about anything that would give us any

14  confidence that the debt would be repaid.

15        The stock was trading below $5 a share. I doubt

16  the ATM even would have been successful  had it succeeded but

17  certainly if there was a pathway to paying us, they didn't

18  mention it and this is another narrative of theirs to deflect

19  from our legal right to collect our debt regardless of

20  whether they had an ATM transaction planned.  Why didn't they

21  do that a year ago when the debt was maturing?  They didn't.

22  Again, this is a debtor who got our money and doesn't want to

23  pay it back and its willing to say or do anything to avoid

24  that.

25        In the absence of filing this involuntary have

1  they told you anything that they were going to do to repay

2  our debt?  No.  The question isn't our bad faith; the

3  question is the company's clear inability to pay off its

4  funded debt or, worse still, its bad faith relating to its

5  consistent refusal to pay our debt.  Again, Celsius is here,

6  you have heard that story too.  It's not just us.  The MIG 1

7  trust receiver is here.  That is an intercompany claim, okay.

8         I want to focus on this because what we're trying

9  to do, in all of our steps, is to avoid litigation over the

10 supposed taint of W Capital and Marshall Capital.  We -- they

11 said, you know what, this assignment to Rayra is wrong, it

12 was done for the purpose of involuntary.  Okay, so what do we

13 do?  We went to the MIG 1 receiver and we said would you be

14 interested in joining this petition, they agreed.  Now that

15 debt, the MIG 1 debt against Mawson, there was a disclosure

16 to an Australian authority that the debt was owed by Mawson

17 to MIG 1 and that debt was sworn to by two directors of

18 Mawson.

19         Now the lift stay motion, okay, is not the subject

20 of today but we have been tarred and feathered by us doing

21 that. The lift stay motion was geared to this. The

22 receivership was filed -- papers were filed before the

23 involuntary.  Mawson took the position that there shouldn't

24 be an automatic stay, there shouldn't be an involuntary.  So,

25 all the winding up proceeding to accomplish was the

1  appointment of someone who is unconflicted, a fiduciary who

2  could make an independent decision about whether this company

3  should be involved in restructuring.  That party agreed and

4  all they want to do is be involved in this proceeding so we

5  can move forward with a global comprehensive restructuring

6  and we would move to lift the automatic stay for the sole

7  purpose of allowing that to happen.

8          Getting to the motion to compel.  First, the

9  communications that we had with Mr. Manning occurred before

10 the debt.  He was the CEO of the company.  We have taken the

11 position, and they have apparently taken the position, that

12 all those communications we both have access to.  They didn't

13 produce anything, we didn't produce anything because the

14 emails are on their server.  There is no reason for us to

15 give those back to him and there is no allegation, no facts

16 of any relationship with Mr. Manning that would somehow

17 obviate that that debt is valid and needs to be repaid.

18          So, where do we go from there?  We go from there

19 to, yes, Mr. Manning has been involved with Australian

20 collection proceedings as a creditor. He is party to a common

21 interest agreement but he has no ability to direct anything

22 or anyone in connection with this involuntary even if there

23 have been communications with him.

24          THE COURT:  Mr. Glenn, let me cut you off and I

25 should have cut off Mr. Niederman.  Some of these facts are

1  disputed.  Your narrative of what is going on and the

2  relationship between Mr. Manning and your clients differs

3  from what the debtor, putative debtor, asserts.  Doesn't

4  that, in and of itself, mean that discovery is appropriate?

5         MR. GLENN:  Well, we have given them discovery on

6  non-privileged documents in connection with our

7  communications with Mr. Manning.  We have done that.  Our

8  position is that the enforcement proceedings, you know, in

9  connection with the common interest agreement and thereafter,

10 are privileged pursuant to that agreement.

11        THE COURT:  And I can discuss -- I can deal with

12 that later but you also assert you have no control over

13 Mr. Manning and can't produce him for a deposition, correct?

14        MR. GLENN:  We have no control over Mr. Manning,

15 that's correct.

16        THE COURT:  Doesn't that mean that I should issue

17 a letter request under the Hague Convention then because I am

18 convinced, based on the allegations, that there is some

19 relevance to his role in any debt owed to the Petitioning

20 Creditors and into the decision to file an involuntary

21 petition here and perhaps with respect to the filing of any

22 action or any pleading in the Australian action.

23        The debtor is asserting bad faith. They have

24 presented some evidence that there may be bad faith on the

25 part of Mr. Manning, whether it involves your clients or not.

1 I think it is relevant or likely to lead to relevant

2 information.  So, on the deposition of Mr. Manning we can go

3 one of two ways.  And if you have no ability to control or

4 persuade Mr. Manning to appear for a deposition then I am

5 left with the Hague Convention.

6        MR. GLENN:  Your Honor, what I would say is this:

7 I believe the evidence will show, and we can talk about the

8 depositions, that Mr. Manning has no ability to control or

9 direct the involuntary petitioners.  So, if that is the case,

10 even if Mr. Manning has done bad things, which I don't

11 believe he has at all, but even if that is the case how is it

12 that Mr. Manning's conduct can taint the independent decision

13 making of the petitioners to decide to file this involuntary

14 proceeding.  You know, I --

15        THE COURT:  Well, I don't know what Mr. Manning

16 may say in that regard.  They're asserting this agreement

17 between two sides.  One side may dispute it but the other

18 side may admit it.  I don't know.  It's certainly relevant to

19 the issues before me.

20        MR. GLENN:  Okay, well, if I can't persuade you

21 that that is not the case and --

22        THE COURT:  Well, I haven't heard any testimony

23 other than allegations at this point and I know that you will

24 be having depositions of your representatives.

25        MR. GLENN:  So maybe the best course here is to

1  let those depositions go forth and we can present Your Honor

2  with the testimony and then decide whether, you know, a

3  potential six month delay in this process is warranted given

4  that we're going to have to go through the -- if he doesn't

5  agree we're going to have to go through the Hague Convention.

6        THE COURT:  Well, if the debtor is willing to

7  proceed through the Hague Convention now it would get the six

8  months started.

9        MR. NIEDERMAN:  If necessary, we are prepared to

10  do so, Your Honor.

11        MR. GLENN:  So, Your Honor, what we will do is I

12  will confer with my client and we will report back to

13  Mr. Niederman and the Court whether we should -- again, we do

14  not have the ability to control Mr. Manning but we will ask

15  if he will appear voluntarily based on the Court's ruling.

16        THE COURT:  Okay.  I think with respect to the

17  deposition of Rayra at this point, Mr. Niederman, given

18  Mr. Glenn's statement that they are not going to rely on

19  Rayra as a petitioning creditor, is it relevant?

20        MR. NIEDERMAN:  I think it is, Your Honor.  And

21  thanks for letting me address this. I think its relevant for

22  a couple of reasons.  One, it may go to the overall bad faith

23  nature of the named Petitioning Creditors in bringing this

24  action, whether they were seeking to manufacture creditors

25  for purposes of this filing.

1          So, I think it's important to get Rayra's
2    deposition and I further think Rayra continues to participate
3    in this.  They were a party to the lift stay motion that was
4    filed last week.  Additionally, I think that under Rule 1003
5    the disqualification of Rayra also disqualifies Marshall. The
6    way I read 1003 is that both Petitioning Creditors would be
7    out if they were filed for improper purposes.

8          MR. GLENN:  Yeah, I think Mr. Niederman's last
9    statement is the relevant point and shows why this is not
10   needed. The purpose of filing the petition is a separate
11   question of who is filing the petition.  It happens all the
12   time that creditors are added, subtracted, before a hearing.
13   The code says very specifically that the creditors can be
14   added.

15         The other thing, Your Honor, is that we have a
16   continuing dispute that I think also has not quite surfaced
17   yet which is we don't even know how many creditors there are.
18   We presumed that there were more than 12 unpaid creditors
19   based on the side of the company but they have never
20   disclosed who is unpaid and whether we need one or three but
21   irrespective of that, if the purpose of this petition was to
22   force the company into restructuring so that debts can be
23   paid it doesn't matter whether Rayra was one of the
24   Petitioning Creditors or the MIG 1 receiver was one of the
25   Petitioning Creditors.  So, I think this is now moot.

1          MR. NIEDERMAN:  If I may, Your Honor.

2          THE COURT:  Yes.

3          MR. NEIDERMAN:  The reading of 1003 is that by

4   bringing a creditor in for purposes of -- for assigning a

5   claim for purposes of filing an involuntary disqualifies both

6   Marshall and Rayra.  It can't be that you could say, well,

7   never mind, we will just take Rayra out of the equation so

8   Marshall is back in play.  That just doesn't -- that is not

9   equitable.  These parties assigned a claim jointly for

10  purposes of bringing this petition. As a result, Marshall and

11  Rayra should be out.  We can have argument on that on another

12  day, I'm sure.

13         THE COURT:  Yeah, I don't want to -- I will allow

14  that deposition then on that issue.

15         MR. NIEDERMAN:  Thank you, Your Honor.

16         THE COURT:  I understand there is no other issue

17  with respect to the depositions being produced by the

18  Petitioning Creditors other than scheduling appropriate

19  dates, correct?

20         MR. GLENN:  I believe so, Your Honor.  And I do

21  want to apologize because Mr. Niederman did raise one valid

22  point.  I will take some responsibility for this.  We -- what

23  we tried to do after the documents were produced for the

24  original Petitioning Creditors was, we really tried to keep

25  the hearing date.  What happened was the time difference,

1  there were miscommunications with the client, which went

2  through my Australian colleague, and there were simple

3  miscommunications about the start time, the witness

4  sequencing and that was caused based on the time difference

5  and some miscommunications.

6          So, what we did on Wednesday, I told Mr. Niederman

7  that, obviously, we weren't going to be able to complete the

8  depositions so we provided a calendar of the deposition in

9  both, I believe, U.S. and Australian time over the next

10  couple of weeks and we agreed given the time differences we

11  are going to try to do three or four hour blocks.  There was

12  nothing nefarious about the depositions other than scheduling

13  snafus which I, as an officer of the court, will take

14  responsibility for.

15          THE COURT:  So, I think the two of you can agree

16  on appropriate times and means of taking depositions.

17          MR. GLENN:  Yes.

18          MR. NIEDERMAN:  Yes, Your Honor.

19          THE COURT:  On the documents -- well, to the

20  extent that the Petitioning Creditors have already responded

21  on that issue that is fine; otherwise, they can supplement

22  their responses but to the extent they state that they have

23  no relevant documents or dispute the allegations or they have

24  provided answers to interrogatories or admissions I don't

25  require them at this time to supplement them. I think that

1  Mr. Niederman, what you are looking for is responses to them

2  from Manning or --

3          MR. NIEDERMAN:  Or if the Petitioning Creditors

4  were communicating with Manning, we would want them to

5  produce those documents as well.  As I indicated --

6          THE COURT:  Well, you are going to have to file a

7  motion now that you have the privilege log and if need be, I

8  will review them *in camera* to see if, in fact, they're

9  governed by --

10          MR. NIEDERMAN:  Yeah, if I could just add one

11  thing.  To the extent that things were being withheld because

12  it was just deemed to be irrelevant to have communications

13  with Mr. Manning either in that gap period leading up to the

14  common interest agreement or in total because they didn't

15  believe that to be discoverable we would request that the

16  Court consider granting that relief as well.

17          THE COURT:  Well, I think that was, in part, why I

18  suggested that they may want to supplement their responses

19  because of my ruling that issues with respect to Mr. Manning

20  are relevant or likely to lead to relevant information.

21          MR. NIEDERMAN:  Understood.  Thank you, Your

22  Honor.

23          THE COURT:  Mr. Wofford, did you wish to be heard

24  on anything?

25          MR. WOFFORD:  No, Your Honor.  Just sensed that we

1  were coming to a conclusion on this matter and I just wanted

2  to make my appearance.

3          THE COURT:  Okay.  I think I -- have I decided

4  everything?

5          MR. NIEDERMAN:  I believe so, Your Honor.  I

6  mentioned in my presentation that -- and I think Mr. Glenn

7  acknowledged the need to talk about scheduling. I suppose

8  that may be dictated by his client or Mr. Manning's respond

9  on sitting for a deposition.  Would you like us to get that

10 issue resolved and then come back to you with potential

11 timing?

12         THE COURT:  What do the parties think?  Do you

13 want to talk about scheduling?  You have to talk about other

14 scheduling and I think we need a new trial date, that's for

15 sure.

16         MR. GLENN:  We do.  I propose, Your Honor, that

17 its now the weekend in Australia.  We will reach out to our

18 clients with a goal of reporting back to Mr. Niederman by

19 early or the middle of next week and then depending on what

20 we hear from Mr. Manning that will, obviously, determine when

21 we even theoretically might try this case.  So, we can either

22 report through letter or ask for a status conference and

23 decide where to go from there.

24         THE COURT:  Okay.  I understand Ms. Capp has

25 already communicated regarding some dates but it looks like

1  those can't fit our schedule.  So, reach out to her with

2  respect to dates you are talking about whenever and then we

3  can talk probably more intelligently if we need to have a

4  further conference call.

5          MR. NIEDERMAN:  Thank you, Your Honor. I guess one

6  last thing and then I will turn my camera off and let others

7  handle things but we would like to make -- we think it would

8  be helpful for the parties to potentially sit down in a room

9  with the neutral party.  So, I don't know if the Court is

10 willing to potentially direct this matter to a mediation with

11 one of the other sitting judges but given all of the

12 discovery issues and ongoing disputes between the parties it

13 seems like mediation could be a productive exercise.  But we

14 wanted to raise it with the Court for consideration.

15         THE COURT:  What do the other parties think?

16         Mr. Glenn.

17         MR. GLENN:  This will depend on the outcome with

18 Mr. Manning.  If we are going to have the six month delay

19 then I would say that it's a virtual certainty that we would

20 want to do a mediation but even if we can keep a relatively

21 near term trial date I would say that we would agree with

22 mediation as long as it does not upset the schedule.  We are

23 always happy to negotiate and we will continue to negotiate

24 whether there is or isn't a mediator.

25         What we don't want to do is have an extension

1  without, kind of, a reasonable ending so that the matter can

2  be resolved.  We have, obviously, been waiting for payment

3  for a long time.  So, I will discuss that with my clients but

4  I believe they're not going to have an opposition to

5  mediation as long as we can proceed on schedule.

6          MR. WOFFORD:  Your Honor, so I am now going to

7  contradict myself in that I thought I wasn't going to speak

8  but now that the mediation topic has come up, I am compelled

9  to.  Given Celsius' substantial interest in these proceedings

10 if there is going to be a mediation, particularly if it's

11 with a sitting bankruptcy judge, Celsius certainly would want

12 to participate in that so as to facilitate if there's going

13 to be a global resolution, one that affects all parties in

14 interest appropriately.

15         MR. GLENN:  I agree with that.

16         THE COURT:  Any objection, Mr. Niederman?

17         MR. NIEDERMAN:  No objection.

18         THE COURT:  Alright, let me ask this then so I can

19 get some timing: If I'm requesting one of my colleagues to

20 mediate, I think it should be sooner rather than later.  So,

21 is this suggestion that within the next 30 days see if one of

22 my colleagues can devote time to this?

23         MR. NIEDERMAN:  I think that makes a lot of sense,

24 Your Honor.

25         THE COURT:  Then let me see if I can and I will

1  have Ms. Capp reach out to the parties to let them know if

2  anyone is willing to do this and then somebody can submit a

3  form of order to me to send it to mediation and then you can

4  contact my colleague.

5          MR. NIEDERMAN:  Understood.  Thank you, Your

6  Honor.

7          THE COURT:  All right.  In the meantime, you'll

8  just proceed as if things are going to proceed in litigation,

9  but I will do that today and see if I can get somebody, twist

10  someone's arm.

11          MR. NIEDERMAN:  Thank you.

12          MR. GLENN:  We appreciate it.

13          THE COURT:  All right.  Then we will stand -- oh,

14  I'm sorry, for Celsius.  Thank you.  We do have one other

15  matter on the agenda.

16          MR. NIEDERMAN:  And, Your Honor, my colleague,

17  just for introduction purposes, Mr. Martos, who's been

18  admitted *pro hac vice*, will be handling the argument portion

19  of that for the alleged debtor.  So I'll turn my screen off,

20  if acceptable.

21          THE COURT:  All right.  Thank you.

22          MR. NIEDERMAN:  Thank you.

23          MR. MARTOS:  Good afternoon, Your Honor, pleasure

24  to be before you today.

25          THE COURT:  All right.  This is the motion for

1  sanctions?

2          MR. WOFFORD:  Yes, Your Honor.  May I proceed?

3          THE COURT:  You may.

4          MR. WOFFORD:  So, Your Honor, Keith Wofford, for

5  the record, of the firm of White & Case on behalf of Celsius

6  Network Limited.  We're before you on our motion for

7  sanctions pursuant to the Court's inherent authority at 105.

8  It was filed on the docket at Number 73, with accompanying

9  declarations at Number 74 and 75.  Mawson duly filed an

10  objection at Docket Number 79, and we filed a reply at Docket

11  Number 93.

12          Our motion covers in detail the history of the

13  debtor's belated TRO motion and the Court's statements on the

14  record with respect to the bad faith of the debtor, and the

15  statements that Mawson was judicially estopped.  We won't

16  bother to restate those further here.  We submit as well that

17  the costs that were forced upon Celsius by virtue of Mawson's

18  opposition to stay relief also merit sanctions.

19          First, Your Honor, just to give you a roadmap

20  here, I'd like to discuss the legal standard that's

21  applicable to the relief we've requested here, and then we're

22  going to talk about the application of that law to the fees

23  and particularly the claim with some granularity, just so

24  that the record is complete on that.

25          We would submit that the legal standard here makes

1  clear why the requested sanctions should be granted by this

2  Court.  The first source of authority is the Court's inherent

3  power to assess fees.  There's no dispute that the Court has

4  the authority to do this, particularly when a party acts in

5  bad faith.  The extent of such fees is to be compensatory,

6  that is, the fees that were occasioned by those acts.  In

7  addition, there's authority to assess fees under 105, which

8  does not require bad faith, but we're focusing our argument

9  today on inherent authority, which I think it's fair to say

10  was a source of disagreement in the briefing.

11          Mawson, in our view, attempted to create a

12  different and higher standard for inherent authority

13  sanctions by stating that this circuit has concluded that

14  inherent authority sanctions are only available where the

15  Rule 11 standard is met, and then they point to the alleged

16  lack of frivolity in their arguments that they made on the

17  various pleadings, and say effectively that they have a safe

18  harbor from sanctions based on that premise.

19          Here's the problem with that.  The statement in

20  their papers that inherent authority can only adhere where

21  Rule 11 applies is directly contradicted by the primary Third

22  Circuit case that Mawson cites.  In particular, Your Honor,

23  Mawson in footnote 9 of its objection says, quote, "Sanctions

24  sought pursuant to a court's inherent authority should not be

25  awarded where the claim involved is sufficiently plausible to

1  survive a Rule 11 sanction."  And that's citing <u>Gillette</u>, 977

2  F.2d at 814.

3         In fact, Your Honor, <u>Gillette</u> states precisely the

4  opposite principle.  To quote, <u>Gillette</u> said, "Though we hold

5  the District Court erred in imposing sanctions in this case,

6  we will not adopt the broad rule Liotta proposes that once a

7  claim is held not to violate Rule 11 the Court is prevented

8  from imposing sanctions under its inherent power."

9         The Third Circuit -- and that was at 813 -- the

10 Third Circuit reiterated that view in <u>Fellheimer</u>, which was

11 also cited in the parties' papers, saying that the circuit

12 has previously rejected the view that lack of a Rule 11 claim

13 prevents an inherent authority sanction.

14        So, Mawson cited <u>Gillette</u> in paragraph 16 and

15 footnote 9 for the exact opposite of what it actually says,

16 and then uses that precedent in building in the rest of its

17 papers to overcome your prior bad faith recognition and

18 finding and all of the circumstances that surround it.

19        Mawson argues for most of its brief that, hey,

20 what we did wasn't Rule 11, so you can't sanction us.  Since

21 that principle is the opposite of the law in this circuit, we

22 believe that you should of course reject it.  So, using that

23 proper standard, as cited in our papers, the sanction relief

24 sought under inherent authority and 105 is justified

25 (indiscernible).

1          So first the bad faith with respect to each of the

2    pleadings.  With respect to the TRO -- pardon me, with

3    respect to the TRO, the bad faith and delay tactics and

4    judicially-estopped conduct have already been recognized by

5    this Court, so we won't deal with that further.  The conduct

6    of Mawson in connection with the lift stay motion was also

7    bad faith.  Mawson was asked well in advance whether they

8    would consent to a proper lift stay motion and allow the

9    arbitrator to complete his work with respect to the guaranty.

10   Mawson knew at that time what the Court had said on the

11   merits of the TRO motion, namely that Mawson was stuck with

12   the arbitration that it had started, and that it had acted in

13   bad faith by sand in the gears with the TRO, and that delay

14   was prejudicial to Celsius.

15          Mawson also knew that the arbitrator had

16   determined in November that we were likely to be successful

17   on the guaranty.  Mawson knew that the arbitrator had

18   rejected in its January 23rd award that the guaranty was

19   intertwined with the colocation agreement, and that the

20   arbitrator said that the loan documents were not subject to

21   these extrinsic defenses.  Mawson knew the extremely limited

22   nature of the stay relief that we were seeking.  This was not

23   us seeking to foreclose on all of the debtor's assets.  And,

24   lastly, Mawson knew that the petitioning creditors -- and

25   they purported to be protecting creditors, Mawson did -- that

1  they had consented to the relief.  Mawson not only refused to

2  consent to the stay-relief motion, but they didn't even

3  respond to us prior to us having to draft the motion and find

4  it.

5          So, having said all of those attendant

6  circumstances, I would call the Court's attention to the

7  Supreme Court in Chambers v. Nasco, which was cited by the

8  Third Circuit in Gillette, that the award of fees is to make

9  the prevailing party whole for the expenses caused by his

10 opponent's obstinacy.  And I think that word, obstinacy, is

11 exactly the right word to describe what Mawson has conducted

12 itself here.

13         So, that said, all of the foregoing alone would be

14 sufficient to support inherent authority and 105 sanctions,

15 there's more we've learned since Mawson filed its objection

16 to our motion.  Your Honor is aware of the wave of pleading

17 and exhibits filed by the petitioners and Mawson, and we're

18 still digesting them, but there's another flavor of bad faith

19 that is potentially there, which is Mawson's alleged concern

20 for the status quo and protecting creditors, there's a little

21 bit of tongue-in-cheek or potential pretext there.  That is,

22 what we learned through those papers is that there has

23 purportedly been an Australian liquidator appointed post-

24 petition in February, not over the Australian subsidiaries,

25 but over the Mawson parent itself that's the subject of this

1  involuntary.

2          So, Mawson, exactly the time that it's objecting

3  to Celsius and saying the status quo should be preserved, let

4  a whole liquidation proceeding going forward in Australia

5  that same month, they were filing papers and affidavits

6  there, and they even, as we saw as Exhibit 6 to the Niederman

7  declaration, had their bankruptcy counsel sending a letter

8  saying that that liquidator appointment was null and void *ab*

9  *initio*.  But notwithstanding all the talk of preserving the

10 status quo and protecting creditors, we haven't seen any --

11 at least to my knowledge, any statements in this court or

12 attempted action to try to declare that null and void or to

13 resolve that.

14         So, today, Celsius is going to express no view

15 here as to the legal effect or propriety of that appointment,

16 but certainly if Mawson was so concerned about protecting

17 creditors as they purported to be when they put us through

18 the ringer on the lift stay motion, they might have let us

19 and let the Court in on what was going on in Australia while

20 they were doing a worldwide litigation campaign.

21         So, having said all of that, let's talk about the

22 granularity of the fees claim because we do claim particular

23 dollars, and it's fair to say that the Supreme Court's

24 precedent in Goodyear requires us to show but-for causation

25 to justify an award for sanctions.

1          So, sanctions and bad faith under that precedent

2    are limited to the fees of the innocent party occasioned by

3    the bad faith.  The causal connection is a but-for test, you

4    get the fees that would otherwise have occurred but for that

5    bad faith comment.  So, that being said, the Supreme Court

6    also said that the goal is to achieve "rough justice," quote-

7    unquote, "not auditing perfection," quote-unquote.

8          So, with respect to each portion of our request --

9    and we're going to treat this with some granularity before we

10   conclude -- the application of this standard is clear with

11   respect to the TRO.  All of the fees incurred in connection

12   with that qualify because, if the debtor had not filed that

13   alleged bad faith TRO and adversary, none of those fees would

14   have been incurred and the Luna Rule 34 arbitration briefing

15   and award would have gone on as scheduled.  And I would have

16   also had a very quiet MLK weekend, although that's not part

17   of the standard.

18         In any event, the but-for causation of the

19   entirety of those fees is beyond dispute, and that's

20   roughly $191,000, as established by the submitted

21   declarations.

22         Second, the application of the but-for standard is

23   admittedly not as simple with respect to the TRO.  Let's take

24   the easy part though first, which is the portion of those

25   fees related solely to addressing Mawson's objection to the

1  lift stay and the argument of that itself.  Clearly, none of

2  those fees would have been incurred but for Mawson assisting

3  on objecting and curing that objection to the bitter end.

4       So, the Supreme Court test is met with respect to

5  those fees, which total roughly an additional $87,000.

6       The second category of the TRO fees are the fees

7  relating to the motion itself, and we submit that these also

8  make the but-for test because the motion we would have

9  drafted had Mawson enjoined the consent of the petitioners

10 would have been perfunctory and short.

11      The vast majority of the lifting was occasioned by

12 our need to prepare a vigorous -- prepare for the vigorous,

13 but, frankly, tongue-in-cheek objection from Mawson, we

14 believe designed just to delay us and designed to benefit

15 them in the involuntary litigation where, as you know from

16 today, a key issue was and is whether Mawson is paying their

17 bona fide debts.

18      So we would have spent -- would we have spent zero

19 dollars on that motion, literally?  Of course not, but here

20 is where we believe the Supreme Court guidance on rough

21 justice rather than accounting perfection comes in because

22 the relatively small amount that we would have expended on a

23 consensual motion wouldn't render a great change in the

24 award, and certainly not enough to cross the line of

25 rendering that award punitive rather than compensatory to our

1  clients.  That said, to the extent that you have reluctance

2  or question around that, the total fees for preparation and

3  filing the lift stay motion were roughly $74,000 in total.

4          So, just to conclude, Mawson's objection raised a

5  policy concern that we should address.  They say that ruling

6  in our favor would inhibit the automatic stay rights of all

7  involuntary debtors, that we would be creating an *in terrorem*

8  effect on exercising the statutory rights of a good faith

9  debtor.  The problem with that argument here and why it fails

10 is when you consider the particular stay relief sought here

11 rather than hypothetical stay relief that could be invoked in

12 some unknown future case.

13         There was no prejudice to other creditors here or

14 to the estates from the actual lift stay that we sought here.

15 This is a motion that -- not a motion that was prejudicial to

16 other creditors, didn't prevent maximization of going concern

17 value, here we simply sought relief to pursue a duplicative

18 award in an arbitration that was already going forward and

19 had gone on with respect to Luna, and which arbitration was

20 precipitated by Mawson and which this Court had already said

21 was prejudicial to Celsius to delay.  You know, Mawson knew

22 about the rulings, we talked about that earlier, Mawson knew

23 about the position of the other creditors, and Mawson knew

24 that us prevailing and receiving that relief would not affect

25 going-concern value or affect a diminution of assets

1  available for the going-concern value of the estate.

2           So, to resist this particular stay relief as

3  opposed to hypothetical stay relief is exactly the type of

4  obstinacy that the Supreme Court has said in Chambers merits

5  sanction.

6           With that, Your Honor, I will cede to the

7  objectors and reserve time for reply, if necessary.  Thank

8  you.

9           THE COURT:  Thank you.

10          You're still on mute, Mr. Martos.

11          MR. MARTOS:  Apologies.  Thank you, Your Honor.

12 It's a pleasure to be here.  And thank you for your patience

13 with the mute.  As you know, this hearing has gone on some

14 time, and I wanted to make sure my shuffling of papers

15 earlier didn't influence Mr. Niederman or Mr. Glenn's

16 argument, and certainly not Mr. Wofford's argument today.

17          I am Martin Martos of Fox Rothschild; I am here on

18 behalf of the alleged debtor, Mawson.  I'm joined, as you

19 know, by Mr. Niederman and Ms. Ward, who have already

20 appeared and performed today.  I'll be taking a slightly

21 different position here, Your Honor.  Of course, we are here

22 on a different motion, we're not here for something that's

23 directly related to the involuntary, from the Mawson

24 perspective, it's something that is tangential.  That said,

25 it's an important issue and, you know, we're here to oppose

1  Celsius' request for relief.

2          There are two governing legal principles at issue

3  here.  The first is the congressional decision in the

4  Bankruptcy Code to extend the protection of the automatic

5  stay in Section 362 to alleged debtors, even alleged debtors

6  in an involuntary where they challenge the position, right?

7  That is not a question; that is the first governing legal

8  perspective here.

9          The second is then the high standard for the

10  sanction that Celsius seeks, and I want to get into each of

11  these one after the other, the first is let's start with the

12  automatic stay.  Your Honor, the automatic stay applies in

13  involuntary cases, no one disputes that, and the debtors and

14  alleged debtors alike have that statutory right even when

15  those debtors contest, like Mawson does here, the propriety

16  of the involuntary petition.  That's the decision that

17  Congress made.

18          So, if we're taking these in the background law

19  position, right, the background law position is that an

20  involuntary debtor, even one that doesn't believe they belong

21  in the involuntary proceeding, is entitled to the protection

22  of that stay.  A number of courts have gone even farther, in

23  fact, and we cite these cases on page 10 of our opposition

24  brief, that we're not even entitled to waive that right or we

25  couldn't stipulate to waiving that right during the gap

1  period.  So I do think it's disingenuous to suggest that

2  relying on that right or somehow not requiring us to consent

3  to anyone's request to lift the stay constitutes bad faith,

4  particularly in light of those cases.

5          Also, and I think this is an important piece, the

6  question comes up and courts have addressed, why did Congress

7  see fit to extend the automatic stay to involuntary debtors,

8  right, particularly involuntary debtors who might contest the

9  involuntary petition.  And in the In re Oxford case, courts

10 give -- for example, one basis is that courts have

11 articulated congressional direction that putative debtors

12 should be free from all other concerns, while the question of

13 bankruptcy at issue is thereby, you know, at issue, allowing

14 the debtor to concentrate exclusively on that issue.

15         And I think that's what it comes down to at its

16 core, both in its original TRO motion, Your Honor, and in its

17 opposition to the lift stay motion, the sole criteria is not

18 whether or not the debtor is protecting the bankruptcy

19 assets, but whether or not a legitimate purpose of that

20 automatic stay, which Congress made the policy decision to

21 give to involuntary debtors, was to also allow them to focus

22 exclusively on the bankruptcy proceeding, and that's what

23 Mawson asked in both of those cases.

24         And that makes sense, Your Honor, because an

25 involuntary proceeding is about the company case.  It's an

1   all-hands-on-deck proceeding that the debtor did not have the

2   control over filing, did not have control over the timing of

3   it, and, you know, it's a categorical right under the

4   Bankruptcy Code that debtors, even an involuntary, can rely

5   on that automatic stay.  It goes in; we don't have to ask for

6   it, it's there.

7          Let's turn now to the sanctions piece because it's

8   against this backdrop of this guaranteed statutory right the

9   debtors have -- even alleged debtors -- that Celsius asks for

10  what the Supreme Court calls undelegated power.  So we have

11  congressional clear intent coming up against the inherent

12  power of the court, and the Goodyear v. Haeger case, in which

13  the Supreme Court addressed this issue, makes it very clear

14  that the undelegated power should be exercised with special

15  restraint and discretion.

16         The Chambers case that Mr. Wofford, my friend from

17  Celsius, has stated for the but-for cause standard also has

18  this instructive phrase which I think is key here that

19  sanctions pursuant to the court's inherent power are

20  appropriate if the court finds -- and this is the key

21  quote  -- that fraud has been practiced upon it or that the

22  very temple of justice has been defiled.

23         Now, Mr. Wofford went into a long soliloquy about

24  Rule 11.  He references footnote 9 of our brief.  Well, I'm

25  in paragraph 14 of our brief where we say what the Supreme

1  Court set the standard to be.  The standard is undelegated

2  power should be exercised with special restraint and

3  discretion, and the circumstances that the Supreme Court

4  directed that to be done under articulates the standard as

5  fraud having been practiced upon the court or the very temple

6  of justice has been defiled.  It is not our position that

7  simply passing over Rule 11 is sufficient.  That's a

8  footnote, that's not the main brief.  The standard here and

9  other courts, including the Third Circuit, have addressed

10  this that circumstances in which a litigant unsuccessfully

11  advocates for an extension of law, which is what Mawson did

12  in the TRO asking for protection for its subsidiaries given

13  the identity of the relief requested against those

14  subsidiaries and against Mawson in the arbitration, right, is

15  not a basis for imposing sanctions.

16          So, when we step back and we look at the Supreme

17  Court saying there must be fraud or there must be a temple of

18  justice being defiled, that's a remarkably high standard, and

19  it's put against this background that Congress decided

20  directly that involuntary debtors were entitled to the

21  automatic stay.

22          So, you know, look, we are not here to re-litigate

23  the prior motions, but I do think the context of the filing

24  of those motions is important to the consideration here, and

25  Mawson's motivation in those contexts are relevant.  I think,

1  dealing first with the TRO that was a question that appears

2  at first impression of whether or not an involuntary debtor

3  can make a motion to extend the automatic stay over its

4  subsidiaries.  No party before this Court has found a case

5  that gave guidance to either.

6          And in fact, contrary to the allegation that

7  Mawson is trying to stop the arbitration, if we go back into

8  the procedural posture, Mawson raised that question with the

9  arbitrator.  We asked the arbitrator to rule on that

10  question, and now I'm reading from the arbitrator's January

11  13th decision, he says, "Based on the extensive letter

12  submission of both sides, the question of whether the

13  automatic bankruptcy stay should be extended to the

14  application pending should be decided by the Bankruptcy

15  Court."  So that's where we went.  The arbitrator said I

16  won't decide this question, it should be decided by the

17  Bankruptcy Court, so Mawson asked the Bankruptcy Court to

18  decide that question.  That's not bad faith, that's not an

19  abuse of process, that's moving to have the answer to the

20  question that the arbitrator referred to us.

21          Secondarily, because there are no cases on point,

22  there's no guidance for the parties to gone through.  And,

23  again, there's cases, we cite these in our opposition, coming

24  up with a new or asking for an extension of existing law is

25  not a basis to impose a sanction.  Ultimately, it was not

1  successful; ultimately, the court decided that was not going

2  to be the way this went.  That was that decision, but it

3  doesn't rise to the level of fraud or defilement to the

4  temple of justice to raise a novel argument for the extension

5  of the law.

6          And in fact there are cases specifically saying in

7  the Third Circuit that in those contexts -- and this is the

8  Garrido (phonetic) case that we cite on page 7 of our

9  opposition -- that awarding sanctions in circumstances where

10 a litigant unsuccessfully advocates for an extension of law

11 to a novel circumstance would chill effective advocacy and

12 would run counter to the purpose of Rule 11, and, by

13 extension, the court's power to sanction under their inherent

14 authority and Section 105.

15         So, Your Honor, that is our position of what the

16 standard is and we would submit that under these

17 circumstances, given the novelty of that question, and the

18 background statutory right that Mawson had even as an

19 involuntary debtor to rely upon the automatic stay, that

20 sanctions are not warranted in this circumstance.

21         THE COURT:  All right.  Thank you.

22         Response?

23         MR. WOFFORD:  Yes.  Your Honor, I heard repeatedly

24 from my esteemed counterpart that effectively the Supreme

25 Court says that the standard is fraud or something akin to

1   fraud upon the Court, but that is not the standard.  The

2   standard, in fact, under inherent authority is bad faith.

3          And I would note that Mawson has not meaningfully

4   contested that you recognize bad faith in connection with the

5   TRO motion and, therefore, we believe *sine qua non* that -- or

6   *res ipsa loquitur*, or whatever Latin phrase you want to use,

7   that the TRO fees are clearly but for a causal result of that

8   bad faith and, therefore, can be awarded not only under

9   Chambers, but under the Supreme Court's 2017 decision in

10  Goodyear.

11         They keep going back and forth to this Rule 11

12  standard.  We will stand by the citations we made.  But at

13  the end of the day, Your Honor, what Mawson seems to be

14  effectively saying is that, even where you recognize or find

15  bad faith, based upon the totality of the facts and

16  circumstances, and we've already described them, that either

17  you cannot, implying -- I think the Supreme Court citation

18  implies that they think you cannot or should not issue

19  sanctions in that circumstance at any level.  We would submit

20  that you should, that the causality is clear as to the TRO,

21  and with respect to the lift stay, it's within your

22  discretion, of course.

23         On the lift stay, clearly they were vexatious and

24  obstinate and promulgated the proceedings.  The existence of

25  the automatic stay for involuntary debtors does not preclude

1  that.  It's not whether that right exists or the backdrop

2  that exists, but how they use that right and whether it's

3  being used for a good faith purpose or merely effectively,

4  again, to throw sand in the gears.  We think because it does

5  stand under the obstinacy/sand in the gears prong that

6  certainly the objection and litigation fees should be

7  awarded, and, frankly, the majority of the fees to prepare it

8  should be awarded, again, given the lengthy proceedings I

9  mentioned.

10        So, while -- all due respect to our colleague as

11  to his explication of the law, we believe that this is a

12  relatively cut-and-dried case, save Your Honor deciding what

13  is the appropriate amount of fees, whether it should be all

14  or the majority.

15        Again, there is no meaningful contest of bad faith

16  here other than to say we made an argument that it was not

17  Rule 11 under the law, and that is not a sufficient rebuttal.

18        Thank you.

19        THE COURT:  Thank you.

20        All right, well, let me just say this.  Although

21  it is clear that I have the authority to impose sanctions

22  under my inherent authority or under Section 105(a), I start

23  with the premise that we are governed by the American Rule

24  generally and parties are expected to pay their own

25  attorneys' fees.  So there has to be cause for me to exercise

1  my discretion to impose attorneys' fees.  And whether the

2  standard is there was a fraud on the Court by a party's

3  actions, vexatious litigation designed only to delay or

4  otherwise cause harm to the other party, or whether it was

5  bad faith to take a position in court, I don't think any of

6  those apply in this case.

7          It's clear that the automatic stay did apply to

8  the involuntary.  So, with respect to taking that position, I

9  don't think that could have been taken in bad faith.

10  Similarly, there is case law that says that a putative debtor

11  in an involuntary cannot consent to relief from the stay.

12  So, again, I don't think taking that position evidences bad

13  faith.  Just losing an argument certainly is not enough, as

14  I've heard plenty of bad arguments, and simply advocating a

15  new or novel theory is not sufficient.

16          So, I just don't see it here with the debtor's

17  actions.  I know there's a lot of assertions of bad faith in

18  this case and I know the parties have been vigorous in their

19  advocacy, but I don't think that alone is sufficient to find

20  bad faith.  So, I will deny the motion.

21          And I will, again, seek to get all of the parties'

22  issues mediated by one of my colleagues, and I'll have

23  Ms. Capp contact you if I'm successful in that.

24          All right, I think that is now all that I have

25  before me, so we can stand adjourned.

1          COUNSEL:  Thank you, Your Honor.

2      (Proceedings concluded at 12:53 p.m.)

1                              CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    May 10, 2025

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    May 10, 2025

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17   /s/ Mary Zajaczkowski                     May 10, 2025

18   Mary Zajaczkowski, CET-531

19   Certified Court Transcriptionist

20   For Reliable

21

22

23

24

25

# Exhibit "C"

| | |
|---|---|
| **From:** | Andrew K. Glenn |
| **To:** | Herz, Michael R.; Sweet, Michael A.; Niederman, Seth A.; Slater Ward, Stephanie |
| **Cc:** | GABF_Mawson; Dehney, Robert; Venit, Grace; Wofford, Keith; Moeller-Sally, Stephen |
| **Subject:** | [EXT] Mawson -- James Manning |
| **Date:** | Thursday, June 19, 2025 11:30:54 AM |
| **Attachments:** | image001.png |

I understand that James Manning has reconsidered, and is prepared to be deposed. Accordingly, we intend to reach out to Judge Walrath to seek new hearing dates given that this roadblock has been eliminated. We can meet and confer once we have the dates.

We will provide a schedule of availability of our witnesses if this matter is proceeding. We will still participate in the mediation, although frankly, given recent events, I think this matter can be settled promptly without the mediation.

Please let me know if you have any questions.

Thanks.

Andrew K. Glenn

Managing Partner

aglenn@glennagre.com

W: (212) 970-1601

M: (908) 581-3659



1185 Avenue of the Americas
New York, NY 10036

****************************Important Notice ****************************
This email and any files transmitted with it are confidential and may be subject to the attorney-client or other privileges. Use or disclosure of this email or any such files by anyone other than the intended recipient is prohibited. If you are not the intended recipient, please notify the sender immediately and delete this message from your system.

# Exhibit " "

**From:** Andrew K. Glenn <aglenn@glennagre.com>
**Sent:** Tuesday, July 22, 2025 4:58 PM
**To:** Sweet, Michael A. <MSweet@foxrothschild.com>
**Cc:** Martos, Martin R. <MMartos@foxrothschild.com>; Herz, Michael R.
<mherz@foxrothschild.com>; Niederman, Seth A. <SNiederman@foxrothschild.com>;
GABF_Mawson <GABF_Mawson@glennagre.com>; MNAT Mawson <MNAT-
Mawson@morrisnichols.com>; Hoang, Kimberly <KHoang@foxrothschild.com>
**Subject:** [EXT] RE: Mawson

Please indicate that Mr. Manning now refuses to be deposed (even if fee advancement is
offered).  I'm trying to persuade him otherwise, but that's where we are.

I also expected to have concrete dates for Martin and your corporate rep by now.  How do
you propose that we sort that out?

Thanks.

Andrew K. Glenn
Managing Partner
aglenn@glennagre.com
W: (212) 970-1601
M: (908) 581-3659

1185 Avenue of the Americas
New York, NY 10036

# Exhibit "E"

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Alleged Debtor. |  |

**MARSHALL INVESTMENTS MIG PTY LTD'S**
**SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS**
**TO THE ALLEGED DEBTOR'S FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable to this action by Rules 9014, 7026, and 7034 of the Federal Rules of Bankruptcy Procedure, and in compliance with the *Order Granting Alleged Debtors' Motion to Compel Discovery and Depositions* [Docket No. 122], Marshall Investments MIG Pty Ltd, as trustee for the Marshall Investments MIG Trust ("Marshall") hereby supplements its Responses and Objections to Mawson Infrastructure Group, Inc.'s (the "Alleged Debtor") *First Set of Interrogatories Served Upon Marshall Investments MIG Pty Ltd as Trustee for the Marshall Investments MIG Trust* (each, an "Interrogatory," and together, the "Interrogatories") as follows:

**GENERAL OBJECTIONS**

Marshall makes the following General Objections (including objections to the Definitions[1] and Instructions set forth in the Interrogatories) to the Interrogatories and incorporates them into its response to each and every Interrogatory, whether or not specifically stated in the individual response. An assertion of the same, similar, or additional objections in response to a specific Interrogatory does not waive any of these General Objections as to that or any Interrogatory.

---

[1] Capitalized terms used but not defined herein have the meaning ascribed to them in the Interrogatories and *Marshall Investments MIG Pty Ltd's Responses and Objections to the Alleged Debtor's First Set of Interrogatories*.

Marshall's failure to object to a specific Interrogatory on a particular ground shall not be construed as a waiver of its right to object on any ground or a waiver of any General Objection.

1.      Marshall objects to the Interrogatories, and to the Definitions and Instructions thereto, to the extent they seek to impose obligations that exceed, are inconsistent with, or differ from those imposed by the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and/or any other applicable rule, statute, case law, or order.

2.      Marshall objects to the Interrogatories, and to the Definitions and Instructions thereto, to the extent they seek information that is beyond the permissible scope of discovery allowable under the Federal Rules of Civil Procedure, the Federal Rules of Bankruptcy Procedure, and/or any other applicable rule, statute, case law, or order.

3.      Marshall objects to the Interrogatories, and to the Definitions and Instructions thereto, to the extent they are not limited in time frame.

4.      Marshall objects to the Interrogatories, and to the Definitions and Instructions thereto, to the extent they and/or the terms or phrases used therein are vague, ambiguous or lack sufficient precision to allow Marshall to formulate an appropriate response.

5.      Marshall objects to the Interrogatories to the extent they seek information not relevant to the subject matter of this action, or not reasonably calculated or tailored to lead to the discovery of admissible evidence or that are overly broad, unduly burdensome, duplicative, cumulative or impose undue hardship or would result in the expenditure of unnecessary time and resources.

6.      Marshall objects to the Interrogatories to the extent they seek information regarding "any" or "all" transactions or communications on the grounds that such language makes the Interrogatories overbroad, unduly burdensome, and not reasonably calculated to lead to the

2

discovery of admissible evidence.

7.      Marshall objects to the Interrogatories to the extent they seek information protected by the attorney-client privilege, the work product doctrine, any joint defense or common interest privilege, or any other applicable rule, doctrine, privilege or immunity, statute, regulation, restriction, or protection from discovery, including any duty or obligation of non-disclosure or confidentiality, and Marshall will not disclose any such privileged information.

8.      To the extent the Interrogatories seek confidential, sensitive, personal, private, proprietary, and/or trade secret information, Marshall objects to providing any such information other than subject to an appropriate protective order entered in this action.

9.      Marshall objects to the Interrogatories to the extent that they or parts thereof are redundant and/or duplicative.

10.     Marshall objects to the Interrogatories to the extent that they seek information that has already been informally provided to the Alleged Debtor or is otherwise in the Alleged Debtor's possession, custody or control, is publicly available, or is obtainable from some other source.

11.     Marshall objects to the Interrogatories to the extent they assume or are premised on disputed allegations, facts, or legal conclusions, or constitutes an inaccurate characterization of the facts.  Marshall's responses to the Interrogatories are not intended to be and shall not be deemed an admission of the matters stated, implied, or assumed by or in the Interrogatories or the Definitions and Instructions thereto.  Marshall does not hereby admit, adopt or acquiesce in any factual or legal contention, assertion, characterization or implication contained in the Interrogatories or the Definitions and Instructions thereto.  Any response, objection, or information provided in response to these Interrogatories is without prejudice to Marshall's continuing objection to such characterizations.

12.     Marshall objects to the Interrogatories to the extent they seek disclosure from which Marshall is entitled to seek protection due to annoyance, embarrassment, oppression, or undue burden or expense.  Marshall expressly reserves the right to seek such protections pursuant to Federal Rule of Civil Procedure 26(c)(1).

13.     Marshall's responses to the Interrogatories and production of information in response to the Interrogatories are made while expressly reserving and without waiving Marshall's right to (a) object on any ground to the use of any such responses or information at any stage of, or any proceeding in, this case, including but not limited to relevancy objections, (b) object on any ground to other requests that involve or relate to the subject matter of the Interrogatories, (c) assert future objections as to the discoverability, relevance, materiality, competency, authenticity or admissibility of any responses or information, and (d) revise, correct, supplement or clarify any of the responses set forth herein.  All information provided without admitting the relevance, materiality, or admissibility of any such information and documents.  Any information provided in response to these Interrogatories is provided solely for the purpose of this action.  All objections to the use of any information or documents produced or to be produced in the future are fully and expressly reserved.

14.     No incidental or implied admissions are intended by these Interrogatories.  These Interrogatories should not be taken as an admission that Marshall accepts or admits the existence of any facts set forth or assumed by any Definition, Instruction, or Request.  Marshall does not hereby admit, adopt, or acquiesce in any factual or legal contention, assertion or characterization contained in the Interrogatories, even where Marshall has not otherwise objected to a particular Interrogatory, or has agreed to provide information responsive to a particular Interrogatory.

15.     Marshall objects to the definition of "Marshall" as overly broad to the extent it

includes any company, individual, or entity other than the named petitioning creditor Marshall

Investments MIG Pty Ltd, as trustee for the Marshall Investments MIG Trust, such as "any other

Marshall affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt."

Marshall will interpret the term "Marshall" to mean only Marshall Investments MIG Pty Ltd,[2] as

trustee for the Marshall Investments MIG Trust.

16.     Marshall objects to the definition of "Rayra" as overly broad to the extent it

includes any company, individual, or entity other than the named petitioning creditor Rayra Pty

Ltd, as trustee for The Mountainview Trust, such as "any other Rayra affiliated entity that has been

involved with the Alleged Debtor or the Alleged Debt."  Marshall will interpret the term "Rayra"

to mean only Rayra Pty Ltd, as trustee for The Mountainview Trust.

17.     Marshall objects to the definition of "W Capital" as overly broad to the extent it

includes any company, individual, or entity other than the named petitioning creditor W Capital

Advisors Pty Ltd, as trustee for the W Capital Advisors Fund, such as "any other W Capital

affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt."  Marshall

will interpret the term "W Capital" to mean only W Capital Advisors Pty Ltd, as trustee for the W

Capital Advisors Fund.

18.     Marshall objects to the definition of "Manning" as overly broad and unduly

burdensome to the extent that it includes any individual, company, or entity other than James

Manning, a former Board Director and CEO of the Alleged Debtor.  Marshall will interpret the

term "Manning" to mean only James Manning.

19.     Marshall objects to the definitions of "document," and "communication," to the

---

[2]     Marshall Investments MIG Pty Ltd recently changed its name to "Marshall Investments GCP Pty Ltd."  For the avoidance of doubt, Marshall will construe "Marshall" to include both iterations of this entity's name.

extent that they purport to impose requirements or obligations on Marshall beyond the scope of, or different from, those imposed by the Federal Rules of Civil Procedure and Federal Rules of Bankruptcy Procedure.  Marshall will comply with the foregoing Rules.

**SPECIFIC SUPPLEMENTAL RESPONSES AND OBJECTIONS**

**INTERROGATORY NO. 5:**

Describe any and all transactions, potential transactions, and negotiations that took place between Marshall and Manning, regardless of whether such transactions, potential transactions, or negotiations referred to, reflected, or related to the Marshall Agreements.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Subject to and without waiving or limiting the foregoing objections, Manning, in his capacity as CEO of the Alleged Debtor and its Australian subsidiaries, was involved in the following transactions and negotiations with Marshall:

- On December 9, 2021, Marshall and MIG No.1 Pty Ltd ("MIG No. 1") entered into a Secured Loan Facility Agreement;

- on December 9, 2021, Marshall and MIG No.1 entered into a General Security Agreement;

- on December 9, 2021, Marshall and the Alleged Debtor entered into a Continuing Guaranty;

- on December 9, 2021, Marshall and the Mawson Infrastructure Group Pty Ltd ("Mawson Pty Ltd") entered into a Put and Call Option Deed;

- on December 9, 2021, Marshall and MIG No.1 entered into a Verification Certificate;

- on December 9, 2021, Marshall, MIG No.1 and the Alleged Debtor entered into an Authority and Undertaking;

6

- on December 9, 2021, Mawson Pty Ltd executed the Written Resolutions of the Shareholder of MIG No.1;

- on December 9, 2021, Mawson Pty Ltd and MIG No.1 entered into a Loan Agreement;

- on December 9, 2021, Mawson Pty Ltd and MIG No.1 entered into a General Security Deed;

- on December 10, 2021, Mawson Pty Ltd and Marshall executed a Conditional Waiver Letter;

- on December 10, 2021, Mawson Pty Ltd, MIG No.1 and Marshall entered into a Priority Deed.

- on December 12, 2021, Marshall, Mawson Pty Ltd and MIG No.1 entered into a Share Subscription Agreement;

- on July 8, 2022, Marshall, Mawson Pty Ltd and MIG No.1 entered into a Letter amending the Secured Loan Facility Agreement; and

- on July 8, 2022, Marshall, Mawson AU Limited, MIG No.1 and the Alleged Debtor entered into a further Letter amending the Secured Loan Facility Agreement.

Furthermore, Manning was involved in the following transactions and negotiations with Marshall:

- Between June 2020 and January 2024, Manning was invoiced a total of A$192,489 by Marshall Rural Pty Ltd for agistment fees related to horses stationed on the property belonging to Marshall Rural Pty Ltd, an entity owned by Marshall;

- between September 4, 2020 and January 22, 2021, Marshall invested a total of A$500,000 across four tranches in Bitcoin Wholesale Access Fund, where Manning serves as director and shareholder;

- on April 26, 2021, Marshall invested A$1,560,000 in Distributed Storage Solutions Pty Ltd, a digital storage infrastructure business of which Manning is a director and shareholder;

- on August 3, 2021, Marshall invested A$500,000 in Cosmos Asset Management Pty Ltd as trustee for Cosmos Asset Management Trust ("Cosmos"), a digital assets platform business then managed by Manning as director and shareholder. Cosmos was wound up in or around 2022;

- on January 17, 2023, Manning Capital Holdings Pty Ltd and Manning Capital Holdings Unit Trust collectively subscribed up to A$250,000 or 0.37% holding in the Marshall Investments Growth Capital Partners Fund ("Fund 2").

At the time of the identified transactions, Manning was the CEO of the Alleged Debtor and its aforementioned Australian subsidiaries.

**INTERROGATORY NO. 9:**

Describe whether, when, where, how, and to what extent Manning negotiated, discussed, or corresponded with Marshall concerning any Alleged Debt.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

Subject to and without waiving or limiting the foregoing objections, Manning, in his capacity as CEO of the Alleged Debtor and its Australian subsidiaries, was involved in the following negotiations, discussions or correspondence with Marshall regarding the Alleged Debt:

- On or about November 7, 2022, Marshall agreed to a forbearance of the Secured Loan Facility Agreement and a revised payment schedule;

- During June 2023, MIG No. 1 informed Marshall that it would be unable to make the scheduled payment due on June 30, 2023 under the Secured Loan Facility; and

- On June 28, 2023, Marshall proposed a further forbearance extending the next due date for repayment of the Alleged Debt.

Dated: June 3, 2025

**AS TO OBJECTIONS ONLY:**

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

/s/ *Luke Brzozowski*
Robert J. Dehney, Sr. (No. 3578)
Tamara K. Mann (No. 5643)
Luke Brzozowski (No. 7377)
1201 North Market Street, 16th Floor
Wilmington, DE 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: rdehney@morrisnichols.com
      tmann@morrisnichols.com
      lbrzozowski@morrisnichols.com

– and –

**GLENN AGRE BERGMAN & FUENTES LLP**
Andrew K. Glenn (admitted *pro hac vice*)
Margaret J. Lovric (admitted *pro hac vice*)
Esther Hong (admitted *pro hac vice*)
1185 Avenue of the Americas, 22nd Floor
New York, New York 10036
Telephone: (212) 970-1600
Email: aglenn@glennagre.com
      mlovric@glennagre.com
      ehong@glennagre.com

*Counsel to the Petitioning Creditors*

# Exhibit " "

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Debtors. | **Related to Docket No. 1** |

**ALLEGED DEBTOR MAWSON INFRASTRUCTURE GROUP, INC.'S FIRST
SET OF INTERROGATORIES SERVED UPON CAMERON HAMISH GRAY, AS
PURPORTED LIQUIDATOR TO MAWSON INFRASTRUCTURE GROUP, INC.**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, made applicable by Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, Mawson Infrastructure Group, Inc. (the "Alleged Debtor" or "Mawson"), through counsel, serves the following First Set of Interrogatories (each an "Interrogatory") upon Cameron Hamish Gray, as purported liquidator to Mawson (the "Liquidator") and requests that the Liquidator serve upon the undersigned attorney answers under oath and responsive to each of the following Interrogatories within thirty (30) days from the date hereof.

## DEFINITIONS AND INSTRUCTIONS

1.      Each Interrogatory is to be answered separately in writing.

2.      These Interrogatories are directed to you, your agents, employees, servants, assigns and representatives, past and present.

3.      These Interrogatories encompass all information, documents and records that are in your or any of your agents, servants, attorneys or assigns' possession, control, or custody.

4.      If any objections are made to an Interrogatory, the bases for such objections must be stated.

5.      If there is any claim of privilege relating to an Interrogatory, you must provide a privilege log in which you:

   a.   identify and describe the information requested, including its general subject matter; and

   b.   describe the basis for the asserted privilege.

172555836.1

6.      If the answer to any Interrogatory may be determined by examining a party's business records, and if the burden of deriving or ascertaining the answer will be substantially the same for either party, you may answer by:

a.      specifying the records that must be reviewed, in sufficient detail to enable the Alleged Debtor to locate and identify them as readily as a Petitioning Creditor could; and

b.      giving the Alleged Debtor a reasonable opportunity to examine and audit the records and to make copies, compilation, abstracts, or summaries.

7.      If any of the following Interrogatories comprise information that you contend is confidential, business, trade secret, or proprietary information, you shall not withhold such information on the grounds of confidentiality, but shall advise all parties to this litigation of the confidential nature of such information and request all parties to stipulate to the entry of an appropriate order preserving such confidentiality.

8.      These Interrogatories are continuous in nature and must be supplemented promptly if any Petitioning Creditor obtains or learns additional or different information after the date of the response.

9.      Unless the content clearly indicates otherwise, the following words shall be deemed to have, without limitation, the following meanings:

a.  The word "and" means "and/or," and "or" means "and/or."

b.  The term "Alleged Debt" means any alleged obligation of the Alleged Debtor that is the alleged basis for the Involuntary Petition.

c.  The term "Assignment Agreement" means that certain Assignment Agreement dated October 18, 2024 by and between Marshall Investments MIG Pty Ltd, as trustee for the Marshall Investments MIG Trust, and Rayra Pty Ltd, as trustee for The Mountainview Trust, attached as Exhibit A to the *Notice of Filing of Exhibit A to the Declaration of Ray Itaoui on Behalf of Rayra Pty Ltd Pursuant to Federal Rule of Bankruptcy Procedures 1003(a)* [Docket No. 6].

d.  The word "communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomever made, and including without limitation, correspondence, electronic mail, documents, conversations, dialogues, discussions, interviews, consultations, agreements, telephone conversations, letters, notes, memoranda, telegrams, telexes, and any other forms of communication.

e.  The term "Deed of Appointment" means the Deed of Appointment of Receivers and Managers dated March 18, 2024, whereby Liam Healy and Quentin Olde were appointed as receivers and managers of MIG1.

f.  The word "document" includes, but is not limited to, any written or graphic matter of any kind or character, however produced or reproduced; any electronically or magnetically recorded matter of any kind or character, however produced or reproduced; and any other matter constituting the recording of data or information upon any tangible thing by any means, as well as any tangible thing on which information is recorded in writing, sound, electronic or magnetic, impulse, or in any other manner including, but not limited to, paper, cards, tapes, film, electronic facsimile, computer storage devices, video discs, or any other media. For the purpose of this definition, "matter" shall include, but shall not be limited to paper, cards, tapes, film, electronic facsimile, computer storage devices, video disks, memoranda, notes, minutes, records, photographs, correspondence, electronic mail, telegrams, diaries, bookkeeping entries, financial statements, tax returns, checks, check stubs, reports, studies, charts, graphs, statements, notebooks, handwritten notes, applications, agreements, books, pamphlets, periodicals, appointment calendar, notes, records, and recordings of oral conversations and work papers, and shall also include, but shall not be limited to, originals plus all copies which are different in any way from the original whether by handwritten notes, interlineation, receipt stamped notation, indication of copies sent or received, or otherwise, as well as preliminary versions, drafts of revisions of any of the foregoing, and any supporting, underlying or preparatory material, which are in your possession, custody, or control, or in the possession, custody or control of your present or former agents, representatives, or attorneys, or any and all persons acting on their behalf.

g.  The word "identify" when referring to a natural person means:

   i.  provide the full name of the person;

   ii.  provide the present or last known address and telephone number of the person including, but not limited to, the street address, city, state and zip code; and

   iii.  provide the occupation and employer of the person at the time referred to in these Interrogatories.

h.  The word "identify" when referring to an entity other than a natural person means:

   i.  provide the full legal and trade name(s) or title(s) of such entity; and

   ii.  provide the present or last known address and telephone number of the entity including, but not limited to, the street address, city, state and zip code.

i.  "The word "identify" when referring to a document means:

   i.  provide a brief summary of its contents;

   ii.  identify the person(s) drafting, preparing, compiling, and signing it;

172555836.1

     iii.  provide the date the document was prepared or received; and

     iv.  provide the date noted on the document itself.

j.    The term "Intercompany Transfer" means the alleged claims by MIG1 against the Alleged Debtor in the amount of A$3,672,445.41, arising from an alleged inter-company loan repayable to MIG1.

k.    The term "Involuntary Petition" means that certain *Involuntary Petition Against a Non-Individual* [Docket No. 1] filed against the Alleged Debtor by the Petitioning Creditors in the above-captioned chapter 11 case.

l.    The word "Joinder" means the *Joinder of Liam Healey and Quentin Olde in their Capacity as Receivers and Managers of MIG No. 1 Pty Ltd (In Liq.) (receivers and Managers Appointed) as Petitioning Creditor in Involuntary Chapter 11 Bankruptcy Proceeding of Mawson Infrastructure Group, Inc.* [Docket No. 61].

m.    The word "Manning" means James Manning, a former Board Director and CEO of the Alleged Debtor, and/or any of his affiliated entities and/or any of his family members, including, but not limited to, any (i) relative of James Manning (ii) partnership in which James Manning is a general partner; (iii) general partner of the James Manning; or (iv) corporation, limited liability company, or other entity of which the James Manning is a director, officer, or person in control.  For purposes of this definition, the term "relative" means an individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree.

n.    The word "Marshall" means Marshall Investments MIG Pty Ltd as trustee for the Marshall Investments MIG Trust or any other Marshall affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

o.    The word "person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, without limitation, a public or private corporation, partnership, joint venture, limited liability company, voluntary unincorporated association, organization, proprietorship, trust, estate, government agency, commission, bureau or department.

p.    The term "Petition Date" means December 4, 2024.

q.    The term "Petitioning Creditors" collectively refers to the following entities and includes all directors, officers, shareholders, partners, agents, employees, representatives, attorneys, accountants, and all other persons or entities acting on their behalf or under their direct or indirect control:

     i.  W Capital Advisors Pty Ltd as trustee for the W Capital Advisors Fund**;**

4

ii.   Marshall Investments MIG Pty Ltd as trustee for the Marshall Investments MIG Trust;

iii.  Rayra Pty Ltd as trustee for The Mountainview Trust; and

iv.   Liam Healey and Quentin Olde in their capacity as Receivers and Managers of MIG No. 1 Pty Ltd.

r.   The word "Rayra" means Rayra Pty Ltd as trustee for The Mountainview Trust or any other Rayra affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

s.   The terms "refer to," "reflect," and "relate to" mean, in addition to the customary and usual meaning, discussing, referring to, mentioning, touching on, reflecting, assessing, recording, comprising, consisting of, evaluating, analyzing, reviewing, and evidencing.

t.   The term "Secured Loan Agreements" means, collectively, that certain Secured Loan Facility Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and any related agreements, including, but not limited to, that certain General Security Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and that certain Continuing Guaranty, dated as of December 9, 2021, between MIG Pty Ltd and Mawson Infrastructure Group Inc.

u.   The term "W Capital" means W Capital Advisors Pty Ltd as trustee for the W Capital Advisors Fund or any other W Capital affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

v.   The words "you" and "your" mean the person to whom these Interrogatories are directed.

172555836.1

## **INTERROGATORIES**

1.      Describe the relationship, if any, between Manning and the Liquidator.

2.      Describe whether, to what extent, and for what purpose(s) Manning has ever asserted or attempted to assert any direction, control, or influence over the Liquidator concerning the Alleged Debtor, including, but not limited to, a description of any negotiations or discussions between Manning and the Liquidator that concerned the Alleged Debtor, the Alleged Debt, the Intercompany Transfer, the Winding-Up Application in Australia, the above-captioned involuntary chapter 11 case, or intentions to file a chapter 15 petition for recognition in the event that stay relief is granted.

3.      Describe whether, when, where, how, and to what extent Manning negotiated, discussed, or corresponded with the Liquidator concerning the Alleged Debtor, the Alleged Debt, the Intercompany Transfer, the Winding-Up Application in Australia or the above-captioned involuntary chapter 11 case, or intentions to file a chapter 15 petition for recognition in the event that stay relief is granted.

4.      Describe the Liquidator's involvement in the Petitioning Creditors' decision to request relief from the automatic stay *nunc pro tunc* to December 4, 2024, including, but not limited to the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the stay relief motion.

5.      Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the W Capital's and/or Marshall's decision to initiate the Winding-Up Application in the New South Wales Registry, Federal Court of Australia.

6.      Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the Liquidator's appointment in the Winding-Up Application in Australia.

7.      Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the Liquidator's discussions with the Petitioning Creditors after his appointment in the Winding-Up Application in Australia.

8.      Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to actions taken by the Liquidator since his appointment in the Winding-Up Application in Australia.

9.      Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the Liquidator's decision to seek relief from the automatic stay.

10.     Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the Liquidator's intention to file a chapter 15 petition for recognition in the event that stay relief is granted.

11.     Describe when the Liquidator decided to file a chapter 15 petition.

6

12.     Describe the Liquidator's understanding of the automatic stay in this involuntary case at the time he was appointed as liquidator.

13.     Describe whether the automatic stay in this involuntary case was a consideration when the Liquidator was appointed.

14.     Describe whether the Liquidator considered the overlap between the Winding-Up Application in Australia and the above-captioned chapter 11 case.

15.     Describe the facts, circumstances, discussions, negotiations, and correspondence that referred to, reflected, or related to the Affidavits of Andrew Kenton Glenn that were filed in the Winding-Up Application in Australia.

16.     Describe the facts, circumstances, discussions, negotiations, and correspondence with counsel to the Petitioning Creditors that referred to, reflected, or related to the Alleged Debtor, the Alleged Debt, the Intercompany Transfer, the Winding-Up Application in Australia, the above-captioned involuntary chapter 11 case, or intentions to file a chapter 15 petition for recognition in the event that stay relief is granted.


Dated: June 12, 2025                     **FOX ROTHSCHILD LLP**


                                         By: _/s/ Seth A. Niederman_
                                         Seth A. Niederman (DE Bar No. 4588)
                                         Stephanie Slater Ward (DE Bar No. 6922)
                                         Citizens Bank Center
                                         1201 N. Market Street, Suite 1200
                                         Wilmington, DE 19801
                                         Tel.: (302) 654-7444
                                         Fax: (302) 656-8920
                                         sniederman@foxrothschild.com
                                         sward@foxrothschlid.com

                                         *Counsel for the Alleged Debtor*

7

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| MAWSON INFRASTRUCTURE GROUP, INC. | Case No. 24-12726 (MFW) |
| Debtors. | **Related to Docket No. 1** |

**ALLEGED DEBTOR MAWSON INFRASTRUCTURE GROUP, INC.'S FIRST REQUEST
FOR PRODUCTION OF DOCUMENTS TO CAMERON HAMISH GRAY, AS
PURPORTED LIQUIDATOR TO MAWSON INFRASTRUCTURE GROUP, INC.**

Pursuant Rules 26 and 34 of the Federal Rules of Civil Procedure, made applicable by Rule 9014(c) of the Federal Rules of Bankruptcy Procedure, Mawson Infrastructure Group, Inc. (the "Alleged Debtor"), through counsel, serves the following First Request for Production of Documents upon Cameron Hamish Gray, as purported liquidator to Mawson (the "Liquidator").

**DEFINITIONS AND INSTRUCTIONS**

1.      If you assert a privilege, work product immunity, or decline to provide an answer on the basis of some other objection, you must provide a privilege log in which you:

(a)      identify and describe the document(s) or communication(s) in question, including its title, its general subject matter, its date, and its author;

(b)      describe the basis for the asserted privilege or objection;

(c)      identify every person to whom the document was sent, or every person present when the communications was made; and

(d)      identify the present custodian of the document, if any.  Include sufficient facts for the court to make a full determination of whether the claim or objection is valid.

172555932.1

2.      If one or more of these requests is or are objected to on the grounds of privilege, overbreadth, vagueness or any similar ground, you must respond to each such request as narrowed to conform with such objection.

3.      If any of the following requests comprise documents that you contend contain confidential, business, trade secret, or proprietary information, you shall not withhold such documents on the grounds of confidentiality, but shall advise all parties to this litigation of the confidential nature of such material and request all parties to stipulate to the entry of an appropriate order preserving such confidentiality.

4.      If, after reasonable and thorough investigation under due diligence, you are unable to furnish a document or any part thereof because a document is not available to you, you shall provide in lieu of a true and correct copy thereof a list of each document so lost, destroyed or otherwise unavailable, together with the following information:

(a)     The date of origin;

(b)     A brief description of such document;

(c)     The author of the document;

(d)     The date upon which the document was lost or destroyed; and

(e)     A brief statement of the manner in which the document was lost or destroyed.

5.      If any part of a document is responsive to any request herein, the entire document should be produced.

6.      Unless the content clearly indicates otherwise, the following words shall be deemed to have, without limitation, the following meanings:

(a)     The word "and" means "and/or," and the work "or" shall mean "and/or."

2

(b)     The term "Alleged Debt" means any alleged obligation of the Alleged Debtor that is the alleged basis for the Involuntary Petition.

(c)     The term "Assignment Agreement" means that certain Assignment Agreement dated October 18, 2024 by and between Marshall Investments MIG Pty Ltd, as trustee for the Marshall Investments MIG Trust, and Rayra Pty Ltd, as trustee for The Mountainview Trust, attached as Exhibit A to the *Notice of Filing of Exhibit A to the Declaration of Ray Itaoui on Behalf of Rayra Pty Ltd Pursuant to Federal Rule of Bankruptcy Procedures 1003(a)* [Docket No. 6].

(d)     The word "communication" means any oral or written utterance, notation, or statement of any nature whatsoever between or among two or more persons, by or to whomsoever made, and including without limitation, correspondence, electronic mail, documents, conversations, dialogues, discussions, interviews, consultations, agreements, telephone conversations, letters, notes, memoranda, telegrams, telexes, and any other understandings.

(e)     The term "Deed of Appointment" means the Deed of Appointment of Receivers and Managers dated March 18, 2024, whereby Liam Healy and Quentin Olde were appointed as receivers and managers of MIG1.

(f)     The word "document" includes, but is not limited to, any written or graphic matter of any kind or character, however produced or reproduced; any electronically or magnetically recorded matter of any kind or character, however produced or reproduced; and any other matter constituting the recording of data or information upon any tangible thing by any means, as well as any tangible thing on which information is recorded in writing, sound, electronic or magnetic, impulse, or in any other manner including, but not

3

limited to, paper, cards, tapes, film electronic facsimile, computer storage devices, video discs, or any other media.  For the purpose of this definition, "matter" shall include, but shall not be limited to paper, cards, tapes, film, electronic facsimile, computer storage devices, video disks, memoranda, notes, minutes, records, photographs, correspondence, electronic mail, telegrams, diaries, bookkeeping entries, financial statements, tax returns, checks, check stubs, reports, studies, charts, graphs, statements, notebooks, handwritten notes, applications, agreements, books, pamphlets, periodicals, appointment calendar, notes, records, and recordings of oral conversations and work papers, and shall also include, but shall not be limited to, originals plus all copies which are different in any way from the original whether by handwritten notes, interlineation, receipt stamped notation, indication of copies sent or received, or otherwise, as well as preliminary versions, drafts of revisions of any of the foregoing, and any supporting, underlying or preparatory material, which are in your possession, custody, or control, or in the possession, custody or control of your present or former agents, representatives, or attorneys, or any and all persons acting on their behalf.

(g)     The term "Intercompany Transfer" means the alleged claims by MIG1 against the Alleged Debtor in the amount of A$3,672,445.41, arising from an alleged inter-company loan repayable to MIG1.

(h)     The term "Involuntary Petition" means that certain *Involuntary Petition Against a Non-Individual* [Docket No. 1] filed against the Alleged Debtor by the Petitioning Creditors in the above-captioned chapter 11 case.

(i)     The word "Joinder" means the *Joinder of Liam Healey and Quentin Olde in their Capacity as Receivers and Managers of MIG No. 1 Pty Ltd (In Liq.) (receivers and*

4

*Managers Appointed) as Petitioning Creditor in Involuntary Chapter 11 Bankruptcy Proceeding of Mawson Infrastructure Group, Inc.* [Docket No. 61].

(j)     The word "Manning" means James Manning, a former Board Director and CEO of the Alleged Debtor, and/or any of his affiliated entities and/or any of his family members, including, but not limited to, any (i) relative of James Manning (ii) partnership in which James Manning is a general partner; (iii) general partner of the James Manning; or (iv) corporation, limited liability company, or other entity of which the James Manning is a director, officer, or person in control.   For purposes of this definition, the term "relative" means an individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree.

(k)     The word "Marshall" means Marshall Investments MIG Pty Ltd as trustee for the Marshall Investments MIG Trust or any other Marshall affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

(l)     The word "person" means any natural individual in any capacity whatsoever or any entity or organization, including divisions, departments, or other units therein, and shall include, without limitation, a public or private corporation, partnership, joint venture, voluntary unincorporated association, organization, proprietorship, trust, estate, government agency, commission, bureau or department.

(m)     The term "Petition Date" means December 4, 2024.

(n)     The term "Petitioning Creditors" collectively refers to the following entities and includes all directors, officers, shareholders, partners, agents, employees,

5

representatives, attorneys, accountants, and all other persons or entities acting on their behalf or under their direct or indirect control:

      i.      W Capital Advisors Pty Ltd as trustee for the W Capital Advisors Fund**;**

      ii.      Marshall Investments MIG Pty Ltd as trustee for the Marshall Investments MIG Trust;

      iii.      Rayra Pty Ltd as trustee for The Mountainview Trust; and

      iv.      Liam Healey and Quentin Olde in their capacity as Receivers and Managers of MIG No. 1 Pty Ltd.

(o)      The word "Rayra" means Rayra Pty Ltd as trustee for The Mountainview Trust or any other Rayra affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

(p)      The terms "refer to," "reflect," and "relate to" mean, in addition to the customary and usual meaning, discussing, referring to, mentioning, touching on, reflecting, assessing, recording, comprising, consisting of, evaluating, analyzing, reviewing, and evidencing.

(q)      The term "Secured Loan Agreements" means, collectively, that certain Secured Loan Facility Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and any related agreements, including, but not limited to, that certain General Security Agreement, dated as of December 9, 2021, by and between Marshall Investments MIG Pty Ltd and MIG No. 1 Pty Ltd, and that certain Continuing Guaranty, dated as of December 9, 2021, between MIG Pty Ltd and Mawson Infrastructure Group Inc.

(r)     The term "W Capital" means W Capital Advisors Pty Ltd as trustee for the W Capital Advisors Fund or any other W Capital affiliated entity that has been involved with the Alleged Debtor or the Alleged Debt.

(s)     The words "you" and "your" mean the person to whom the document request is directed.

7.     Each request for production is ongoing and continuous, so that if a document described herein comes into your possession, custody or control after the date of these requests, or after production of documents pursuant to the requests herein, this request for production of documents shall apply fully to such document.

7

172555932.1

## DOCUMENT REQUESTS

1.      All documents that refer to, reflect, or relate to the relationship between the Liquidator and W Capital and/or Marshall.

2.      All documents that refer to, reflect or relate to any and all meetings of/with and/or communications to/from the officers, directors, managers and/or equity holders of W Capital or Marshall related to the Winding-Up Application in Australia.

3.      All documents that refer to, reflect or relate to any and all meetings of/with and/or communications to/from the officers, directors, managers and/or equity holders of W Capital or Marshall related to the Involuntary Petition.

4.      All documents that refer to, reflect or relate to any and all meetings of/with and/or communications to/from the officers, directors, managers and/or equity holders of W Capital or Marshall related to the above-captioned chapter 11 case.

5.      All communications or other documents between the Liquidator and Manning.

6.      All communications or other documents between the Liquidator and counsel to the Petitioning Creditors.

7.      All communications or other documents that referred to, reflected, or related to the Affidavits of Andrew Kenton Glenn that were filed in the Winding-Up Application in Australia.

8.

9.      All documents that refer to, reflect, or relate to any proposal, offer, or agreement between or among Manning and any Petitioning Creditor concerning the Alleged Debtor.

10.     All communications that took place after the Liquidator's appointment between the Liquidator and Manning that refer to, reflect, or relate to the Alleged Debtor, the Alleged Debt, the Intercompany Transfer, the Winding-Up Application in Australia, the above-captioned involuntary chapter 11 case, or intentions to file a chapter 15 petition for recognition in the event that stay relief is granted.

11.     All communications that took place after the Liquidator's appointment between the Liquidator and the Petitioning Creditors that refer to, reflect, or relate to the Alleged Debtor, the Alleged Debt, the Intercompany Transfer, the Winding-Up Application in Australia or the above-captioned involuntary chapter 11 case.

12.     All documents that refer to, reflect, or relate to the identities of the parties involved in the decision relating to the Liquidator's intention to file a chapter 15 petition for recognition in the event that stay relief is granted.

13.     All documents that refer to, reflect, or relate to the decision by the Petitioning Creditors to file a chapter 15 petition for recognition in the event that stay relief is granted.

172555932.1

14.     All communications that took place on or after the Petition Date between the Liquidator and the Petitioning Creditors that refer to, reflect, or relate to the Involuntary Petition filed against the Alleged Debtor.

15.     All communications that took place on or after the Petition date between the Liquidator and any other entity believed or suspected to be a creditor of the Alleged Debtor that refer to, reflect, or relate to filing an involuntary petition or chapter 15 petition against the Alleged Debtor.

16.     All communications that took place on or after the Petition Date between the Liquidator and any other third party that refer to, reflect, or relate to a potential voluntary or involuntary petition for relief under title 11 of the United States Code.

17.     All communications that took place on or after the Petition Date between the Liquidator and the professionals of the Petitioning Creditors or any other entities or individuals concerning the above-captioned involuntary chapter 11 case.

18.     All communications that took place on or after the Petition Date between the Liquidator and the Petitioning Creditors that refer to, reflect, or relate to the Petitioning Creditors' decision to request relief from the automatic stay *nunc pro tunc* to December 4, 2024.

19.     All communications that took place on or after the Petition Date between the Liquidator and the Petitioning Creditors that refer to, reflect, or relate to W Capital's and/or Marshall's decision to initiate the Winding-Up Application in the New South Wales Registry, Federal Court of Australia.

20.     All communications that took place on or after the Liquidator's appointment relating to the Winding-Up Application in Australia, the above-captioned involuntary chapter 11 case, or intentions to file a chapter 15 petition for recognition in the event that stay relief is granted.

21.     All documents that refer to, reflect, relate to, or were used in supporting or formulating your answers to the interrogatories propounded simultaneously herewith that have not already been produced in response to any of the above requests.

172555932.1

Dated:  June 12, 2025

**FOX ROTHSCHILD LLP**

By: _/s/ Seth A. Niederman_
Seth A. Niederman (DE Bar No. 4588)
Stephanie Slater Ward (DE Bar No. 6922)
Citizens Bank Center
1201 N. Market Street, Suite 1200
Wilmington, DE 19801
Tel.: (302) 654-7444
Fax: (302) 656-8920
sniederman@foxrothschild.com
sward@foxrothschlid.com

_Counsel for the Alleged Debtor_

# Exhibit " "

Page 1

1          IN THE UNITED STATES BANKRUPTCY COURT

2              FOR THE DISTRICT OF DELAWARE

3                      — — —

4

   In re:                        :

5                                 : Chapter 11

   MAWSON INFRASTRUCTURE GROUP,   :

6   INC.,                         : Case No. 24-12726(MFW)

                                  :

7   Alleged Debtor.               :

                                  :

8                      — — —

9             DEPOSITION OF ANDREW MARTIN

10               MONDAY, JULY 28, 2025

                       — — —

11

12          Deposition of ANDREW MARTIN, taken

13     remotely, before Patricia R. Frank, Registered

14     Merit Reporter, Certified Realtime Reporter, and

15     Notary Public, commencing at 9:35 p.m. EDT, on

16     the above date.

17

18                      —   —   —

19

20

21

22

23

24

25

Page 69

1   divulge any communications with your counsel.

2           THE WITNESS:  From my

3   understanding, it was predominantly just

4   around cost sharing.

5   BY MR. NIEDERMAN:

6       Q.     Okay.  Not information

7   gathering?

8       A.     No.

9       Q.     What was the cost share or what

10  is the cost share?

11          MR. GLENN:  I'm going to

12  instruct the witness not to answer that

13  question on the grounds of attorney work

14  product.

15          MR. NIEDERMAN:  We'll note the

16  objection and mark the transcript to revisit.

17          I've kept going for more than

18  five minutes.  Do you want to take that break

19  now?

20          THE WITNESS:  Sure.  If you

21  want to take a break, I'll take a break.

22  Give us five minutes.  I'll be back in a

23  minute.

24          MR. NIEDERMAN:  I'm fine to

25  keep going.  I'm offering it to you.

Page 79

```
 1   let you answer that question, Mr. Marshall,
 2   if you know.
 3                THE WITNESS:  Answer the
 4   question again?
 5   BY MR. NIEDERMAN:
 6        Q.    Sure.  Does the common interest
 7   agreement restrict Marshall's ability to
 8   enter into a resolution with Mawson if other
 9   participants are not resolving with Mawson?
10        A.    I do not believe so.
11        Q.    Does Marshall have any
12   agreement with Manning in terms of sharing in
13   any recoveries that it gets through its
14   efforts in this involuntary?
15        A.    No.
16        Q.    Do all participants in the
17   common interest agreement share in costs
18   related to the common interest efforts?
19                MR. NIEDERMAN:  I'm going to
20   object to the form and instruct you not to
21   answer that question.
22                MR. NIEDERMAN:  Okay.  Ago, if
23   I could ask you to bring, up the June 21,
24   2024 e-mail and ask the court reporter, once
25   it's brought up, if we could mark this as
```

Page 127

1   have an understanding."
2   BY MR. NIEDERMAN:
3          Q.     Did you have any discussions
4   with members of the common interest group
5   about the application of the automatic stay
6   to the Australian liquidation?
7                MR. GLENN:  I'm going to
8   instruct you not to answer that question
9   because it calls for the divulging of
10  privileged information.
11               MR. NIEDERMAN:  Well, if it's
12  just between members of the group, it doesn't
13  call for privileged information.  If it
14  involves advice of counsel, that's a separate
15  story.
16               MR. GLENN:  Well, yeah.  I'm
17  going to stand on my objection.  I don't
18  think there's any other way that this could
19  have been discussed other than through
20  communications with counsel.
21  BY MR. NIEDERMAN:
22         Q.     Well, Mr. Marshall did you have
23  any communications without counsel concerning
24  application of the automatic stay vis-a-vis
25  the Australian liquidation?

# Exhibit " "

Page 1

```
 1              IN THE UNITED STATES BANKRUPTCY COURT
 2                 FOR THE DISTRICT OF DELAWARE
 3                            — — —
 4
        In re:                        :
 5                                     : Chapter 11
        MAWSON INFRASTRUCTURE GROUP,   :
 6      INC.,                          : Case No. 24-12726(MFW)
                                       :
 7      Alleged Debtor.                :
                                       :
 8                            — — —
 9              DEPOSITION OF DAVID MARSHALL
10                 MONDAY, JULY 28, 2025
                              — — —
11
12           Deposition of DAVID MARSHALL, taken
13      remotely, before Patricia R. Frank, Registered
14      Merit Reporter, Certified Realtime Reporter, and
15      Notary Public, commencing at 6:00 p.m. EDT, on
16      the above date.
17
18                            —   —   —
19
20
21
22
23
24
25
```

Page 48

1   focused solely on what Marshall Investments

2   would be able to procure out of commencing

3   the involuntary.

4           Q.      Did the information that

5   Mr. Manning provided help inform the decision

6   to file the involuntary bankruptcy?

7           A.      No.

8                   MR. GLENN:  Objection to form.

9   BY MR. NIEDERMAN:

10          Q.      No, it did not?

11          A.      No.

12          Q.      Can you give me a better

13  understanding of the information that

14  Mr. Manning did provide pursuant to the

15  common interest agreement?

16                  MR. GLENN:  I'm going to object

17  to form and instruct you not to answer that

18  question.

19  BY MR. NIEDERMAN:

20          Q.      And I'll make another

21  clarification.  This request includes

22  communications that were had just among the

23  parties to the common interest agreement, not

24  concerning the advice of counsel.  And I

25  don't know if your attorney has a similar

Page 49

1  objection.

2            MR. GLENN:  Discussions

3  concerning enforcement and how the debt would

4  be enforced is subject to the common interest

5  agreement whether attorneys were specifically

6  copied or not.

7            MR. NIEDERMAN:  Okay.  And so

8  your instruction is not to answer on that

9  question?

10            MR. GLENN:  Correct, correct.

11  BY MR. NIEDERMAN:

12      Q.     Did Marshall ask Manning to

13  join the involuntary bankruptcy filing?

14      A.     No.

15      Q.     Are you aware of statements

16  that Marshall made in court filings that

17  identify Mr. Manning as an obvious choice to

18  include as an additional member based upon

19  his status as both a former director and a

20  creditor of Manning -- of Mawson?  Excuse me.

21      A.     Sorry.  I'm not quite sure what

22  the question is.

23      Q.     So if Marshall submitted

24  filings to the Delaware bankruptcy court that

25  Manning was an obvious choice to include as a

Page 51

1   remember the exact, you know, reason why or

2   why not.  We never -- I never asked him.

3          Q.     Was the circumstances by which

4   Mr. Manning left Mawson in their claim of

5   insider transactions a consideration as to

6   why he was not asked to be a petitioning

7   creditor?

8          A.     I don't know the answer to

9   that.

10         Q.     From Marshall's perspective.

11         A.     Yes.  I said I don't know the

12   answer.  I can't recall.

13         Q.     Does the common interest

14   agreement prevent Mr. Manning from being a

15   petitioning creditor?

16              MR. GLENN:  Objection to the

17   form.  The common interest agreement is

18   privileged, and I instruct you not to answer

19   that question.

20   BY MR. NIEDERMAN:

21         Q.     Did Mr. Manning help to try and

22   recruit creditors to serve as petitioning

23   creditors in this case?

24         A.     He did not.

25         Q.     Do you have an understanding of

Exhibit "I"

111

ROUGH DRAFT - WOLTER

1    not aware of them?

2         A.    I'm not aware, no.

3         Q.    Has W Capital has any

4    communications with Rayra related to the

5    involuntary bankruptcy?

6         A.    No.

7         Q.    Does W Capital have an

8    understanding of the number of creditors that

9    are required to file an involuntary

10   bankruptcy?

11        A.    I think the number is 13.

12        Q.    And did you have a discussion

13   with Mr. Manning about this?

14             MR. GLENN:  Objection to form.

15   I believe this falls within the construct of

16   the cooperation agreement so I'm instructing

17   you not to answer that question.

18   BY MR. NIEDERMAN:

19        Q.    And so my question I'll expand

20   on it relates to communications you may have

21   had with Mr. Hang outside of the presence of

22   counsel and I'll allow your counsel to make a

23   further objection if he chooses to do so

24   before you answer.

25             MR. GLENN:  Yeah, I'm

112

ROUGH DRAFT - WOLTER

1    instructing the witness not to answer that

2    question.

3             MR. NIEDERMAN:  Thank you.